# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FOTOBOM MEDIA, INC.<br>27702 Crown Valley Pkwy, D4 #283<br>Ladera Ranch, CA 92694,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043,<br><br>Defendant. | Case No. 1:22-cv-00712<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      In October 2020, the U.S. Department of Justice filed a Section 2 case against Google alleging that Google has taken steps to thwart competition from "apps that link to general search engines, such as smart keyboards" because such apps are a competitive threat to Google's general search monopoly.  *United States v. Google LLC*, 20-cv-03010, ECF No. 1, ¶ 44 (D.D.C. Oct. 20, 2020).  Fotobom Media, Inc. distributes a "smart keyboard" app.  Fotobom is a direct victim of the conduct described in DOJ's complaint.

2.      Fotobom developed and began distributing its smart keyboard app for mobile devices in 2015.  Now called "Keyboard+," Fotobom's smart keyboard offers more functionality than traditional mobile keyboards that consumers use to type on their phones.

3.      Among other features, Keyboard+ brings the power of a search engine directly to the user's fingertips.  Keyboard+ offers users its own search results:  it directs users to content (for example, links to buy movie tickets) precisely at the time that content will be useful to them

(for example, when texting a friend to arrange a time to go see a movie) based on keywords in the user's typing.  Keyboard+ is also a "search access point."  A mobile user can run a search in the keyboard using a general search engine without needing to leave an app or open a browser. Keyboard+ displays its own links alongside the search engine's results, so the user can compare results and pick the most relevant content.  The result for users is maximal choice and efficiency.

4.      Fotobom also partners with carriers and phone manufacturers to incorporate this search functionality into messaging apps — including a six-year long ongoing relationship with Verizon to incorporate search functionality into the Verizon Messages app, which is installed on more than 100 million phones in the United States.  When incorporated into messaging apps, Fotobom's search software displays search results to users based on the content of the messages being sent and received, and regardless of the specific mobile keyboard that is being used.  The ability to provide search results to users based on the content of their messages makes mobile messaging an important search access point.

5.      Fotobom generates revenue much like a search provider:  by offering content providers the opportunity to bid on "keywords" to display their content to users.  Content providers then pay an additional fee if a mobile user clicks through the content (such as a suggested website or user app) that Keyboard+ displays.

6.      Defendant Google LLC took notice of Fotobom's innovative product.  At Google's invitation, Fotobom met with Google multiple times between 2016 and 2018.  Soon after the first meeting in 2016, Google launched its own smart keyboard, Gboard.  Later, in 2018, Google met with Fotobom again and suggested it was looking to acquire a company in the keyboard and messaging space.  Google told Fotobom that "it's not a matter of if we work together, it's a matter of when," and that, accordingly, Fotobom should share with Google as

much as possible about its smart keyboard and company strategy.  A few months after its meeting with Fotobom, Google acquired another keyboard app created by a company named Tenor, which allows users to search a "GIF" library directly from the keyboard.

7.      Following Google's decision not to partner with or acquire Fotobom, Google began to interfere with Fotobom's distribution of Keyboard+.

8.      For example, Fotobom reached an agreement in principle with América Móvil — one of the world's largest wireless carriers — to preload Keyboard+ as the default keyboard app on millions of Android devices.  América Móvil told Fotobom that it wanted to preload Keyboard+ as the default keyboard app "on as many phones as possible."  América Móvil and Fotobom expended significant time and effort on this relationship.  But when Google discovered that América Móvil was planning to preload Fotobom's keyboard, Google threatened América Móvil that it would be violating its agreement to preload Google's own smart keyboard app — Gboard — as the default on América Móvil devices, and that Google would penalize América Móvil by withholding potentially several hundred million dollars in payments.  Following that threat, América Móvil told Fotobom that it could not preload Keyboard+ as the default keyboard app on any of its Android devices.

9.      Google has similarly threatened other carriers and original equipment manufacturers ("OEMs") that wanted to preload Keyboard+ on their devices.

10.     In its complaint against Google, DOJ alleges that "[a]s innovation has increased the number of search access points on mobile devices — including smart keyboards and voice assistants — Google has expanded its [agreements with carriers and manufacturers] to close off these avenues to search rivals."  *United States v. Google LLC*, 20-cv-03010, ECF No. 1, ¶ 80. "Google . . . uses its agreements to ensure that new search access points are not available to

competitors.  For example, Google developed a smart keyboard — a mobile app that can be used as an alternative for the standard-issued keyboards on smart phones — with the recognition that such keyboards might be 'the next big search access point.'  Google relies on its preinstallation and default restrictions in its revenue sharing agreements as a 'strategic defense' against rival keyboards that might provide a '[b]ridge' to rival general search engines."  *Id*. at ¶ 151; *see also Colorado v. Google*, 1:20-cv-03715, ECF No. 3, ¶¶ 103 *et seq*. (D.D.C. Dec. 17, 2020) (Section 2 case filed by 35 states based in part on Google's contracts that restrict independent distribution of search access points); European Press Release IP/18/4581, *Antitrust:  Commission Fines Google* (July 18, 2018) (fining Google $5 billion for paying carriers and manufacturers not to preinstall rival search apps), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

11.     Google has similarly paid mobile carriers like AT&T, Verizon, and T-Mobile more than $100 million to preload Google Messages as the default messaging app on their customers' mobile phones.  Google Messages uses the Rich Communications Services ("RCS") messaging protocol that is controlled by Google and that Google is attempting to make the standard messaging protocol for all mobile devices.  Beginning in 2022, Google Messages will be the default messenger app on each carrier's Android devices, which will result in the end of popular independent messaging apps like Verizon Messages.  Verizon has already begun to discontinue support for Verizon Messages despite the app's popularity.

12.     On July 7, 2021, Attorneys General from 36 states and the District of Columbia filed a separate suit against Google alleging that Google uses its control over Android app distribution to charge a 30 percent supra-competitive commission for paid apps.  *See Utah et al. v. Google LLC*, 3:21-cv-05227-JSC, ECF No. 1 (N.D. Cal. July 7, 2021).  The States and District allege that Google extracts this supra-competitive commission, in part, by using its "considerable

leverage over mobile device manufacturers and Android app developers." *Id.* ¶ 7. Google uses Revenue Sharing Agreements ("RSAs") with carriers and manufacturers as a "carrot" to restrict them from fostering competition in Android app distribution. *See id.* ¶ 20. Google uses other agreements as "sticks" to "require Android device manufacturers to preload Google Play Store on the default home screen, render it undeletable from the device, and ensure that no other preloaded app store has a more prominent placement than the Google Play Store." *Id.* Google also "has taken the extraordinary step of attempting to buy off Samsung . . . by, among other things, offering incentives for Samsung to turn the Galaxy store into a mere 'white label' for the Google Play Store — meaning that Samsung would use the backend services of the Google Play Store, including Google Play Billing, while retaining its Samsung Galaxy Store branding." *Id.* ¶ 21. The case is related to a private multidistrict litigation currently proceeding before Judge Donato. *See In re Google Play Store Antitrust Litigation*, 3:21-md-02981-JD (N.D. Cal).

13. Google's conduct interferes with independent efforts to compete in two ways. First, Google enforces tying arrangements. The Android mobile operating system does not contain many of the features or apps necessary for manufacturers to offer a commercially viable Android device. Instead, Google offers "Google Mobile Services," which is a bundle of Google's most dominant apps, including Google's app store (Google Play), the Google Search app, Google Chrome, Google Maps, and YouTube. Google Mobile Services also includes the Application Programming Interfaces ("APIs") that are necessary for apps to function properly on a device. A carrier or OEM can preload Google's dominant apps and APIs only if they preload other Google-controlled search access points, including Gboard. Google enforces this tie through the Google Mobile Services licensing agreements (sometimes called "Mobile Application Distribution Agreements") and restrictive certification requirements. Effectively,

OEMs and carriers must ensure that all default-search-access-points preloaded on a device direct search traffic to Google.  As Google has stated, it uses "compatibility as a club to make [OEMs] do things [Google] want[s]."  OEMs and carriers have no choice but to accede to the tie because, without the Google Play Store, Google's Search app, Chrome, or Google Maps, their mobile devices would not be commercially viable.

14.     Second, Google has entered into exclusionary distribution agreements that require distributors, including mobile manufacturers and carriers, to set Google as the default search engine for all search access points installed on a device and to preload as defaults Google's own search access points, like Chrome, Gboard, and Google Messages.  Google's agreements prevent carriers and manufacturers from preinstalling smart keyboards (and other apps with search-related features) produced by rivals such as Fotobom.  Google pays for exclusivity by giving carriers and manufacturers a percentage of its general search monopoly revenues, which amounts to hundreds of millions of dollars each year.

15.     Google's preventing of OEMs and carriers from doing business with search rivals and search access points like Keyboard+ ties up the most effective distribution channel for rival apps:  being the default, or even just being preloaded, on the user's device.  Because the vast majority of users will not alter the default settings, users will continue to use the apps that come preloaded on their devices.  That is why Google pays Apple $12 billion annually to be the default search engine for the Safari browser and for Apple not to use or preinstall rival search products.

16.     Prohibited from being able to preload its keyboard as the default on mobile devices, Fotobom must instead convince users to download and install its smart keyboard — a multi-step process that few users will undertake.  The fact that Google allows Fotobom's keyboard to be installed through the Google Play Store (a process that requires Google's review

and approval of the app), just not preloaded or made the default, confirms that there is no procompetitive justification for Google's restrictions.  Fotobom does not distribute its keyboard app through "sideloading" — a process through which the user downloads the app directly without using an app store and which Google claims is insecure.  If Google will permit Keyboard+ to be used on Android devices, there is no legitimate reason to prohibit Keyboard+ from being preloaded as the default keyboard.  Rather, Google wants to cripple Fotobom and other rival search access points so they cannot threaten Google's search monopoly, and so Google can dominate the market for Android mobile keyboard apps.

17.     Google's practices are unlawful under Sections 1 and 2 of the Sherman Act. Fotobom seeks to recover the damages it has suffered because of Google's antitrust violations, as well as equitable relief to enjoin Google from enforcing its anticompetitive agreements.

## PARTIES

18.     Plaintiff Fotobom Media, Inc. is a Delaware corporation with its corporate headquarters and principal place of business in San Francisco, California.

19.     Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California.  Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of Delaware and headquartered in Mountain View, California

## JURISDICTION AND VENUE

20.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and California state law.

21.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15.  This Court has supplemental

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because those claims are so closely related to the federal claims that they form part of the same case or controversy.

22.     The Court has personal jurisdiction over Google because Google has caused "tortious injury in the District of Columbia by an act or omission outside the District of Columbia," and because Google "regularly does or solicits business," engages in "other persistent course[s] of conduct," and "derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).

23.     Venue is proper in this District under Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. § 1391, because Google transacts business and is found within this District.

## FACTUAL ALLEGATIONS

### I.     FOTOBOM'S SMART KEYBOARD

#### A.     Fotobom's Software and Related Services

24.     Fotobom is a small, innovative company that develops mobile apps and software that can reach users within their favorite messengers and most frequently used applications. Fotobom provides mobile users with suggestions of relevant content, websites, apps, and services that are useful to them — for example, Fotobom might suggest a link to purchase movie tickets when the user's actions indicate he or she is trying to plan a movie night.

25.     One of Fotobom's core products is a keyboard app, Keyboard+.  Mobile devices are preloaded with at least one keyboard that allows a user to type on the phone.  Fotobom has reimagined the standard mobile keyboard to offer enhanced features such as predictive text, shareable GIFs/Stickers, customized dictionaries, one-handed swipe typing, autocorrect, and more.  Fotobom enriches a user's mobile experience by providing faster, easier access to the content and features that people want — all delivered to the user at a contextually relevant time.

26.     Fotobom first launched its keyboard in August 2015.  Fotobom's initial offering
focused on providing engaging media content that users could share in a messenger app, such as
videos, stickers, and GIFs from its content partners, such as college sports teams.  For example,
Fotobom worked with a number of colleges to enable their fans to quickly and easily share sports
highlight clips in their preferred messaging app via Fotobom's keyboard.

27.     Since 2015, Fotobom has upgraded its keyboard to provide additional targeted
user content — including links to relevant media, apps, information, and websites — based on
keywords typed by the user and other contextual information.  Fotobom has partnered with
companies across various industries, including sports, movies, television, and music, to provide
access to content that people enjoy seeing and sharing with one another.  Most importantly, a
user can access these features without leaving the app they are using.  Fotobom's keyboard can
generate content whenever a user calls up their keyboard:  such as while playing games,
searching the web, messaging friends, or watching videos.

28.     Fotobom's keyboard directs users to relevant content in several ways.  Keyboard+
can provide users links to media and websites based on keywords they are typing.  Clicking on
the provided link sends the user directly to that webpage, bypassing the need for the consumer to
separately search for the information through a browser like Google Chrome or a search engine
like Google Search.  Similarly, a user exchanging text messages about biking somewhere in San
Francisco may receive a link to a Yelp page regarding bike rentals in San Francisco without the
need to switch to a different app or go through a general search engine.

29.     Fotobom's keyboard can also redirect users to other types of content, including
apps they already have installed on their devices.  For example, if Uber's ride-sharing app is

installed on a user's phone, when a user texts about needing to call an Uber, Keyboard+ will

present an icon that will lead the user to the Uber app as shown below.

**Figure 1:  How Fotobom Can Direct Users to the Uber App**



30.     The software in Keyboard+ generates suggested content in much the same way as

a search engine generates search results.  Fotobom's software analyzes what the user is typing in

the keyboard app (or a messaging app) and uses server side technology to suggest appropriate

content and actions to the user.  The suggested content may include links to websites to purchase

movie tickets, make restaurant reservations, etc.  Keyboard+ also has the capability to open this

content on Fotobom's custom web browser.

31.     Beyond providing mobile users targeted content, Keyboard+ permits users to

browse the internet directly from the keyboard.  Specifically, Fotobom powers a web browser

that can appear at the top of a user's keyboard at the touch of a button.  The web browser enables

users to access information, make purchases, watch videos, quickly share links with friends, and more.  The browser is useful because it allows users to interact with any website or general search engine without having to leave the app they are using.

32.    Because Fotobom's keyboard appears anywhere a standard mobile keyboard appears, Keyboard+ has the capability to reach the user in any app he or she is using.  As a result, Fotobom's keyboard provides its partners an opportunity to redirect traffic to their websites or apps not just from within the user's messaging app, but also from within other apps, including the web browser.  As depicted in Figure 2 below, using Keyboard+ in a web browser or Google's Search app allows Fotobom to deliver suggested search results to the user.  The user can then compare Fotobom's suggested results alongside the results of the search engine.  Users have the choice of engaging with Fotobom's suggested search result or simply ignoring it.  The search results provided by Keyboard+ compete with the search results provided by Google.

**Figure 2:  Step-by-Step How Fotobom Can Redirect Google Search Traffic**



| Step 1:<br>User opens the<br>Google Search app | Step 2:<br>User types<br>"the mandalorian" | Step 3:<br>Fotobom's keyboard displays a suggested action<br>relevant to: the search term — "the mandalorian" | Step 4:<br>User is directed to The Mandalorian<br>in the Disney+ App |

33.    The software that powers Keyboard+ also can be integrated into other apps, like a messenger app.  Through integrations with other apps, Fotobom's software currently reaches

millions of daily active users.  This past year alone, Fotobom drove over 10 billion sticker and GIF impressions for various content providers and also provided users with search results based on their messaging activity.

34.     Fotobom is able to generate revenue from Keyboard+ and its software in a variety of ways, including through driving app downloads, app engagement, impressions (that is, a charge each time suggested website or app is shown to a user), and click-throughs to websites, apps, products, and services.  Fotobom's revenue model is similar to the revenue model of a search engine.

35.     For example, the software in Fotobom's keyboard can target customers who need ridesharing services who are texting a friend and using keywords like "taxi."  Fotobom can then suggest the Uber app to a user and receive a commission for driving Uber app installs, or rides placed on the app.  In addition, content providers pay for placement around keywords in Keyboard+ that are relevant to their brand.  A sports broadcaster like ESPN may bid against other sports content providers, like NBC and Hulu, to pair a link to its app with a keyword like "football."  A keyword can also connect a user to a website:  the keyword "movie" might surface a Fandango link for movie tickets at a local venue based on a customer's geolocation.  Fandango would pay Fotobom for driving customers to their website.  And, if that customer also purchases a ticket, Fandango would pay an additional fee for the successful transaction.  Finally, Fotobom can promote a search engine of choice for all search inquiries that it drives through Keyboard+.

36.     Fotobom updates its targeted content suggestions in real-time from its servers in San Francisco.  It periodically updates featured keywords so that users receive timely and targeted content that will be useful to them.

37.     There are two versions of Keyboard+:  one compatible with Android and another "light" version that is compatible with "Android Go" devices that Fotobom developed for Android manufacturers.  Android Go is a stripped-down version of Android designed to run on low-end and budget smartphones with 2 GB of RAM or less.  Fotobom also offers a keyboard app called "YourMoji" that is also compatible with iOS and allows users to create and share personalized emoji and GIFs.

**B.      Fotobom's Keyboard App Competitors**

38.     Several other companies offer "smart" keyboards — *i.e.*, an app that can be used as an alternative for the standard-issue keyboard on smart phones.  A number of smart keyboard apps offer users options for customization (*e.g.*, fonts, colors, personalized themes), and many offer features like emoji, GIFs, autocorrect, predictive texting, and swipe typing.  Examples include Gboard, GO Keyboard, SwiftKey, Tenor's GIF Keyboard, PayKey, GIPHY, Kika keyboard, Ginger Keyboard, Grammarly Keyboard, Chrooma, and ai.type.

39.     Google acquired Tenor's GIF Keyboard for an undisclosed sum in 2018, which, on information and belief, was more than $200 million.

40.     Facebook acquired GIPHY in 2020 for approximately $400 million.

41.     Some smart keyboards also offer, in addition to features such as GIFs and predictive texting, the added functionality of being able to connect users to a general search engine or other third-party content, like apps and websites.  Such keyboards include Fotobom's Keyboard+ and Fleksy's keyboard.

42.     Until recently, Microsoft's SwiftKey had a search bar built into the keyboard.  Microsoft acquired SwiftKey in 2016 for $250 million and the feature allowed users to run searches on Bing and share the search results instantly with a link or a screenshot.

43.     In July 2021, Microsoft announced that it had removed search from SwiftKey, which prompted user confusion and complaints.  Around the same time Microsoft removed its search toolbar, Microsoft started using Google's Tenor as its GIF provider.

44.     In April 2022, Microsoft deleted the search feature from older versions of SwiftKey.  This prompted more complaints from consumers who used older versions of the app because they considered the search bar an important feature.  Deleting features from older versions of apps that have already been deployed is an unusual step that suggests Google had pressured Microsoft to do so.  Ordinarily, software companies merely remove features from future versions and cease supporting the older app versions, which over time causes those features to not be used.  Forceful deletion of deployed features is a larger undertaking.

45.     Google also has its own keyboard app, "Gboard," which it launched in 2016.  Gboard currently offers glide typing, voice, and multilingual typing, Google translate, handwriting, emoji search, and GIFs from its Tenor acquisition.

46.     Previously, Gboard also offered a popular search feature that integrated Google Search into the keyboard itself — much like Keyboard+.  Indeed, when Google first launched Gboard, Google touted the keyboard as providing fast access to search.  In a video posted to YouTube advertising Gboard, Google noted that many users must flip back-and-forth between a messaging app and a search engine to find information and then paste that information back into the messaging app.  Google's solution:  "So we had a thought.  What if you could search right from your keyboard?"[1]  Using a dedicated button on the keyboard, users could open a search field with three suggested queries offered.  Users could then search the web with information

---

[1] Youtube, Gboard: now available for Android, https://www.youtube.com/watch?v=Hj_91ntoi50&t=59s.

presented as a carousel of cards and immediately share/paste results into their current conversation.  Around April 2020, Google removed this search feature from its keyboard on Android devices.

47.     Gboard users complained about this loss in useful functionality,[2] but Google has not reinstated the app's search functionality for Android devices.  However, Gboard's search functionality is still live for its iOS counterpart, and Google promotes Gboard on the Apple Store as "offering nearby stores/restaurants, videos/images, weather forecast, news, and sport scores."

**C.     Integration in Messaging Apps**

48.     As described above, Fotobom's Keyboard+ software can be integrated into other apps, like a messenger app.  Fotobom has integrated into some of the most popular messaging apps in the U.S., enabling users to search for suggested apps, websites, and stickers/GIFs based on keywords in their typing.  Among others, Fotobom's software has been integrated into Verizon Messages which, through 2021, was preloaded as the default messaging app on Verizon's Android devices.

49.     After removing search functionality from Gboard, Google announced a similar approach:  it has integrated search functionality into its Android messenger app, "Messages."  On its website, Google promotes that Messages users have "Google at [their] fingertips," with Google providing links to suggested content based on keywords in their typing.  According to Google's support page, "Messages can show you suggestions to get more info from the Google Assistant about movies, restaurants, and more."

---

[2] *See*, *e.g.*, Abner Li, *Gboard beta removes built-in Google Search for some*, 9to5Google (June 24, 2020), https://9to5google.com/2020/06/24/Gboard-removes-google-search/ (including user comments such as:  "This was literally the main feature of Gboard.  Some people at Google really need to get fired.").

50.     Over the past 15 years, Google has introduced more than a dozen messaging services spanning text, voice, and video calling.  But none has been popular with consumers.  For example, Google's messaging apps Hangouts and Allo had limited usage, largely because Allo was not preloaded on any Android devices and Hangouts was preloaded only on a limited number of devices.  Google ultimately discontinued these apps but it took many features from Allo and incorporated them into its Messages app.

51.     To ensure consumers use Messages, Google has entered into agreements with the largest U.S. carriers, Verizon, T-Mobile, and AT&T, which require these carriers to get rid of their own default messaging apps and preload Google Messages (formerly, Android Messages) as the default instead.[3]

52.     The carriers' messaging apps have significant user bases.  Verizon Messages, for example, has over 100 million installs and is one of the top used Android apps.  According to the app analytics firm SimilarWeb, in March 2021, Verizon Messages was ranked as the 13th most used Android app in the U.S.  Put into perspective, this means that Verizon's messenger app had more active engagement than WhatsApp (ranked 15), Twitter (ranked 27), Netflix, and Spotify (ranked 16) amongst Android users in the U.S.  Google recently began paying Verizon as much as, or even more than, $13 million per month to remove Verizon Messages as their default messenger app and replace it with Google Messages.  Verizon Messages presently remains one of the top 25 Android apps in the U.S., but without the ability to be preloaded as the default messenger app, its user base has already begun to decline.

---

[3] *See*, *e.g.*, Dieter Bohn, *Verizon is also switching to Android Messages as default for RCS*, The Verge (July 20, 2021), theverge.com/2021/7/20/22584443/verizon-android-messages-rcs.

53.     Apple also had a feature in iMessage that would underline various keywords, such as the names of musicians, restaurants, in an iMessage conversation.  A user could tap on one of these keywords and pull up a page of information related to that keyword (*i.e.* it displayed Apple's search results for that keyword).  This page linked to various Apple services/apps — Apple Maps, Safari, iTunes, and a list of Apple's suggestions for related websites.  But this feature abruptly disappeared in 2019.

## II.     THE RELEVANT MARKETS

### A.     General Search Services

#### 1.     General Search Services in the United States Is a Relevant Market

54.     In the early 1990s, the rapidly expanding number of internet sites created the need for an innovative way to search and index those sites.  The solution was the emergence of so-called "search engines" that utilize different methods of gathering, organizing, and presenting information about different internet sites.

55.     Today, consumers use search engines to explore the internet for answers to a wide range of queries.  General search services are unique because they offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet — with Google Search being the prime example.  Consumers use search engines to perform several types of searches, including navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase).

56.     Consumers can also use specialized search engines (sometimes called "vertical" search engines) to gather information on a narrow range of queries.  In contrast to general search engines, specialized search engines offer users deeper topical results than general search engines by using specialized data or information gathered from users or supplied by third parties.

Examples include search retail marketplaces such as Amazon or eBay, where consumers can shop for products, and websites such as Expedia or Priceline, where consumers can compare information on airfares.

57.     Most general search engines do not charge consumers for the ability to use the search engine to run queries.  But that does not mean that general search engines are without cost to consumers.  Rather, when a consumer uses a general search engine like Google Search, the consumer provides personal data and their attention in exchange for search results.  Google can then monetize the consumer's information and attention by selling ads, including ads that are targeted to specific users.

58.     Search advertising first appeared on Google in 2000.  At first, Google sold only general search text ads, which were shown above and below the search engine results.  Over time, Google's search advertising has grown to include specialized search ads that promote specific categories of goods and services, including retail products and services.

59.     Search advertising is particularly valuable to advertisers because it enables them to target potential customers based on keywords entered by those users, at the exact moment the user expresses interest in the topic of the query.  Advertisers are willing to pay steep prices for a consumer's attention:  the search advertising business in the United States is worth over $50 billion per year.  Indeed, in the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page.

60.     General search services (or engines) form a relevant product market.  Other search tools, platforms, and sources of information are not reasonable substitutes for general search engines.  Offline and online resources, such as books, publisher websites, social media platforms, and specialized search providers such as Amazon, Expedia, or Yelp, do not offer

consumers the same breadth of information or convenience.  These resources are not "one-stop shops" and cannot respond to all types of consumer queries, particularly navigational queries.

61.     Few consumers would find alternative sources a suitable substitute for general search services.  Thus, there are no reasonable substitutes for general search services, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

62.     The United States is a relevant geographic market for general search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States.  General search services available in other countries are not reasonable substitutes for general search services offered in the United States. Google also analyzes search market shares by country, including the United States.

### 2.     Google's Market Power

63.     Google has monopoly power in the United States general search services market. There are currently only four meaningful general search providers in this market:  Google, Bing, Yahoo!, and DuckDuckGo.  According to public data sources, Google dominates the market with approximately an 88-percent share, followed far behind by Bing with about seven percent, Yahoo! with less than four percent, and DuckDuckGo with less than two percent.

64.     Google has steadily increased its dominant position in general search services in the last decade.  In July 2007, Google estimated its general search services market share at 68 percent.  By June 2013, Google estimated that its share in the United States had already increased to 77 percent on computers.  By April 2018, Google estimated that its share was 79 percent on computers and even higher — 93.5 percent — on mobile.  More recently, Google has accounted for almost 90 percent of all general search engine queries in the United States, and almost 95 percent of queries on mobile devices.

65.     There are significant barriers to entry in the general search services market. General search engines, such as Google Search, use software to "crawl" the internet, indexing webpages and the information within them.  For example, when a search user enters a query into Google's search engine, Google's software uses algorithms to evaluate the relevance of information on any given webpage to the user's query.  Its search engine then delivers the results on the search engine results page.

66.     Given the internet's enormous breadth and constant evolution, establishing and maintaining a commercially viable general search engine requires a massive capital investment, highly complex technology, access to effective distribution, and adequate scale.  Google's search index, for instance, contains hundreds of billions of webpages and is over 100,000,000 gigabytes in size.  Developing a general search index of this scale, as well as viable search algorithms, would require an upfront investment of billions of dollars.  And the costs for maintaining a scaled search business can be hundreds of millions of dollars a year.  For that reason, only two U.S. firms — Google and Microsoft — maintain a comprehensive search index.

67.     Scale is also a significant barrier to entry.  Scale affects a general search engine's ability to deliver a quality search experience.  The more data that a general search engine has, the better that search engine's algorithms will be able to respond to queries, particularly location-based queries, uncommon queries, and queries seeking recent information.  Scale is also critical to generating the necessary revenues and profits to recoup the large investment in creating and maintaining a general search engine.

68.     Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States.

B.     **Android Keyboard Apps**

1.     **Keyboard Apps for Android Devices Is a Relevant Market**

69.     Keyboard apps for Android devices form another relevant antitrust market.  Much like a physical keyboard for a desktop computer, a keyboard app for a mobile device allows the user to type messages, notes, search queries, and more.  Other mobile apps are not reasonably interchangeable with a keyboard app because keyboard apps fulfill this specific and unique function.  That is why only other keyboards can be substituted for the default keyboard app, and a manufacturer must preload at least one keyboard app on a device.

70.     Trade publications recognize keyboard apps as a distinct type of software application that is necessary to use a mobile phone and that cannot be substituted by other types of apps.  These publications rank Android keyboard apps specifically.

71.     A keyboard app must be compatible with the device's mobile operating system, thus developers often offer separate keyboard apps for the iOS and Android operating systems (which together account for more than 99 percent of mobile device usage in the United States).  Once an OEM has decided to install Android on its devices, it cannot — for technical reasons — preload a keyboard app that has not been developed for Android.  A keyboard app written for iOS cannot function on Android devices, and vice versa.  Thus, Android keyboard apps are not reasonably interchangeable with keyboard apps for other mobile operating systems.

72.     Moreover, neither a device user nor an Android manufacturer would switch to other mobile operating systems in the event of either a small but significant, non-transitory increase in price or decrease in quality of Android keyboard apps.  OEMs would not have any incentive to switch to another licensable mobile operating system (of which there are a limited number), because device end-users would be unlikely to switch, and cannot switch to Apple's iOS, which is not licensable.  End users are unlikely to switch because the price increase for a

keyboard app is negligible compared to the cost of switching mobile operating systems and there is a high degree of customer loyalty for mobile operating systems.  If a consumer switches to another mobile operating system, the consumer also loses their financial investment in the previously purchased mobile devices — often hundreds of dollars — as well as digital content consumable only through the apps available for that device's operating software.

73.     Android keyboard apps also have distinct customer groups:  Android device users, and Android manufacturers and carriers.  Companies develop and market keyboard apps to be compatible with Android's operating software.  In addition, the functionality of a keyboard app might vary depending on whether the app is for Android or another operating system — Gboard being one example.

74.     The relevant geographic region is worldwide in scope, excluding China.

75.     Geographic barriers to entry are low in most of the regions of the world, and there are no significant limitations that would prevent an Android keyboard app from being made available on a worldwide basis.  Keyboard developers often make apps available in many countries and users get apps from developers who operate in different geographies.  In fact, there are at least 11 Android keyboard apps, including SwiftKey, Gboard, and PayKey, that are available on four or more continents.  In terms of distribution, adding new countries for availability in the Google Play Store is as easy as ticking a box.[4]  In addition, app developers for the Google Play Store sign distribution agreements that are written to apply globally if the developer chooses to make their app available that broadly.

---

[4] *See Distribute app releases to specific countries*, Google Play Store Console Help, https://support.google.com/googleplay/android-developer/answer/7550024?hl=en ("App availability refers to your app's availability in the production track.  When you select a country as available, any future production releases include that country.").

76.     Language specific demand characteristics for Android keyboard apps exist, but do not impede developers from offering these apps on a global basis in accordance with language-related preferences.  Most Android keyboard apps are preloaded with multiple languages.  For example, Gboard, SwiftKey, and Samsung's keyboard support hundreds of languages that users can switch between with ease.

77.     Conditions of competition are different in China, where Google's activities are severely limited.  For example, Google's products are not available in China.  In addition, many OEMs use a forked and heavily customized version of Android for devices that are sold in China; by contrast, OEMs that sell outside of China have entered into licensing agreements with Google that cover all devices sold outside of China.

### 2.     Google's Market Power

78.     Google has a significant share of the Android keyboard app product market — at least a 50-percent share, and likely a higher percentage.  Of the keyboard apps available on the Google Play Store, Gboard has been installed on more than five billion devices — more than twice as many times as any other keyboard app.  In fact, Google has over a 50-percent share of Google Play's keyboard app installations, with the next highest competitor, SwiftKey, having a share of less than 26 percent.  All other keyboard apps offered on the Google Play Store have shares of less than six percent (and most have shares of less than one percent).

79.     Google's share of app installations is driven by the fact that Gboard already comes preinstalled as the default keyboard app for numerous Android devices (alleviating the need for the consumer to download Gboard from Google Play).  As one article notes, "You're

probably already using Gboard since it came pre-loaded on your phone."[5]  Others explain that Gboard is the "default keyboard app for Android"[6] and "if you're using an Android device, chances are, you might have used Gboard to search and find this article."[7]  For example, Gboard comes preloaded as the default on all Android devices manufactured by many OEMs, including OnePlus, Xiaomi, and nearly every small OEM, and every Android GO phone.  Gboard is also the default keyboard for many LG devices.

80.     Industry publications recognize Google's dominance.  For example, one explains that Gboard is the "most widely used keyboard app on Android."[8]

81.     Google's market share is also durable because scale is a significant barrier to entry.  The single most effective way for an Android keyboard app to achieve meaningful scale is to be preloaded, and more importantly, set as the default, on the user's mobile device.  As Google has recognized, consumers rarely change a default, and they often do not look beyond a device's default, preloaded apps.  Defaults are buried within settings menus, making it unlikely that the typical user will change these default settings on his or her phone.  Changing a default setting requires users to follow a multi-step process, increasing the consumer time and knowledge needed to change a default.  Thus, consumers tend to "stick" with the apps and settings, like a keyboard, that are available from the moment they begin using a device.

---

[5] Ara Wagoner, *Gboard vs. Microsoft SwiftKey: Which Android keyboard should you use?*, Android Central (June 30, 2020), https://www.androidcentral.com/Gboard-vs-swiftkey.

[6] Chrissy Montelli, *How to turn off the auto-capitalization tool on your Android's Gboard keyboard*, Business Insider (Nov. 10, 2020), https://www.businessinsider.com/how-to-turn-off-auto-capitalization-on-android.

[7] Abhilekh Das, *12 Best Keyboards for Android for Privacy and Security in 2022*, Fossbytes (Jan. 10, 2022), https://fossbytes.com/best-android-keyboard-apps/.

[8] *10+ Best Keyboard Apps of 2021 for Easier Typing*, Mobile App Daily (June 10, 2021), https://www.mobileappdaily.com/best-keyboard-apps.

82. Changing the default for a keyboard is particularly tricky. Each Android phone buries its settings in a different place on the device. Some phones require, for example, that a user navigate to Settings, then click on General Management, then Keyboard List and Default, then Default Keyboard, and only then select a downloaded keyboard to use. Changing keyboards presents an issue of sunk costs: changing a keyboard, even to a better product, will cost the user, as the new keyboard will not have any of the information that the user's prior keyboard had stored about them, tailoring predictive text suggestions to their needs.

83. In light of this consumer dynamic, it is difficult for keyboard developers to enter the market successfully without relationships with OEMs and mobile carriers. For Google's rivals, preloading a keyboard app as the default is impossible because, as described in more detail below, Google controls the distribution and certification of Android apps and devices. Keyboards currently preloaded on Android devices as defaults are preloaded with Google's knowledge and consent. Accordingly, smaller keyboard apps that might enter the market do not impose any threat to Google's market share.

84. Google's control over the distribution of keyboard apps is also evident in its ability to determine the features that non-Google keyboards preloaded on Android devices may offer, for example, by forbidding that the keyboard offer a search feature or by requiring that any search feature come preloaded with Google Search. In addition, on information and belief, much like Google has offered incentives for Samsung to turn the Galaxy store into a mere white label for the Google Play Store, *see Utah et al. v. Google LLC*, 3:21-cv-05227-JSC, ECF No. 1, ¶¶ 21, 141, Samsung's Android keyboard app is merely a white label for Google.

C.      **Android App Distribution**

1.      **The Android App Distribution Market Is a Relevant Market**

85.      There is a relevant product market for the distribution of apps to users of Android mobile devices.

86.      The market includes all channels by which Android apps on mobile devices may be distributed to consumers.  The distribution of Android apps primarily occurs through Android app stores, such as the Google Play Store, Samsung's Galaxy Store, Aptoide, and Huawei's AppGallery.  This market also nominally includes direct downloading of apps by consumers without using an app store — something Google refers to as "sideloading."

87.      App stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection.  In addition, app stores, including the Play Store, are important for other functions, such as payments or the updating of apps.  App stores cannot be replaced by other apps for such purposes.  For mobile device manufacturers, it is commercially necessary to ship a mobile device to a consumer with at least one app store installed, as a consumer's ability to obtain new mobile apps is an important part of the value provided by smart mobile devices.

88.      App stores selling and distributing mobile apps are currently OS-specific, meaning they distribute only apps that are compatible with the specific mobile operating system on which the app store is used.  Once a manufacturer has decided to install Android on its devices, it cannot, for technical reasons, preinstall an app store that has not been developed for Android.  Similarly, a consumer who has an Android mobile device cannot use apps created for a different mobile operating system.  They must use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps.  App stores for other mobile

operating systems cannot substitute for Android-specific app distribution platforms and are therefore not part of the Android App Distribution Market.

89.     For example, as the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary concluded in its October 2020 report, "Investigation of Competition in Digital Markets":  "The [Apple] App Store and the [Google] Play Store do not compete against one another" because "Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa."

90.     Due to market imperfections such as high switching costs, a monopolist app distributor on Android mobile devices is not constrained from raising prices, or reducing quality or innovation, by app distribution on any other mobile devices that use an alternative to Android or on desktop devices.

91.     As with Android keyboard apps, a consumer would be unlikely to switch to another mobile operating system in response to a small price increase (or a small reduction of quality) in Android app distribution.  A consumer would lose his or her financial investment in the previously purchased mobile device, as well as data on that device and digital content consumable only through Android apps.  In addition, different mobile operating systems have distinct designs, controls, and functions that consumers learn to navigate and become familiar with over time.  These and other switching costs deter most consumers from switching.  OEMs would not have any incentive to switch to another licensable mobile operating system (of which there are a limited number), because device end-users would be unlikely to switch.

92.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.

93.     Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores such as the Play Store, available on Android devices on a worldwide basis (except in China).  China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Play Store, within China.

94.     Additionally, app stores that are prevalent in China are not available in, or have little presence outside of, China.  Examples include Myapp, 360 Mobile Assistant, Baidu Mobile Assistant, MIUI app store and Wandoujia.

### 2.     Google's Market Power

95.     Google has monopoly power in the Android App Distribution Market.

96.     More than 90 percent of apps on Android devices are downloaded from the Google Play Store.  A 2017 internal Google report confirmed that the "Play Store dominates in all countries."  Google also has recognized that in one quarter (June to September 2016), app installations through channels other than the Play Store (including direct downloads and competing app stores) amounted to only 4.4 percent of Android app downloads in the United States.

97.     A June 2022 report released by the Competition and Markets Authority similarly found that the Play Store is the main app store used by consumers in the U.K., representing 90-100 percent of app downloads in 2021.  It found the usage of alternative Android app stores, both by device users and app developers, is substantially lower.

98.     Other existing Android mobile app stores do not discipline Google's exercise of monopoly power, even Samsung's Galaxy Store, which is the most widely available alternative app store within the Android ecosystem.  No other app store is able to reach nearly as many Android users as the Play Store.  That is because the Play Store is preloaded by OEMs on

practically all Android mobile devices sold outside of China.  With the exception of app stores designed for and installed only on mobile devices sold by those respective OEMs, such as the Samsung Galaxy, no other Android app store is preinstalled on more than 10 percent of Android devices, and many have no appreciable market penetration at all.  Aptoide, for example, is an Android app store that claims to be the largest "independent" app store outside of China, but it comes preinstalled on no more than 5 percent of Android mobile devices.

99.     Google's market power is durable.  Because of Google's success in maintaining its monopoly in Android app distribution, there is no viable substitute to distributing Android apps through Google's Play Store.  The Play Store offers over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing.  The Play Store therefore benefits from network effects based on the large number of participating app developers and users.  The large number of apps attracts large numbers of users, who value access to a broad range of apps, and the large number of users attracts app developers who wish to access more Android users.  Android OEMs find it commercially unreasonable to make and sell phones without the Play Store, and they view other app stores as poor substitutes for the Play Store because of the lower number of apps they offer.

100.    The CMA's June 2022 Report found that alternative Android app stores, especially new entrants, face barriers to effective competition.  "For example, while manufacturers' app stores could be sideloaded . . . sideloading is limited in practice.  Similarly, while one manufacturer could seek to enter into preinstallation agreements with another manufacturer, there is no evidence this occurs in practice.  The incentive to preinstall another

manufacturer's app store is further reduced by manufacturers' agreements with Google leading to the pre-installation of the Play Store which provides access to such a large range of apps."[9]

101.     Sideloading places only a very limited constraint on the Play Store at present, partly because the majority of app developers (including Fotobom) do not use sideloading as a distribution channel or identify it as an alternative to the Play Store.  There are third-party app stores that can be sideloaded on Android, such as APKpure and F-Droid.  But use of these app stores is extremely low.  Web-based alternatives, including websites and web apps, likewise are rarely used and do not place a competitive constraint on the Play Store.

102.     Further, Google takes various steps to discourage OEMs and carriers from directly competing or sponsoring any app store competition.  Google has paid carriers 20 to 25 percent of app store purchases to prevent them from creating a competitive offering.  Google also makes the sideloading process unnecessarily cumbersome and impractical by adding superfluous, misleading, and discouraging security warnings and by deterring users by requiring them to grant permission multiple times for a single app installation.

### D.     Android Mobile Browsers

#### 1.     Android Mobile Browsers Is a Relevant Market

103.     Mobile browsers for Android devices form another relevant antitrust market.

104.     Browsers are a type of mobile application that enable users of mobile devices to access and search the internet and interact with content on the open web.  Browsers are a crucial gateway for users to access the web from mobile devices and are one of the most used apps on

---

[9] Competition and Markets Authority, *Mobile Ecosystems:  Market Study Final Report*, at ¶ 4.78 (June 10, 2022), https://www.gov.uk/cma-cases/mobile-ecosystems-market-study.

users' phones.  And demand remains for mobile browsers as a general entry point for accessing and interacting with web content on mobile devices.

105.    Browsers comprise two main elements:  a browser engine, which transforms web source code into web pages (or web apps — applications which run in web browsers) that users can engage with; and a branded user interface, which is responsible for user-facing functionality. The browser user interface is responsible for features such as favorites, browsing history, and remembering passwords and payment details.  It also determines the layout of the navigation bar and settings.  The default search engine is set as part of the browser user interface.

106.    Browsers for personal computers do not belong in the relevant market.  PC browsers and mobile browsers rely on different technology because of the differences between operating systems for PCs and smart mobile devices.  Browsers generally have a version which is designed for the desktop and a version which is designed for the mobile device (in the form of an application).  Though developers of PC browsers can switch and have switched, to the development and supply of mobile browsers, such a switch takes significant time and requires substantial investments.  Moreover, from the perspective of users, PC and mobile browsers are significantly differentiated as they are available on different devices and consumers may not own both; and they are used in different contexts.

107.    Mobile browsers are specific to the operating system for which they are developed to run on.  Android manufacturers can only preload web browsers that are developed for the operating system on which their devices are running.  Likewise, users can only either obtain mobile browsers together with their smart mobile devices or download those developed for the operating system running on their devices.

108.    For the reasons described above, neither a device user nor an Android manufacturer would switch to other mobile operating systems in the event of either a small but significant, non-transitory increase in price or decrease in quality of Android mobile browsers.

109.    The relevant geographic region is worldwide in scope.

110.    The technical framework, functionality, and application of mobile web browsers are the same throughout the world.  In addition, barriers to entry in terms of import restrictions, transportation costs, or technical requirements for mobile web browsers are low.  To the extent there are language-specific demand characteristics, the related costs appear to be insignificant.

### 2.    Google's Market Power

111.    Google has a significant share of the Android mobile browser market.  Even including Apple's Safari — which is not a reasonable substitute for Android users and manufacturers — Google's share of the worldwide mobile browser market is over 65 percent, with Safari at 24 percent, Samsung at 4 percent, and all other mobile browsers having less than a five percent share.  Excluding Safari, Google's share is even higher.  For example, the CMA's June 2022 Report found that Chrome's share on Android devices in the U.K. for 2021 was 74 percent and far higher than any other browser's, including Samsung Internet (15 percent), Firefox (4 percent), DuckDuckGo (2 percent), Opera (2 percent), Brave (2 percent), Edge (0.7 percent) and Yandex (<0.5 percent).

112.    The CMA's June 2022 Report also found that the competitive constraints faced by Google from other mobile browsers are weak, and there are significant barriers to competition. It concluded that "[a]bsent intervention, Apple and Google are highly likely to retain this market power within their respective ecosystems for the foreseeable future, raising developers' costs and hindering innovation."

113.    Other apps with in-app browsers, such as apps like Snapchat, Facebook, and search widgets, do not constrain Google's market power.  The web pages that users access through brewers are much greater in reach and diversity and browsers are the primary channel for web pages to reach new audiences and grow their user base.

E.    **Android Navigation Apps**

1.    **Android Navigation Apps Is A Relevant Market**

114.    Navigation apps for Android devices form an additional relevant antitrust market.

115.    Navigation apps are mobile applications that consumers use to navigate while driving, using public transit, bicycling, or walking.  They provide maps, directions, and suggested routes based on traffic patterns and other considerations.  Google Maps, Waze, Apple Maps, and MapQuest are examples of navigation apps.

116.    Navigation apps are among the most important mobile applications for consumers.  In 2018, Insider Intelligence estimated that approximately 65-70 percent of mobile device users use a navigation app at least monthly.  Similarly, a 2018 survey from the Manifest found that 77 percent of mobile device users regularly use navigation apps.

117.    Navigation apps for personal computers do not belong in the relevant market.  Because navigation apps are frequently used while in transit, apps available on a personal computer cannot be used as a substitute.

118.    Navigation apps are specific to the operating system for which they are developed to run on.  Android manufacturers can only preload apps that are developed for the operating system on which their devices are running.  Likewise, users can only either obtain navigation and video apps together with their smart mobile devices or download those developed for the operating system running on their devices.

119.    For the reasons described above, neither a device user nor an Android manufacturer would switch to other mobile operating systems in the event of either a small but significant, non-transitory increase in price or decrease in quality of navigation apps.

120.    The relevant geographic region is worldwide in scope.

121.    The technical framework, functionality and application of navigation apps are the same throughout the world.  In addition, barriers to entry in terms of import restrictions, transportation costs or technical requirements for navigation apps are low.  To the extent there are language-specific demand characteristics, the related costs appear to be insignificant.

### 2.    Google's Market Power

122.    Google has an overwhelming share of navigation apps through Google Maps and Waze (which it acquired in 2013).  According to a 2020 Wall Street Journal report — across all mobile OS — 70 percent of consumers used Google Maps and 17 percent used Waze.  The next closest app — Apple Maps (used by 16 percent) — is not available on Android and is not part of the relevant market.  The only non-Google navigation app available on Android listed (MapQuest) was used by only 1 percent of consumers.  Similarly, a 2020 House Report found that Google Maps and Waze had an 81 percent market share.  Google (with Google Maps and Waze) accordingly has an overwhelming share of the relevant market limited to Android OS — likely approaching 100 percent.

123.    There are no meaningful competitors to Google's navigation apps.  The 2020 House Report noted comments from business who license Google Maps that they are essentially given "a contract of adhesion" without any ability "to negotiate any changes."  There are also high barriers to entry due to the high fixed costs of creating mapping data.  The only recent new entrant — Apple Maps available only on iOS — required "billions of dollars" in investments according to Apple.  Google also has a built-in advantage because its Android devices are

tracking enabled, which gives Google access to location data that is not available to potential new entrants.

## III.    GOOGLE'S UNLAWFUL CONDUCT

124.    Google is a monopolist in the market for general search engines.  To maintain its monopoly — and to insulate the billions of dollars in search advertising revenue that flows from it — Google seeks to control all "search access points":  applications that could connect a user to a general search engine or a specialized search provider like Yelp.  In the process, Google has attempted to monopolize (and has a dangerous probability of monopolizing) individual search-access-point markets, including the market for keyboard apps for Android devices.

125.    Like Microsoft almost 20 years ago, Google has used tying arrangements and exclusionary agreements to deny rivals access to the most effective distribution channels, including by coercing mobile carriers and manufacturers to preload Google's search engine, or Google's proprietary search access points, as defaults on computers and mobile devices.  When taken together, Google's exclusionary contracts cover almost 60 percent of U.S. search queries. That figure is even higher — 80 percent — for search queries run on mobile devices.  Almost half the remaining searches are funneled through properties owned and operated directly by Google.  As a result, the large majority of searches are covered by Google's exclusionary contracts and own properties, leaving only a small fraction for competitors.

126.    To remedy these unlawful practices, the United States and several State Attorneys General have filed antitrust suits against Google.  *See United States v. Google LLC*, 20-cv-03010, ECF No. 1 (D.D.C. Oct. 20, 2020); *Colorado v. Google*, Case No. 1:20-cv-03715, ECF No. 3 (D.D.C. Dec. 17, 2020); *Utah et al. v. Google LLC*, 3:21-cv-05227-JSC, ECF No. 1 (N.D. Cal. July 7, 2021).  The European Commission also has condemned the unlawful tying and exclusive dealing arrangements described below.

127.    Google's anticompetitive scheme has directly harmed Fotobom.  Fotobom's Keyboard+ is a disruptive search access point:  it can direct users in any app to a rival search engine.  Fotobom's keyboard also poses a unique threat to Google because it offers a niche navigational search function that allows users to bypass Google Search and go directly to a relevant webpage (or vertical search provider).  Recognizing this threat, Google's anticompetitive conduct has prohibited Keyboard+ — like other search access points that Google does not control — from succeeding in the market, harming consumers and competition.

128.    Similarly, messaging apps can be search access points.  They can direct users to search engines or content directly based on the context of a conversation.  For example, Google Messages integrates with Google Assistant to provide search results for movies, restaurants, and more.  Fotobom's software integrations with messaging apps like Verizon Messages provides similar search-access-point functionality.  Google has sought to control messaging apps as search access points by entering into agreements with all three major U.S. mobile carriers (Verizon, AT&T, and T-Mobile) to require them to preload Google Messages.

**A.    Google Blocks Rival Search Access Points Like Keyboard+ Because They Are a Threat to Google Search**

**1.    "Search Access Points"**

129.    Search is like many other businesses in that the providers of general search engines need a network of distributors to get their products to consumers.  The distribution of general search engines takes place primarily through "search access points," which are applications on computers and mobile devices through which consumers access a general search engine — like web browsers.

130.    With the significant growth of mobile device usage, most searches are now conduced on mobile devices.  As of 2019, 63 percent of all Google's U.S. search traffic

originated on mobile.  A recent study found that "[s]ignificantly more searches are carried out on the mobile phone (64 percent) than on the desktop (35 percent)" and that "[t]here are also more than twice as many keywords that are characterised by mobile traffic."[10]  Mobile devices thus represent the largest and fastest growing search-engine distribution channel.

131.    Search engines can be accessed by mobile-device users through a variety of search access points, including:  (1) a web browser, (2) a static search widget on the device's home screen, (3) a search app, (4) software accessed by a button or voice command and designed to answer voice-initiated queries (voice assistants), (5) smart keyboards, and (6) messaging apps.

132.    Smart keyboards serve as search access points by directing users to a general search engine.  As Google has described it, smart keyboards can serve as a "[b]ridge" to its or rival search engines.  For example, as described above, Fotobom's keyboard allows users to browse the internet within the app they are using, and Fotobom can choose to which search engine Fotobom routes search queries.

133.    Messaging apps can also serve as search access points.  As of July 2022, Google advertised that one of the features of Google Messages is having "Google at your fingertips" because users can "ask the Google Assistant for helpful information right from [their] conversation."[11]  Google Assistant is another Google app that is a search access point and that displays search results from Google Search.

134.    Search engine providers can enter into agreements with distributors, including mobile carriers and manufacturers, to have their search engine set as the default search engine on

---

[10] Johannes Beus, *The proportion of mobile searches is more than you think — What you need to know*, Sistrix (Mar. 9, 2021), https://www.sistrix.com/blog/the-proportion-of-mobile-searches-is-more-than-you-think-what-you-need-to-know/.

[11] *Messages:  Simple helpful messaging by Google*, https://messages.google.com (last visited August 12, 2022).

search access points.  Google, for instance, has an agreement with Apple under which Google is the out-of-the-box default search provider for Apple's Safari browser (for computers and mobile devices) and all other significant search access points on any iPhone or iPad.  General search engine providers can also enter into agreements with distributors to preload their own proprietary search access points (such as Google's search app, Google Messages, or Google Chrome).

135.    For search providers, alternative methods of distribution — such as direct marketing to consumers — are not as effective or cost-effective as preloading a search access point and setting its default search engine.  Being the preset default general search engine has significant value because consumers rarely change the preset default, giving the preset search engine *de facto* exclusivity.  Indeed, in 2014, Yahoo's use increased by 20 percentage points as a result of becoming the default search engine in Firefox version 34 in the U.S.[12]  That agreement ceased in 2018, and Google is now the default search engine on Firefox.

136.    The "stickiness" of default settings is particularly strong for mobile devices: Google itself has admitted that "[p]eople are much less likely to change [the] default search engine on mobile."  And a study commissioned by Facebook to assess the "impact of preinstalled apps on the competitive app ecosystem" confirmed that the majority of apps people use on their phones in the United States come preinstalled.[13]

137.    Similarly, for app developers, alternative methods of distribution are far less effective than preloading an app onto a user device.  As the European Commission found

---

[12] *See* Wayne Williams, *Yahoo has actually managed to make a dent in Google's market share*, ITProPortal (Dec. 5, 2014), https://www.itproportal.com/2014/12/05/yahoo-use-soars-google-nosedives-firefox-34s-great-search-switcheroo-begins/.

[13] Alex Heath, *Apple and Google Crowd Out the Competition With Default Apps*, The Verge (July 7, 2021), https://www.theverge.com/2021/7/7/22549338/apple-google-apps-comscore-study-facebook.

studying this issue, users are unlikely to look for, download, and use alternative apps, at least when the app that is preinstalled, premium placed, and/or set as default already delivers the required functionality to a satisfactory level.

138.    Google has also recognized this challenge, including in the following slide pitching carriers to preload Google Messages as their default messaging application.

**Figure 3:  The Advantages of Preloading[14]**



### 2.    Search Access Points Pose a Threat to Google if It Cannot Control How Those Access Points Route Searches

139.    By providing a window into search, search access points (such as messaging apps or smart keyboards) pose a threat to Google's search dominance — and search advertising revenues — if they route users to a competing search engine.  As one internal Google document explains, tying up search access points is critical to maintaining Google's monopoly because "otherwise Bing or Yahoo can come and steal away our Android search distribution at any time."

---

[14] Available at https://developers.google.com/business-communications/rcs-business-messaging/files/rbm-telco-deck.pdf.

140.    Google was acutely aware that Fotobom's keyboard could pose such a threat. Prior to Google launching Gboard and prior to carriers and OEMs refusing to preload Fotobom's software (because of Google's exclusivity agreements), Fotobom had multiple meetings with Google about its smart keyboard.  Fotobom first met with Google in April 2016, roughly eight months after Fotobom had launched its smart keyboard, and again in November 2016.  Google employees present at the meetings included a product manager, who later created Google's Allo messenger app, and the Director of Software Partner Business Development.

141.    At that time, Fotobom showed Google its keyboard and discussed some of its content and distribution partnerships, as well as upcoming plans for the product.  Fotobom also explained that a smart keyboard was a unique opportunity to monetize messaging apps like iMessage and WhatsApp, which are normally closed off to third-party developers.  Google released Gboard about a month after the meeting.

142.    Fotobom met with Google again in February 2018, when Google was looking to buy a messaging content company.  Google told Fotobom that "it's not a matter of if we work together, it's a matter of when" and given that, Fotobom should share with Google as much as possible about its keyboard, messaging products, and company strategy.  Google also explained that it saw Gboard as "a new access point to search" and had seen very high user engagement with the product.  Fotobom outlined its business strategies, current partners, and plans to preload its keyboard with OEMs and carriers.  Fotobom also specifically outlined its relationship with Verizon (*i.e.*, its integration with Verizon Messages), prompting Google to note that Verizon Messages was "one of [Google's] biggest competitors."

143.    Google was impressed with Fotobom's technology and, during the meeting, Google asked Fotobom to set up an additional meeting that day with the product manager in

charge of Allo (with whom Fotobom had previously met).  At Google's request, Fotobom discussed with Google in more detail its relationships with carriers and OEMs.

144.    Shortly after the meeting, Google purchased another keyboard/messaging company, Tenor.  Google then told Fotobom that the companies could no longer work together, but "thanks again for being willing to have a conversation and share your insights."

### 3.    Search Access Points Can Pose an Additional Threat to Google's Monopoly if They Allow Users To Bypass Google Search

145.    Search access points also pose a threat to Google Search if they remove the need for a user to access a general search engine at all by directing specific searches directly to the content that is the subject of the search — for example, directing a search for movie tickets directly to a site where tickets can be purchased (like Fandango).  This is especially threatening to Google's search advertising revenue, which comes disproportionately from a small category of inquiries about commercial segments, such as travel and local services.

146.    Fotobom's Keyboard+, and its software that integrates with messaging apps, poses such a threat to Google's search monopoly.  That software provides users direct links to relevant websites.  It can also provide access to popular vertical search providers like Yelp, removing the need for consumers to navigate to Yelp through Google Search.

147.    As alleged in the State of Colorado's Complaint against Google, and as described below, Google throttles consumers from bypassing its general search engine and going directly to their chosen destination, especially when those destinations threaten Google's search revenues.  *See Colorado v. Google*, Case No. 1:20-cv-03715, ECF No. 3, ¶¶ 14, 51-55.  In a more competitive market, Google's search-related monopolies could be challenged or even replaced by new forms of information discovery.

B.    **Google Enforces Unlawful Tying Arrangements To Foreclose Fotobom and Other Rivals from the Most Effective Distribution Channels**

1.    **Google's Android and "Google Mobile Services"**

148.    As early as 2007, Google recognized that "[m]ore individuals are using non-desktop devices to access the internet.  If users of these devices do not widely adopt versions of our web search technology, products or operating systems developed for these devices, our business could be adversely affected."

149.    In the mobile world, Google knew it would have to deal with mobile device manufacturers and carriers, who could influence how consumers access general search engines on mobile devices.  Google's solution was to purchase its own mobile operating system, Android, in 2005.  In 2007, Google released the Android code for free under an open-source license (the "Android Open Source Project") to entice OEMs and carriers to adopt Android.

150.    Android quickly became the dominant licensable mobile operating system in the United States.  Today, Android represents over 95 percent of licensable mobile operating systems for smartphones and tablets in the United States and accounts for over 70 percent of all mobile device usage worldwide.

151.    The only other mobile operating system with significant market share in the United States is Apple's iOS, which is not licensable.  That means Apple does not license iOS to third-party mobile-device manufacturers; iOS runs only on Apple products.  In the United States, Apple and Google roughly split the market for mobile operating systems, with all competitors, combined, accounting for less than one percent of mobile-device usage in the United States.

152.    The Android operating software provides device-level functionalities but does not contain many features or apps necessary for manufacturers to offer a commercially viable Android device.  Instead, Google has chosen to include important features and functionality in

Google's own ecosystem of proprietary apps and APIs, rather than the open-source Android code.  Google refers to this proprietary layer as "Google Mobile Services."

153.    Google Mobile Services is a suite of Google apps.  The bundle has evolved over time but includes certain must-have apps that a consumer expects to be able to use on a device out-of-the-box such as Chrome, Google Maps, and YouTube.  Google Mobile Services also includes the Google Play Store, Google's app store, which is the only viable way for users to download popular apps like Facebook, Snapchat, and Instagram.  Unlike other Google apps, the Play Store is not downloadable and thus needs to be preinstalled by OEMs for users to have access to it.

154.    Importantly, Google Mobile Services also includes the APIs required for running other mainstream apps that Google has not developed, like Facebook's app.  Google refers to this API package as "Google Play Services."

155.    The APIs available within Google Play Services allow devices to perform functions that are not possible using the open-source version of Android.  For example, using the open-source Android system, third-party apps cannot provide basic "push notifications," enable in-app purchases through Google Play, or use data from Google Maps; to have these functionalities, third-party apps must use Google Play Services.  Google Mobile Services (together with the Google Play Services APIs) is thus essential for OEMs and carriers to offer a commercially viable mobile device.

156.    Google has degraded the open-source version of Android to a degree that it is no longer a viable operating system for a modern smartphone.  As one of Google's senior Android engineers has commented, the open-source version of Android is "less than 'bare minimum'

AOSP by itself isn't actually shipped on anything."  What this means is that Google has forced OEMs to use the combination of both Android *and* GMS in order to build a viable smartphone.

157.    Another major reason why Android with Google Mobile Services is commercially viable, and Android without Google Mobile Services is not, is that Google limits the availability of app updates to devices with Google Mobile Services.  Typically, Google offers an unviable open-source version of an app, and a separate, closed-source update for that app that requires Google Mobile Services to access.  Google began aggressively migrating its app updates from open-source Android to closed-source Google Mobile Services starting in 2014.

158.    Google's actions have driven OEMs to abandon the open-source version of Android.  As of July 2020, over 99 percent of smartphones with licensed mobile OSs were powered by the Google-certified version of the Android OS.

### 2.    Google Ties Google Mobile Services and Its Must-Have Apps to Default Status for Google-Controlled Search Access Points

159.    Google provides the license to distribute Google Mobile Services (sometimes abbreviated "GMS") through preinstallation agreements called "Mobile Application Distribution Agreements" ("MADAs") (sometimes referred to as the "GMS license").

160.    Under these agreements, Google provides access to its Google Mobile Services and APIs for preinstallation, but only if the manufacturer agrees to (1) install a bundle of other Google apps — including Google-controlled search access points like Chrome, the Google search app, and Google Assistant, (2) make certain apps undeletable, and (3) give Google's apps prime placement on the default home screen.  Google further prevents manufacturers from preinstalling any search access points that do not use Google as the default search engine.

161.    For example, a 2011 MADA between Google and Samsung required Samsung to "distribute the Google Applications . . . only in the Territories specifically authorized by Google

via the distribution methods specified by Google."[15]  The "Google Applications" covered by the agreement include:  "Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client (not products downloaded from Android Market) [now the Google Play Store], Google Voice Search, and Network Location Provider."

162.    Under the terms of the MADA, Samsung "may sublicense the Google Applications to Affiliates, resellers and distributors for distribution or manufacturing purposes *only when the Google Applications are preloaded on the Devices*."  In addition, "Devices may *only be distributed if all Google Applications . . . authorized for distribution in the applicable Territory are preinstalled on the Device*, unless otherwise approved by Google in writing."

163.    Under Section 3.4, "Placement Requirements," Google requires, unless otherwise approved by Google in writing, that Samsung (1) "preload all Google Applications approved in the applicable Territory or Territories on each Device"; (2) place Google Phone-top Search and the Android Market Client icon "at least on the panel immediately adjacent to the Default Home Screen"; (3) place all other Google Applications "no more than one level below the Phone Top"; and (4) set Google "*as the default search provider for all search access points on the Device*."

164.    Under Section 3.5, "Distribution," Samsung also must "preload the Google Applications on the Devices so that, after preload, an icon representing each Google Application shall appear on the Device as specified in the above Placement Requirements."

---

[15] While the MADA states that "neither party may make any public statement regarding the relationship contemplated by this Agreement without the other's written approval," the Samsung-Google MADA, as well as Google's MADA with HTC Corporation, were made public in connection with litigation between Google and Oracle.

165.    As innovation has increased the number and types of search access points, Google has expanded its MADAs to also cover new pathways to a general search engine and ensure that emerging search access points are not available to competitors.  For example, the Google Mobile Services licensing agreement for Android Go devices requires OEMs to preload Google's Gboard — an app Google has classified as a search access point — as the default keyboard app for Android Go devices.

166.    In 2009, Google required the preinstallation of only a dozen Google apps; by 2013 it required two dozen; now, Google requires OEMs to preinstall up to thirty Google apps.

167.    Google's MADAs are textbook unlawful ties:  to receive "must-have" products over which Google has market power — the Play Store, Chrome, Google Maps, Google Search, as well as other dominant apps like YouTube — OEMs and carriers must preload Gboard.

168.    OEMs, carriers, and end-users demand the "tying products" (the Play Store, Chrome, Google Maps, Google Search, and other dominant apps like YouTube) separately from the "tied product," Gboard.  As described below, Fotobom's dealings with América Móvil are direct evidence that Android manufacturers demand a keyboard app separately from other apps. In addition, an Android app store, browser, search app, navigation app, and keyboard app all offer unique functionalities and each is offered by providers that do not also offer the other kinds of apps.

169.    The Google Play Store is a distinct product that gives Google market power.  The Play Store enables users to download, install, and manage a wide range of diverse apps.  Unlike other Google apps, the Play Store is not downloadable and thus needs to be preloaded by OEMs for users to have access to it.  Other Android app stores are not available to be downloaded through Play Store, but can be preloaded by manufacturers alongside the Play Store (Samsung's

Galaxy Store being the most common example) or (in rare instances) sideloaded by users. Numerous developers offer a smart keyboard app on a stand-alone basis, independently of Android app stores.

170.    Google's 90 percent share of the Android app distribution market gives Google sufficient economic power with respect to the Play Store to demand acceptance of "tied" products to obtain the Play Store.  As further proof of its monopoly power, Google has imposed a supra-competitive commission of 30 percent on the price of apps purchased through the Play Store, which is a far higher commission than would exist under competitive conditions and is the subject of separate antitrust litigation.

171.    Chrome is also a distinct product that gives Google market power.  Mobile browsers are a type of application that enable users of mobile devices to access and search the internet and interact with content on the open web.  Numerous developers offer a smart keyboard app on a stand-alone basis, independently of browsers.  Google's significant share of the Android browser market gives Google sufficient economic power with respect to Chrome to demand acceptance of "tied" products to obtain Chrome.

172.    Google's search app is also a distinct product that gives Google market power. Google's search app enables users to search for information across the Internet.  Numerous developers offer a smart keyboard app on a stand-alone basis, independently of browsers. Google's monopoly power in the market for general search services gives Google sufficient economic power with respect to the search app to demand acceptance of "tied" products to obtain Google's search app.

173.    Google's navigation apps are also distinct products that give Google market power.  They enable consumers to use their mobile device for directions — a feature that

consumers expect from their mobile phone.  Numerous developers offer a smart keyboard app on a stand-alone basis, independently of navigation apps.  Google's monopoly power in the market for navigation apps gives Google sufficient economic power with respect to the navigation apps to demand acceptance of "tied" products to obtain Google's navigation apps.

174.    YouTube is also a critical app that gives Google market power because consumers expect YouTube to be preloaded on their device out-of-the-box.  Indeed, a recent study found that 95 percent of 13- to 17-year-olds currently use YouTube.[16]  Another study found that 81 percent of Americans use YouTube, compared to 69 percent who use Facebook, and that YouTube remains the most commonly used online platform.[17]

175.    It is in carriers' and OEMs' interests to pick-and-choose the app combinations they think consumers will find most appealing (for example, preinstalling the Bing app along with the Play Store).  Non-Google apps may also provide better monetization opportunities for carriers or manufacturers, like Fotobom's Keyboard+.  Google's ties, however, force manufacturers to preload Gboard because manufacturers cannot offer a commercially viable device without the Google Play Store, Chrome, Google's search app, Google Maps, and other dominant Google apps like YouTube.

176.    Google further coerces manufacturers to accede to its tie by including within Google Mobile Services the APIs necessary for apps downloaded from the Google Play Store to integrate with other Google services — *e.g.*, Google's proprietary cloud services — and function

---

[16] Heather Kelly, *Teens have fled Facebook but are loyal to YouTube, poll shows*, Wash. Post. (Aug. 10, 2022), https://www.washingtonpost.com/technology/2022/08/10/teens-social-pew/.

[17] Peter Suciu, *YouTube Remains The Most Dominant Social Media Platform*, Forbes (Apr. 7, 2021), https://www.forbes.com/sites/petersuciu/2021/04/07/youtube-remains-the-most-dominant-social-media-platform/?sh=1dc9820a6322.

properly on Android.  Developers of competing search access points cannot offer a similar product to lure OEMs away from Google's MADAs.

177.    Google is able to exercise its market power vis-à-vis device manufacturers in ways that do not increase the cost to users and developers and thus in ways that do not prompt users and developers to switch to rival operating systems.

178.    Google also has recognized that it could "make [the] phone experience better for user[s] by ensuring . . . preloaded apps are deletable."  This is because "[u]sers can free up space by deleting apps they don't want" — space that could be used to install non-Google apps.  But Google's tying agreements prohibit users from deleting many of Google's preloaded apps.

### 3.    Google Reinforces the Tie Through Restrictive Device Certification Requirements

179.    Google uses device certification requirements to reinforce the tie, and to secure search defaults not covered by its MADAs.

180.    Though Android is open-source — meaning individuals and entities could potentially use the code to make their own, modified operating system (referred to as a "fork") — Google uses various restrictions to prohibit OEMs and carriers from doing so and to maintain control over the mobile search distribution channel.  *First*, Google requires Android device manufacturers that want to preload Google Mobile Services to agree to "anti-forking" terms. These terms ensure that no entity using Google Mobile Services can create an Android fork to compete with the Android ecosystem controlled by Google and thereby serve as a viable path to market for a search competitor.  As described in the Arizona Attorney General's complaint against Google, Google also uses these restrictions to make it easier for Google to collect and monetize user location information.  *See State of Arizona v. Google LLC*, No. CV 2020-006219, ECF No. 1 (Ariz. Super. May 27, 2020).

181.     *Second*, to run an Android device with Google Mobile Services, the device must

first obtain "GMS certification."  Without GMS certification, a device cannot offer any of

Google's must-have proprietary apps or services that consumers expect out-of-the-box.

Internally, Google views its anti-fragmentation mandate, and its final approval of devices before

they launch, as a "poison pill" to control search access points on Android devices.  As Google

has summarized, it must be "obvious to the [manufacturers] that we are using compatibility as a

club to make them do things we want."

182.     There are two paths to obtain Google's stamp of approval for an Android device:

GMS certification and GMS express certification.  Google also has separate GMS certification

requirements for Android Go devices (low-end and budget smartphones), which are additions

and changes to the GMS requirements specifically for Android Go devices.  More than 80

percent of entry-level Android phones run on Android Go.  The U.S. is the second largest market

for entry-level devices, after India.

183.     **GMS Certification**.  Google uses GMS certification to make it unreasonably

difficult for manufactures to preload non-Google controlled search access points.  Obtaining

GMS certification involves a complicated, time consuming, and expensive process, especially for

device makers who are not top Android manufacturers.  To be certified by Google, the device

must pass through a series of tests or "suites," including:  the "Compatibility Test Suite" (which

purportedly verifies the compatibility of the device's hardware and software), the "Compatibility

Test Suite Verification" (manual Android compatibility testing), the "Vendor Test Suite" (which

purportedly verifies the compatibility of the OEM device and the Android system), and the

"Google Test Suite" (which tests the compatibility of Google proprietary apps with the device).

184.    While some of these tests are open-source tests available to app developers for free, others are available only for Google's authorized partners.  And, even once a device has passed all of Google's tests, it still must be submitted to a Google-authorized third-party laboratory to conduct additional, independent testing.  The third party's laboratory submits the results of the official testing to Google, and, once Google verifies the laboratory's testing process, Google will (in its discretion) finally award the device GMS certification.

185.    Google keeps its certification requirements — the details of which are protected by non-disclosure agreements — purposefully opaque, which makes it difficult for competing developers to work with OEMs to ensure their product can be successfully preloaded.  For example, if an OEM preloads a non-Google search access point, like Fotobom's keyboard, its device can fail the certification process at any point in the process without a clear explanation as to why or how to resolve the issue.  Google also does not publish a set price for device certification.  This increases uncertainty surrounding the cost of certification for OEMs that might wish to preload a competitor's app as the default, particularly for smaller OEMs.  In turn, this uncertainty further dissuades OEMs from working with Google's competitors.

186.    Numerous manufacturers have told Fotobom that the time and costs of certification significantly increase if the manufacturer attempts to preload a third-party keyboard app (like Fotobom's) as the default instead of Google's own Gboard unless Google has signed off in advance.  Manufacturers have also told Fotobom that Google has become more involved in and stringent with certification in the past few years, making it increasing difficult for an OEM to preload a keyboard other than Gboard (or, in some instances, its own keyboard).

187.    Moreover, if an OEM exclusively preloads Gboard (and a list of other Google applications), Google reimburses that OEM for its certification fees.  But if an OEM preloaded

Keyboard+, it would no longer have its certification fees reimbursed.  This further discourages OEMs from preloading Fotobom's keyboard:  if manufacturers preload Gboard, certification is free; if they preload Fotobom's keyboard, certification can be expensive.

188.    Google also offers the "Android One" program where an OEM offers phones with a "software experience designed by Google."  "Android One" devices come preloaded with a "carefully curated set of preinstalled apps" — predominately Google's apps — and that forbids preloading of other apps like Keyboard+.  By participating in the "Android One" program, OEMs can avoid difficulties of Google's certification programs because Google controls what is preloaded on the phone.

189.    **GMS Go Certification.**  Google's Android Go certification requirements are even more restrictive.  For Android Go devices, Google has developed a set of "GMS Go Core" apps, which include Assistant Go, Chrome, Gmail Go, Maps Go, the Play Store, and YouTube Go, as well as certain "GMS Go Core services," which include Gboard.  Google's GMS Go certification requirements require manufacturers to preload GMS Go Core apps and set Gboard as the default keyboard on every device.  Google's GMS Go requirements also place strict limitations on the number of non-Google apps that a manufacturer can preload on a Go device.

190.    A number of entry-level OEMs have told Fotobom that they wanted to preload Keyboard+ but could not due to Google's certification restrictions for Android GO devices.  If an OEM were to ignore Google's rules and preloaded Keyboard+ onto just one entry-level device, then that particular phone model would fail GMS certification and the OEM would lose access to the Google Play Store (including non-Google apps available on the Play Store like Snapchat) and Google's other dominant apps.

191. **GMS Express Certification.**  It can take months for an OEM to get GMS certification for an Android or Android Go device.  Moreover, having an MADA is generally a prerequisite for GMS certification, making it difficult for smaller manufacturers to obtain certification.  Thus, Google created a GMS "express" program that provides Android device manufacturers with pre-tested, pre-certified, fully compliant Android builds.

192. GMS express certification comes with conditions.  Though Google generally maintains its certification requirements under non-disclosure agreements and refuses to provide developers this information, publicly disclosed documents have revealed that GMS express certification requires exclusivity for numerous Google apps.  As Figure 4 demonstrates, if a manufacturer uses GMS express certification, they must exclusively preload Gboard as the device's keyboard app.  Thus, through GMS express certification, Google achieves additional exclusivity for its search access points.

**Figure 4:  GMS Express Certification Requirements as of January 2018**

| | App Requirement | GMS Express Plus | Go Requirement (by MADA/GMS Req.) | GMS Express Plus for GO |
|---|---|---|---|---|
| | Google Search | Exclusive (DHS in EU/Turkey/Korea) | Go Version | Exclusive (DHS in EU/Turkey/Korea) - Go Version |
| | Google Assistant | Exclusive (except 1P OEM) | Go Version | Exclusive (except 1P OEM) - Go version |
| | Gmail | Exclusive | Go Version | Exclusive - Go Version |
| | Google Calendar | Exclusive | not required | Exclusive - Main Version |
| | GBoard | Exclusive | Default, Go Version | Exclusive - Go Version |
| | Photos | Exclusive | not required | not required |
| | Android Messages | Exclusive; in hotseat | not required | Exclusive; Main Version, in hotseat |
| | Chrome | Default; in hotseat | Main Version, in hotseat | Default - Main Version, in hotseat |
| | Duo | DHS | not required | not required |
| | Google "Feed" | Integrated on -1 screen | not required | not required |
| | YouTube | mandatory GMS | Go Ver. / Main Ver. depending on geo | Go Ver. / Main Ver. depending on geo; DHS |
| | Google Maps | mandatory GMS | Go Version* | Go Version* |
| | Files Go | not required | Optional | Exclusive |

*On 512MB devices, Maps Go is optional

*GOOGLE  PRIVILEGED & CONFIDENTIAL*

193.    Adoption of GMS express certification has been rapid and widespread.  By the end of 2018, 54 percent of OEMs were using GMS express for their certification.  In 2018 alone, 1,611 devices had their certification fees reimbursed by Google in connection with the GMS express program.

194.    Google also has worked directly with large chip manufacturers like UNISOC, Qualcomm, and MediaTek to provide OEMs with special chips that had Gboard exclusively preloaded onto those chips.  If OEMs used these special chips, Google reimburses their certification costs as part of the GMS Express Plus program.

195.    Since 2016, Google has locked users out of Google apps on what it deems "uncertified" Android devices, by blocking sign-in of Google accounts during setup and displaying a "Device is not certified by Google" error message.  In doing so, Google ensures that device manufacturers cannot bypass its certification requirements and ship devices with the promise that users can simply sideload the popular apps and the Google Play Store.

### 4.    Google's Unlawful Ties Have Prevented Android Manufacturers from Preloading Keyboard+

196.    Fotobom faces an impossible barrier because of Google's MADAs, which cover almost all Android devices sold in the United States.  Google's MADAs tie Google's dominant and commercially necessary apps to the preinstallation of Google's search access points like Gboard — thus prohibiting Fotobom (a competitor and search access point) from being preloaded on Android devices.

197.    Google's GMS certification requirements reinforce this barrier.  Because a manufacturer must pass GMS certification before it can distribute devices with Google Mobile Services, manufacturers need Google's certification to produce a viable phone.  But Google places significant barriers for competing third-party apps to receive the necessary certification to

work with manufacturers without justification.  In fact, Google's device certification requirements have made it impossible for Keyboard+ to be preloaded as the default keyboard app on Android devices sold in the United States or abroad, even though Fotobom's Keyboard+ can be downloaded on an Android device from the Google Play Store.  This means that — in contrast to developers who attempt to circumnavigate Google's app store and "sideload" their apps on to devices — Google has reviewed and approved Keyboard+ for installation through Google Play.

198.    In 2018, for example, Keyboard+ was loaded on Unimax devices.  Unimax is an American OEM based in New York.  TracFone Wireless, Inc. — an American prepaid, no-contract mobile phone provider owned by Verizon — sells Unimax devices in the U.S.  Unimax's devices failed Google's certification tests because Fotobom's keyboard, rather than Gboard, was preloaded as the default.  Unimax explained:  "It seems that for the type of certification we are using for this particular unit, we are unable to have any other keyboard installed except for G Board."  Unimax also explained that to go through a different certification process would take additional time and increase the costs of certification.

199.    Fotobom had a similar experience with an American OEM called TeleEpoch, as well as many others, including Senwa and Vortex.

200.    Fotobom's experience is not unique.  As far back as 2011, Korean companies NHN (owner of popular Korean search engine Naver) and Daum alleged that Google was blocking the installation of their search service on Android phones by delaying the certification of devices that had other search services as their default.

### C.   Google Has Entered Into Exclusive Agreements To Foreclose Fotobom and Other Rivals from the Most Effective Distribution Channels

#### 1.   Google Requires Exclusivity for Its Search Engine and Search Access Points in Return for a Share of Its Search Advertising Revenue

201.   Google also enters into search RSAs with distributors, including mobile device manufacturers and carriers to foreclose rivals from effective distribution.  In exchange for a percentage of Google's search advertising monopoly revenues, Google requires exclusive distribution as the default general search engine and exclusive preloading for its own search access points (like Gboard).  Google has also used its RSAs to prevent apps (such as messaging apps) from containing search-related features, and more recently, has entered into exclusive agreements with each of the three major U.S. mobile carriers requiring them to preload Google Messages as the default messaging app.

202.   Google's RSAs typically contain a provision prohibiting the preinstallation of a competing general search access point.  In other words, Google pays distributors not to deal with competing search providers or preload rival search access points.  Google has admitted that its "philosophy is that we are paying revenue share *in return for* exclusivity."  Google has further admitted that its RSAs are "really important" to Google because otherwise competitors "can come and steal away our Android search distribution at any time," and has described its agreements as an "[i]nsurance policy that preserves our search and assistant usage."

203.   As stated in a draft 2014 Google strategy deck excerpted in DOJ's complaint and in Figures 5 and 6 below, Google's RSAs "provide exclusivity of Search" and "prevent[] the pre-installation of other Search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user."

**Figure 5: Revenue Share Payments to Android Manufacturers**



**Figure 6: Revenue Share Payments to Android Carriers**



204.    As innovation has increased the types of search access points on mobile devices,

Google has expanded its RSAs to close off novel distribution avenues to search rivals.  For

example, Google has used its RSAs to preclude the preinstallation of keyboards other than its

own Gboard as a "strategic defense" against rival keyboards that might provide a "[b]ridge" to

rival general search engines.  As discussed above, Google has also made substantial payments to carriers to entice them to kill their own default messaging apps — another kind of search access point — and preload as the default Google Messages.

205.     Some of Google's RSAs require blanket coverage for all Android devices sold by Google's counterparty.  Under this version of the RSAs, the distributor receives a payment from Google only if all the distributor's Android devices comply with the exclusivity requirements. Other versions require exclusivity on a model-by-model basis.

206.     Google also structures its agreements to penalize any distributor that might walk away.  The typical term of the carrier and manufacturer RSA is two to three years.  But, if a carrier or manufacturer does not renew its RSA with Google, the distributor loses out on revenue share not only for new mobile devices but also for the phones and tablets previously sold and in the hands of consumers.

207.     All leading U.S. carriers, including AT&T, T-Mobile, Verizon, have entered into RSAs with Google.  Similarly, Google has entered into RSAs will all major (and many smaller) Android manufactures.  In fact, Google's RSAs (together with its preinstallation agreements) with Android device manufacturers alone account for more than 30 percent of mobile device usage in the United States.  This is significant, given that in the United States, Apple iOS devices account for roughly 60 percent of mobile-device usage.  For the year 2021, Google paid Samsung over one billion dollars in connection with its RSA.  The agreement governs Samsung's keyboard designs, as well as which applications Samsung may load on their devices.

208.     On information and belief, Google's RSAs also cover all or almost all Android devices sold in the U.S.  For some Android manufacturers, including LG and Motorola, Google has replaced RSAs with mobile incentive agreements.  These agreements still require

manufacturers to preinstall Google Search as the out-of-the-box default search service for search access points and to preinstall a suite of Google apps.  And Google retains "sole discretion" to determine what constitutes a "search access point."

209.    Since 2019, Google also has offered OEMs the chance to participate in its "Premier Device Program," which contains even more restrictions on OEMs.  In exchange for certain exclusivity commitments, Google offers OEMs various forms of financial incentives, including four percent of Google's Search revenues earned on the covered devices (on top of the eight percent of Search revenues Google already commits to OEMs who sign a non-Premier RSA and a MADA), as well as other financial incentives such as monthly bonuses.

210.    Google's RSAs and mobile incentive agreements tie up search access points on both mobiles and desktops.  For example, Google has also entered into RSAs with rival browsers and other device manufacturers, further blocking off search access points from competition.  Google has admitted to sharing revenue derived from certain search queries performed on Apple devices, as well as entering into agreements with Firefox, Opera, and UCWeb, to share revenue derived from certain search queries performed on those browsers.  For mobile browsers in particular, Google is the default search provider for both Apple Safari (approximately 55-percent share) and Google Chrome (over 35-percent share), which together account for over 90 percent of the browser usage on mobile devices in the United States.

211.    Google's RSAs also play a significant role in inducing OEMs to sign a MADA, because OEMs cannot have the benefits of an RSA without being a party to a MADA.

### 2.    Google's Exclusivity Arrangements Have Blocked Its Rivals, Including Fotobom

212.    Recognizing that smart keyboards might be "the next big search access point," Google's restrictive RSAs — along with its MADAs and certification requirements — have

prohibited rivals like Fotobom from gaining a foothold in this area.  Google's anticompetitive conduct now also extends to messaging, which will prevent rivals like Fotobom from working with carriers to include search-related features in carriers' default messaging apps, like Verizon Messages.

213.    Fotobom's Keyboard+ and messaging app software poses a threat to Google's search monopoly and its search advertising revenue because it could divert search traffic to other search engines or make use of search engines unnecessary by providing content directly to consumers.

214.    Industry players and third-party content providers view Fotobom's keyboard and messaging app software as an innovative products that both engage customers with a product they enjoy and offers the potential for a diverse (and until now, untapped) revenue stream. However, Google has threatened to penalize carriers and OEMs that have attempted to work with Fotobom, reinforcing its monopoly power.

215.    América Móvil provides one example of how Google has prevented carriers and device manufactures from preloading Fotobom's smart keyboard as the default on Android mobile devices.  América Móvil is the leading provider of integrated telecommunications services in Latin America (in Mexico alone it serves almost 78,000,000 wireless subscribers). América Móvil also served more than 21 million U.S. customers prior to selling TracFone to Verizon in November 2021.  And América Móvil owns a carrier called A1 that operates in seven European counties and serves approximately 22.7 million subscribers in that region.

216.    Beginning in August 2018, América Móvil and Fotobom discussed América Móvil preloading Fotobom's keyboard on its Android devices — first in América Móvil's biggest markets, in Mexico and Brazil, and then elsewhere.  It was the expectation of the parties

that América Móvil would expand the distribution of Keyboard+ to consumers located in the United States, including through its subsidiary, TracFone. The América Móvil executives Fotobom met with thought Keyboard+ would be an immensely successful product and intended to do a "big push" to get Fotobom's keyboard preloaded as the default onto as many phones as possible.

217.    In September 2019, the parties developed a memorandum of understanding under which Fotobom would work with América Móvil's ad sales team to develop partnerships with local and regional content providers and advertisers. América Móvil also wanted to use Fotobom's keyboard to promote its other products and services, like data top-up services and its "Claro Video" streaming app. América Móvil's stated goal was to get Fotobom's keyboard installed on as many devices as possible, primarily through preloading it as the default but also through providing consumer incentives. The parties discussed that América Móvil would receive 50 percent of the net revenue generated from third parties through Fotobom's keyboard — with Fotobom projecting that gross revenue generation from third-party content providers could exceed $180 million in the first year, even with conservative assumptions of user engagement.

218.    In connection with the parties' memorandum of understanding, Fotobom worked extensively with América Móvil's marketing, value-added services, and ad-sales groups. Fotobom tested a number of use cases for Keyboard+ with América Móvil's teams, adding features that allowed Keyboard+ to display banner ads and link a wide range of keywords to América Móvil services such as Claro Video (movie keywords), Marca Claro (sports keywords), and Claro Música (music keywords).

219.    By late 2018, América Móvil had discussed preloading Keyboard+ as the default keyboard with some of its largest OEMs, including Motorola, LG, Huawei, and TCT (currently the fifth largest handset manufacturer in North America).  América Móvil also introduced Fotobom to its smaller OEM partners, Senwa, Lanix, Nyx, Doppio, and M4.  Two of América Móvil's OEMs, Nyx and M4, told Fotobom that preloading its keyboard should not be a problem as long as América Móvil had instructed the OEM to do so, while all others informed Fotobom that they would not be able to preload Keyboard+ because of certain Android device certification requirements imposed by Google.

220.    During this period, Fotobom modified its keyboard in an attempt to appease Google.  In one example, Google told América Móvil that "Fotobom's keyboard browser should be set up as Google.com with [América Móvil's] client ID."  Google then provided a search referral link for Fotobom to put into Keyboard+'s search function.  That is, each time Keyboard+ referred a search to Google, a specific referral would be sent with that search so that Google could track the search and share the appropriate revenue with América Móvil.  While Fotobom could use a non-Google general search engine in its app, Google told América Móvil that Fotobom was required to route all keyboard searches through Google.

221.    In another example, Fotobom showed an América Móvil marketing executive a demo of Keyboard+'s ability to deliver ads inside of Google's Search app, YouTube, Google Play, and other apps.  The executive told Fotobom that it needed to remove the feature from its keyboard and make sure that Google never saw it.  He said Google would definitely not allow América Móvil to work with Fotobom with that feature in the keyboard, and that if Google even saw the feature it would potentially cause problems for both América Móvil and Fotobom. These Google-required modifications made Fotobom's keyboard less useful to users.

222.    By September 2019, some OEMs had successfully preloaded Keyboard+ as the default keyboard on their devices and were ready to launch.

223.    As Fotobom and América Móvil were finalizing their agreement, however, Google made clear to América Móvil that it would not allow the partnership to come to fruition. América Móvil (sometimes abbreviated "AMX") explained to Fotobom on March 26, 2020, that "AMX and Google have an agreement in which we must to instruct [sic] to all OEMs to preload Google's keyboard (among other things)," and "[i]f in an audit Google finds any device without the customization, Amx will be penalized."  América Móvil further explained that "[t]his is the reason for which we can't not [sic] preload Fotobom keyboard."

224.    Because the OEMs that had preloaded Fotobom's keyboard work exclusively with América Móvil as the carrier service, Google's agreement with América Móvil prevented Fotobom from working with these OEMs as well.

225.    On information and belief, Google's search agreements are negotiated by Google's U.S. employees and applied worldwide as part of its global strategy to maintain its search monopoly and to monopolize search-access-point markets, like the market for Android keyboard apps.

226.    Fotobom's experience with América Móvil is not an isolated event.  Other carriers and manufacturers have likewise told Fotobom that they would preinstall its keyboard if not for an agreement with Google prohibiting them from doing so.  For example, an executive at a Canadian carrier told Fotobom that, while they were interested in working with Fotobom, they would be hesitant to preload an app that competes with Google, which might "poke the bear" and put the carrier's revenue-share payments in jeopardy.

227.    As such, to be a commercially viable option, Fotobom would need to cover the revenue that the carrier or manufacturer would have earned from Google.  And not just for new devices.  If a carrier or manufacturer does not renew its RSA with Google, the distributor loses out on revenue share for the devices previously sold, meaning Fotobom would also need to cover the revenue that the carrier or manufacturer would have earned on all the devices that are currently in the hands of consumers.  That is simply unfeasible for any company, especially a small, innovative company like Fotobom.

228.    Other channels of distribution left open for Fotobom are far inferior to having its keyboard set as the default.  While a consumer can in theory download Fotobom's app from the Google Play Store, as Google has admitted, "most users just use what comes on the device" and do not attempt to download or use other search access points for general search services.  As explained above, consumers are unlikely to look for, download, and use alternative apps, at least when the app that is preinstalled as the default already delivers the required functionality to a satisfactory level.  Relegating Keyboard+ to the Google Play Store is therefore, in essence, a total ban.

229.    In 2020, Fotobom began offering the same search access point functionality that exists in Keyboard+ directly into Verizon Messages — a popular application used by tens of millions of Verizon customers.  This software served the same function as Keyboard+:  it provided content to users depending on the content of their text messages, similar to how Keyboard+ provided content to users depending on what they had entered into Keyboard+.

230.    Google's exclusionary agreements have foreclosed this Fotobom product as well. In 2020-21, Google entered into agreements with the three major U.S. mobile carriers (Verizon, AT&T, and T-Mobile) to make Google Messages the default messaging app, which will

eventually end the use of Fotobom's software in Verizon Messages as that messaging app stops being used because it is no longer the preloaded default messaging app.

231.    These agreements also affected Fotobom's ongoing efforts as of 2021 to release additional search functionality in Verizon Messages.  Google's payments to Verizon to preload Google Messages and not Verizon Messages will inevitably deplete the user base for Verizon Messages and thus diminish Verizon's willingness to invest in that app.

232.    In addition to those two specific examples, Google's continued use of the exclusionary agreements has denied Fotobom access to the scale that would allow it to increase its marketability and the quality of its offerings.  By depriving Fotobom of scale, Google also hinders Fotobom's ability to secure distribution going forward, insulating Google from future competition.

## IV.    FOTOBOM HAS SUFFERED ANTITRUST INJURY

233.    Google's anticompetitive conduct has not just harmed Fotobom, it has harmed competition itself.  By increasing barriers to entry and excluding competition at emerging search access points from nascent competitors on mobile devices, Google has stunted innovation in new products that could serve as alternative search access points.  Google's increased ability to monetize search through online advertising also harms consumers.

234.    In addition, by denying competition in search, Google is ultimately increasing the cost of products and services for which consumers pay.  For example, for search advertisements displayed through its keyboard app or messaging app software, Fotobom would likely be willing to charge providers less than what Google charges for a similar advertisement — a cost benefit that providers could then pass on to their customers or use to generate more revenue and invest in their businesses.

235.    Google has inflicted competitive harm on Fotobom as part of Google's unlawful efforts to maintain its search monopoly precisely because Fotobom — a search access point — poses a threat to that search monopoly.  By precluding Fotobom's search access point from being preloaded as the default on mobile devices, Google prevents competing general search engines from getting a foothold in the market and further insulates its search monopoly.  That, in turn, harms consumers because Google has denied its rivals the necessary scale to compete effectively in the general search services market.

236.    In particular, Google's anticompetitive agreements and tying arrangements insulate Google from significant competitive pressure to improve its general search products and search advertising services, harming consumers.  Absent Google's exclusionary agreements and other conduct, increased competition in these markets would lead to higher quality search, increased consumer choice, and a more beneficial user experience.

237.    As a direct result of Google's conduct, Fotobom has suffered harm in the District of Columbia.  Fotobom has been foreclosed from distributing its smart keyboard app and related services and software to D.C. users.  For example, Google's conduct interfered with Fotobom's agreement-in-principal with América Móvil.  It was the expectation of the parties that, after initially preloading Keyboard+ as the default keyboard for consumers in Mexico, that América Móvil would expand the distribution of Keyboard+ to consumers elsewhere.  This would have included consumers of TracFone — then a subsidiary of América Móvil that offers prepaid, no-contract mobile phones to approximately 21 million U.S. subscribers, many of whom are located in the District of Columbia.  Google's anticompetitive conduct has also interfered with Fotobom's ability to preload Keyboard+ and its software with other OEMs, including Unimax, TeleEpoch, and Vortex, each of which have customers in the District of Columbia.  Google's

conduct has also interfered with Fotobom's ability to distribute its messaging app software to customers in the District of Columbia.

238.    In addition, Google's anticompetitive conduct has harmed Fotobom's ability to derive additional revenue from D.C. users by preventing Fotobom from developing scale. Greater scale would allow Fotobom to partner with more third-party advertisers, and thus provide more engaging (and paid) content to the thousands of D.C. residents who currently use Fotobom's software on their devices.  Greater scale would also allow Fotobom access to more consumer data, which, in turn, Fotobom could use to improve its software for D.C. users.

239.    Google's anticompetitive conduct has had a direct, negative impact on Fotobom's financial position.  While the precise amount of Fotobom's damages will be proven at trial, its damages exceed many millions of dollars.

## CLAIMS ALLEGED

### COUNT ONE
### Maintaining Monopoly of General Search Services in
### Violation of Section 2 of the Sherman Act

240.    Fotobom incorporates by reference the preceding allegations.

241.    Google has willfully maintained and abused its monopoly power in the general search services market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

242.    Google has willfully maintained and abused its monopoly power through tying arrangements; through exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; and other restrictions that drive queries to Google at the expense of competitors.

243.    Google's exclusionary conduct has foreclosed a substantial share of the general search services market and has had harmful effects on competition and consumers.

244.     The anticompetitive effects of Google's exclusionary conduct outweigh any procompetitive benefits, or can be achieved through less restrictive means.

245.     As a direct and proximate result of Google's unlawful conduct, Fotobom has suffered injury to its business.  Fotobom is entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT TWO
### Excusive Dealing in Violation of Section 1 of the Sherman Act

246.     Fotobom incorporates by reference the preceding allegations.

247.     Google has entered into contracts with mobile carriers and manufacturers that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

248.     Google was able to impose these exclusive dealing provisions on distributors, including mobile device carriers and manufacturers, as a result of its market power in the markets for general search services.

249.     Because these agreements unreasonably foreclose competition in a substantial portion of the general search services market, and harm the distribution of competing search access points, these agreements are likely to, and in fact have, led to reduced output in the market and a reduction of quality in general search services and Android keyboard apps.

250.     Through its exclusive dealing provisions, Google has caused actual injury to competition in the general search services market.

251.     Google's exclusive dealing agreements have, individually and collectively, substantially foreclosed Fotobom's access to vital distribution channels for its competing smart keyboard app and related services.

252.     The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in the market, or can be achieved through less restrictive means.

253.     As a direct and proximate result of Google's unlawful conduct, Fotobom has suffered injury to its business.  Fotobom is entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT THREE
### Illegal Tying in Violation of Section 1 of the Sherman Act

254.     Fotobom incorporates by reference the preceding allegations.

255.     Google has imposed tying arrangements on Android distributors that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

256.     Google has tied the distribution of the Google Play Store, Chrome, Google's search app, and Google Maps, and other dominant Google apps like YouTube to the preinstallation of Google search access points like Gboard.  Google coerces Android distributors into preloading as defaults its search access points like Gboard over those of competitors because distributors need the Play Store, Chrome, Google's search app, Google Maps, and other dominant Google apps to offer a commercially viable device.

257.     The Google Play Store, Chrome, Google's search app, and Google Maps are separate and distinct products from Gboard.

258.     Google has sufficient market power in the tying product markets — Android app distribution, Android mobile browsers, general search services, and Android navigation apps — to appreciably restrain free competition in the market for the tied product — Android keyboard apps.  Further, Google has demonstrated its ability to leverage its market power in the tying

69

markets to substantially exclude competition in the tied market.  Google's ties have affected a substantial amount of interstate commerce, as well as commerce worldwide.

259.   Google's tying arrangements are a *per se* violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade and commerce.

260.   As a direct and proximate result of Google's unlawful tying arrangement, Fotobom has suffered injury to its business or property.  Fotobom is entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT FOUR
### Attempted Monopolization of the Android Keyboard App Market in Violation of Section 2 of the Sherman Act

261.   Fotobom incorporates by reference the preceding allegations.

262.   Google unlawfully has attempted to monopolize the market for Android keyboard apps in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

263.   The anticompetitive conduct set forth herein, including Google's unlawful tying and exclusive dealing arrangements, evinces a specific intent to monopolize and a dangerous probability of monopolizing the market for Android keyboard apps.

264.   As a direct and proximate result of Google's unlawful conduct, Fotobom has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

## COUNT FIVE
### Violation of California Unfair Competition Law

265.   Fotobom incorporates by reference the preceding allegations.

266.   The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*., defines "unfair competition" to include any "unlawful, unfair, or fraudulent business act or practice."

267.     Google has engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, the Sherman Act, 15 U.S.C. §§ 1 and 2, and California common law, including the tort of interference with prospective economic advantage.

268.     Google's acts and practices as alleged herein have also been "unfair" under the UCL.  Google's conduct has threatened an incipient violation of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition to a California business.  Furthermore, any utility from Google's conduct does not outweigh the harm it causes to competitors, distributors, and consumers.

269.     A substantial portion of the unlawful and unfair acts and practices alleged herein occurred from Google's headquarters in California and harm to Fotobom was inflicted in California, for all the reasons set forth in the preceding allegations.

270.     As a direct and proximate result of Google's unlawful and unfair conduct, Fotobom has suffered injury to its business or property.  Fotobom is entitled to injunctive relief and restitution in an amount to be proven at trial.

### COUNT SIX
**Intentional Interference with Prospective Economic Advantage**

271.     Fotobom incorporates by reference the preceding allegations.

272.     Google interfered with the prospective economic advantage that Fotobom would have received from its partnership with América Móvil to preload Fotobom's keyboard app on millions of mobile devices.

273.     Fotobom's economic relationship with América Móvil was likely to benefit the company.  The partnership would have given Fotobom access to millions of mobile users, as

well as América Móvil's content and advertising partners, which would have generated substantial revenue for Fotobom.

274.    Google was aware of Fotobom's negotiations with América Móvil because América Móvil had to interface with Google to set up a search referral link in Fotobom's keyboard's search function.  América Móvil's Head of Value Added Services also informed Fotobom that Google was preventing finalization of Fotobom's agreement with América Móvil.

275.    Google's intention was to thwart the preinstallation of Fotobom's competing smart keyboard on América Móvil devices.  At the very least, Google knew that its revenue share agreement — which required the exclusive preinstallation of Google's keyboard — was certain or substantially certain to prevent América Móvil from preloading Fotobom's keyboard on its devices.  Further, Google accomplished this unlawful objective:  América Móvil determined that its contract with Google prohibited it from preloading Fotobom's keyboard onto its devices.

276.    Google was not privileged to interfere with Fotobom's prospective economic advantage.  Google's interference was and is illegal under federal antitrust laws and California state law.

277.    As a direct and proximate result of Google's interference, Fotobom has suffered injury to its business.  At trial, Fotobom will prove the precise amount of damages suffered.

### JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38(b), Fotobom demands a trial by jury on all issues so triable.

### PRAYERS FOR RELIEF

To remedy these illegal acts, Fotobom requests that the Court:

 (a)    Adjudge and decree that Google acted unlawfully to maintain a general search services monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)    Adjudge and decree that the conduct alleged herein is an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)    Permanently enjoin the unlawful conduct alleged herein;

(d)    Enter structural relief as needed to cure any anticompetitive harm;

(e)    Award Fotobom damages, as provided under the federal antitrust laws, and that a judgment in favor of Fotobom be entered against Google in an amount to be trebled in accordance with such laws;

(f)    Award Fotobom its reasonable costs and expenses incurred in this action, including expert fees and attorney's fees; and

(g)    Award Fotobom any such further relief that the Court may deem just and proper.


Date:  August 12, 2022

/s/ *John Thorne*

John Thorne (Bar No. 421351)
Daniel V. Dorris (Bar No. 1012305)
Bethan R. Jones (Bar No. 156261)

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jthorne@kellogghansen.com

*Counsel for Plaintiff Fotobom Media*