## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FOTOBOM MEDIA, INC.,

               Plaintiff,

       v.

GOOGLE LLC,

               Defendant.

Case No. 1:22-cv-00712-APM

HON. AMIT P. MEHTA

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF DEFENDANT GOOGLE LLC'S MOTION TO DISMISS

WILLIAMS & CONNOLLY LLP

John E. Schmidtlein
(D.C. Bar No. 441261)
Benjamin M. Greenblum
(D.C. Bar No. 979786)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jschmidtlein@wc.com
bgreenblum@wc.com

*Attorneys for Defendant Google LLC*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND ..........................................................................................2

LEGAL STANDARD......................................................................................................6

I.      COUNTS ONE AND TWO FAIL FOR TWO INDEPENDENT REASONS...................7

      A.      Plaintiff has no antitrust standing to bring Counts One and Two...........................7

      B.      Even if Plaintiff competed in the alleged general search services market, it
          fails to plead substantial foreclosure of competition in that market. ....................10

II.     COUNT THREE FAILS BECAUSE PLAINTIFF HAS NOT PLED TYING
      THAT IS UNLAWFUL UNDER EITHER A *PER SE* OR RULE OF REASON
      ANALYSIS........................................................................................................14

      A.      Plaintiff Fails to Plausibly Allege Coercion. ......................................................14

      B.      Plaintiff Fails to Plead Illegal Tying Under the Rule of Reason. .........................20

III.    THE COURT SHOULD DISMISS COUNT FOUR BECAUSE PLAINTIFF
      FAILS TO ALLEGE ANTICOMPETIVE CONDUCT OR A DANGEROUS
      PROBABILITY OF MONOPOLIZATION. ....................................................22

IV.     THE COURT SHOULD DISMISS COUNTS FIVE AND SIX BECAUSE
      PLAINTIFF RELIES ENTIRELY ON ALLEGED CONDUCT OUTSIDE THE
      JURISDICTIONAL REACH OF THE RELEVANT STATUTES AND
      ARTICULATES NO INDEPENDENT LEGAL VIOLATION......................................26

      A.      The California Unfair Competition Law does not apply extraterritorially. ...........26

      B.      California common law does not apply extraterritorially. ....................................28

      C.      The Court should dismiss Counts Five and Six for the same reasons it
          should dismiss Counts One, Two, Three, and Four...............................................30

CONCLUSION.............................................................................................................32

i

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Adams v. Pan Am. World Airways, Inc.*, 640 F. Supp. 683 (D.D.C. 1986) ......................8, 10, 11

*Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205 (4th Cir. 2012) ......................................................29

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992) ....................................................15

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ................................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................................6, 27

*Ass'n for Intercollegiate Athletics for Women v. Nat'l Collegiate Athletic Assoc.*, 735 F.2d 577 (D.C. Cir. 1984).................................................................................................23

*Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488 (S.D.N.Y. 2005) ...................8, 10

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997) ........................................................................................................................................9, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................................6

*Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814 (M.D.N.C. 2000) ..................................12

*Beverly v. Network Sols., Inc.*, No. 98-cv-0337, 1998 WL 917526 (N.D. Cal. Dec. 30, 1998) .............................................................................................................................31, 32

*BLK Enters., LLC v. Unix Packaging, Inc.*, No. 18-cv-02151, 2018 WL 5993844 (C.D. Cal. June 14, 2018) ......................................................................................................28, 29

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ...................................20, 21, 22

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..............................................................11

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177, 2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ......................................................................28

*Collins Inkjet Corp. v. Eastman Kodak Co.*, 957 F.2d 1318 (6th Cir. 1992)..................16, 17, 20

*Contact v. Bank of Am. Corp.*, No. 17-cv-03139, 2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018) ..........................................................................................................................26

*Cyntegra, Inc. v. IDEXX Labs, Inc.*, 322 F. App'x 569 (9th Cir. 2009).........................................8

*Dial a Car v. Transp., Inc.*, 82 F.3d 484 (D.C. Cir. 1996) ........................................................23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................15

*Eastman v. Quest Diagnostics*, No. 15-cv-00415, 2016 WL 1640465 (N.D. Cal.
    Apr. 26, 2016) (*Eastman II*)............................................................................................16, 20

*Eastman v. Quest Diags. Inc.*, No. 15-cv-00415, 2015 WL 7566805 (N.D. Cal.
    Nov. 25, 2015) ....................................................................................................................12

*Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394 (1981) ......................................................30

*Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768 (D.C. Cir. 1982) ......................................29

*In re Bystolic Antitrust Litig.*, No. 20-cv-5735, 2022 WL 323945 (S.D.N.Y. Feb.
    2, 2022) ...............................................................................................................................30

*In re Cox Enters., Inc.*, 871 F.3d 1093 (10th Cir. 2017)................................................................21

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) .....................12

*\*In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008).........................................9

*In re Ind. Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070 (D. Kan. 2000) .............................15

*Int'l Distr. Ctrs. Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987)..................................23

*It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475 (D. Md. 2015) .....................................12

*It's My Party, Inc. v. Live Nat., Inc.*, 811 F.3d 676 (4th Cir. 2016) .............................................15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .............................................15, 21

*\*Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ............................7

*Kentmaster Mfg. Co. v. Jarvis Prod. Corp.*, 146 F.3d 691 (9th Cir. 1998) .................................32

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, No. 15-cv-01086, 2015 WL
    7008185 (C.D. Cal. Sept. 18, 2015)...................................................................................32

*\*LiveUniverse, Inc. v. Myspace, Inc.*, 304 F. App'x 554 (9th Cir. 2008).....................................30

*\*Marts v. Xerox, Inc.*, 77 F.3d 1109 (8th Cir. 1996) .......................................................15, 16, 19

*\*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-04457, 2013 WL 791457
    (N.D. Cal. Mar. 4, 2013)...............................................................................................26, 28

*Nobel Sci. Inds., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313 (D. Md.
    1986) ...................................................................................................................................15

*Ortho Diagnostics Sys. v. Abbott Lab.*, 920 F. Supp. 455 (S.D.N.Y. 1996).................................15

*Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ....................................15

*R. J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002) ........................................................................................................................................12

*Ramallos Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118 (D.P.R. 2005) ......................15

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. 93-cv-20613, 1995 WL 853037 (N.D. Cal. Sept. 7, 1995) ..............................................................................15

*Shamrock Mktg., Inc. v. Bridgestone Bandag, LLC*, 775 F. Supp. 2d 972 (W.D. Ky. 2011) ..............................................................................................................................16

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ......................................................23

*Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169 (D.C. Cir. 2006) .....................................................7

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004) .....................................................................................................................11

*Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035 (C.D. Cal. 2019) ..................................27

*U.S. v. Microsoft Corp.*, No. 98-cv-01232, 1998 WL 614485 (D.D.C. 1998) .............................24

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................ passim

*Wholesale All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069 (E.D. Mo. 2019) .....................................................................................................................15, 20

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996) .............................................................................................................29

## STATE CASES

*Aghaji v. Bank of Am., N.A.*, 202 Cal. Rptr. 3d 619 (Ct. App. 2016) ..........................................26

*Chavez v. Whirpool Corp.*, 113 Cal. Rptr. 2d 175 (Ct. App. 2001) .............................................31

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376 (1995) ................................31

*Jordache Enters., Inc. v. Brobeck, Phleger & Harrison*, 18 Cal. 4th 739 (1998) ......................28

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ......................................31

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) .........................................................28

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 35 Cal. Rptr. 3d 469 (Ct. App. 2005) ........................32

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011) .....................................................................27

**STATUTES & OTHER AUTHORITIES**

15 U.S.C. § 1 .................................................................................................1, 11, 13

15 U.S.C. § 2 .............................................................................................1, 10, 11, 22

28 U.S.C. § 1367 ..................................................................................................29

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................ passim

Fed. R. Civ. P. 12(b)(6) .....................................................................................7, 12

Jeffrey Meyer, *Extraterritorial Common Law: Does the Common Law Apply
Abroad?* 102 Geo. L.J. 301 (2014) .........................................................................30

**INTRODUCTION**

Plaintiff filed this case on March 15, 2022, asserting four Sherman Act claims and two claims under California law: (1) monopoly maintenance of a "general search services" market in violation of Section 2; (2) exclusive dealing in a "general search services" market in violation of Section 1; (3) unlawful tying in violation of Section 1; (4) attempted monopolization of an "Android keyboard app" market in violation of Section 2; (5) violation of California's Unfair Competition Law, and (6) intentional interference with prospective economic advantage under California law. ECF No. 1. Rather than defend against a Rule 12(b)(6) motion filed by Google, ECF No. 15, Plaintiff filed an Amended Complaint. ECF No. 19.

The Amended Complaint asserts the same six claims and attempts to cure their deficiencies with additional allegations. It does no such thing. Many of the deficiencies in Plaintiff's original complaint remain. And Plaintiff's new allegations introduce new reasons its claims fail.

Counts One and Two allege monopoly maintenance of, and exclusive dealing in, an alleged "general search services" market. Am. Compl. ¶¶ 241, 248-50. But Plaintiff has not alleged that it is a competitor or a consumer in that market. So it has no antitrust standing to bring those claims. *See* Section I.A. Counts One and Two also fail because Plaintiff has not alleged that Google's conduct substantially foreclosed rival search engines from accessing consumers in an alleged "general search services" market. *See* Section I.B. Count Three fails because Plaintiff does not allege coercion, an essential element of a *per se* tying claim. *See* Section II.A. And if the Court analyzes Count Three under the rule of reason, it still fails. *See* Section II.B. Count Four fails because Plaintiff fails to allege anticompetitive conduct or a dangerous probability that Google will monopolize an alleged "Android keyboard app" market. *See* Section III. Counts Five and Six fail because they only allege conduct in Mexico and Brazil,

and the California laws at issue do not apply extraterritorially.  *See* Sections IV.A & IV.B. Those Counts also fail because they do not allege conduct separate from the conduct Plaintiff alleges in support of its inadequately pleaded federal antitrust claims.  *See* Section IV.C.  Given these many deficiencies, despite Plaintiff's attempt to cure them through amendment, the Court should dismiss Plaintiff's Amended Complaint with prejudice.

## FACTUAL BACKGROUND

Plaintiff developed and launched in 2015 a keyboard for mobile devices on the Android Operating System, known as "Keyboard+."  Am. Compl. ¶ 2.  Keyboard+ allegedly "offers users its own search results . . . based on keywords in the user's typing," and is also, itself, a "search access point," in that a user can run a search on a "general search engine without needing to leave an app or open a browser."  *Id.* ¶ 3.  Although Plaintiff suggests that its keyboard app can *connect* users to general search engines, Plaintiff does not allege that Keyboard+ is itself a search engine, or that it has ever entered into any commercial arrangement with a search engine.  Its product today sends typed words to Google (without any commercial obligation to do so) so that users may access Google search results if they so choose.  Plaintiff makes no allegation that it ever connected users with rival general search engines, such as Bing or Yahoo!, or that Google has taken (or could take) any action to prevent it from doing so.

Plaintiff's claims relate to its failure to obtain preload distribution of its smart keyboard app on Android mobile devices.  According to Plaintiff, smart keyboards are one of numerous potential "search access points" for consumers using Android mobile devices.  *Id.* ¶ 131. Plaintiff alleges that Google has stymied distribution of Keyboard+ in the course of allegedly maintaining a monopoly for "[g]eneral search services" and attempting to monopolize an alleged market for "[k]eyboard apps for Android devices."  *Id.* ¶¶ 63, 78.  In particular, Plaintiff alleges that Google's contracts with Android manufacturers and mobile phone carriers preclude

2

Keyboard+ from being preloaded as the default keyboard on Android mobile devices.  Am. Compl. ¶¶ 14, 196, 204.  Notably, Plaintiff does not allege any contractual restrictions preventing it from gaining distribution on Apple mobile devices (*i.e.*, iPhones and iPads), Apple desktop computers (Macs) or Microsoft Windows PCs—the mobile and desktop computing platforms where, per the Complaint in *United States v. Google LLC* that Plaintiff repeatedly references, over 70% of all general search engine searches occur.  Amended Complaint ¶ 44, *United States v. Google LLC*, No. 20-cv-03010 (D.D.C. Jan. 15, 2021), ECF No. 94 ("DOJ Compl.").

Plaintiff's Amended Complaint suggests that Android device manufacturers (original equipment manufacturers, or "OEMs") and mobile phone carriers "have no choice" but to preload Google's competing Gboard keyboard—in order to gain access to other popular Google apps and application programming interfaces ("APIs") that are distributed as part of the Google Mobile Services "bundle." Am. Compl. ¶ 13.  But cutting through Plaintiff's factually unsupported rhetoric, even after an amendment as of right, the Amended Complaint pleads little about specific Android contracts that actually prevented a particular OEM or carrier from entering into a distribution agreement with Plaintiff, much less how Plaintiff's distribution shortcomings have caused Google to monopolize or harm competition in an alleged market for "general search services"—a market in which Plaintiff's keyboard app does not even compete.

The first type of agreement that Plaintiff challenges is Google's Mobile Application Distribution Agreement ("MADA").  Plaintiff claims that partners preload Google's Gboard because it is unlawfully tied to the Google Mobile Services (GMS) suite of Google applications. *Id.* ¶ 167.  The GMS suite includes apps such as the Google Play Store, Chrome, Google Maps, Google Search, and YouTube—apps Plaintiff pleads are extremely popular among and demanded by users.  *Id.* ¶¶ 153, 175.  Plaintiff alleges that the first four such apps compete,

respectively, in separate antitrust relevant markets for "general search services," "Android app distribution," "Android mobile browsers," and "Android navigation apps," *id.* ¶¶ 54, 85, 103, 114, and are tremendously successful in these alleged markets, *id.* ¶¶ 63, 96, 111, 122.

Plaintiff tries to imply that the MADA requires *all* Android OEMs to preinstall Google's Gboard on *all* Android devices in order to gain access to the GMS suite of Google applications. *Id.* ¶¶ 159-60, 167.   In support of this claim, Plaintiff references a 2011 Google MADA with Samsung that allegedly bundles various Google applications as part of a single license agreement.  *Id.* ¶ 161.   But a careful review of Plaintiff's Amended Complaint reveals no specific factual allegations of any Google MADA with Samsung that requires preinstallation of Google's Gboard app—Gboard is *not* among the "Google Applications" described in Paragraph 161 of the Amended Complaint as being incorporated into that agreement and in fact is not part of that agreement.[1]

At most, Plaintiff alleges that "the Google Mobile Services licensing agreement for *Android Go devices* requires OEMs to preload Google's Gboard . . . as the default keyboard app for *Android Go devices*."  *Id.* ¶ 165 (emphasis added).   "Android Go is a stripped-down version of Android designed to run on low-end and budget smartphones with 2 GB of RAM or less."  *Id.* ¶ 37.   In other words, Plaintiff does *not* allege that Google agreements have any impact on distribution of its app on the most popular and technologically advanced Android devices sold in the United States—it pleads such agreements *only* as to a small subset of "low-end and budget smartphones."  *Id.*   And Plaintiff fails to allege what volume of mobile search occurs on Android

---

[1] *See* Am. Compl. ¶ 161 ("The 'Google Applications' covered by the agreement include:  'Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client (not products downloaded from Android Market) [now the Google Play Store], Google Voice Search, and Network Location Provider.'").

Go devices, as opposed to on fully powered Android devices, such as Samsung's Galaxy smartphones—on which Plaintiff concedes Gboard is not preinstalled.

Separate and apart from the lack of pleaded facts suggesting that Gboard is required to be preloaded on standard Android devices, Plaintiff does not plead facts suggesting that the MADA otherwise prevents the preinstallation of other keyboard apps, such as Plaintiff's Keyboard+. *Id.* ¶¶ 159–78. Indeed, elsewhere, Plaintiff acknowledges that Samsung, by far the largest manufacturer of Android mobile devices, actually preinstalls its own Samsung Keyboard as the default keyboard on all Samsung mobile devices. *Id.* ¶ 84.

The second type of agreement that Plaintiff challenges is Google's revenue share agreements ("RSAs") with Android OEMs and carriers that allegedly "prevent" them from preinstalling Keyboard+ as the default keyboard on devices covered by those agreements. *Id.* ¶ 14. But notwithstanding a litany of conclusory allegations about the terms of RSAs, Plaintiff's Complaint alleges no facts concerning any Android devices sold in the United States on which Plaintiff alleges it actually would have achieved preinstallation of Keyboard+ *in the absence of an RSA*. Nor does Plaintiff allege that any OEM or carrier was coerced into signing an RSA; such agreements are voluntary agreements and are not required to obtain a license to the Android operating system or any Google applications.

Plaintiff identifies by name only a single mobile carrier—America Movil—where a Google RSA allegedly prevented preloading Keyboard+ on an Android mobile device. *Id.* ¶ 215. America Movil operates as a mobile carrier predominantly in Latin America and only outside the United States. In a halfhearted effort to allege harm to competition in the United States, Plaintiff claims that America Movil previously served customers through a U.S. subsidiary called TracFone. But it sold TracFone to Verizon in November 2021, *id.*, and Plaintiff's allegations

about obtaining pre-installation on America Movil phones only reference discussions with American Movil executives in Latin America.  Am. Compl. ¶¶ 215–23.  Plaintiff does not allege to have had a single conversation with a TracFone executive about preinstallation of Keyboard+ on a TracFone Android device available for sale in the United States, either before or after the sale of TracFone to Verizon.  And Plaintiff never alleges that any Google agreement stopped TracFone from entering into a contract that it was otherwise prepared to execute with Plaintiff. Instead, and tellingly, Plaintiff only alleges in the most speculative of terms that "[i]t was the expectation of the parties that America Movil would expand the distribution of Keyboard+ to consumers located in the United States" *after* it launched the app on devices in Mexico and Brazil.  Am. Compl. ¶ 216.

In sum, Plaintiff has not alleged that its Keyboard+ app would have been preinstalled on any Android mobile devices in the United States in the absence of Google's supposed agreements with OEMs and carriers.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint and draw all inferences in the plaintiff's favor, conclusory

allegations "are not entitled to the assumption of truth." *Id.* at 679. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

## I.   COUNTS ONE AND TWO FAIL FOR TWO INDEPENDENT REASONS.

### A.   Plaintiff has no antitrust standing to bring Counts One and Two.

Counts One and Two allege monopoly maintenance of, and exclusive dealing in, an alleged "general search services" market. Am. Compl. ¶¶ 241, 248-50. Those claims fail because Plaintiff does not have antitrust standing to bring them: it does not compete in the alleged market nor is it a consumer in that market.

Separate and independent from Article III's constitutional standing requirements, federal antitrust law asks "whether the plaintiff is a proper party to bring a private antitrust action." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017) (citation omitted). A plaintiff does not satisfy that requirement "merely by showing that it was injured in a proximate and reasonably measurable way by conduct of the defendant violating the antitrust laws . . . [n]or is it enough that the injury be causally connected to the acts that violate the antitrust laws." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001). Rather, to have standing to bring a private antitrust action under federal law, a plaintiff must show that it was either a consumer or competitor in the market in which it alleges the defendant engaged in anticompetitive conduct. *Adams v. Pan Am. World Airways, Inc.*, 640 F. Supp. 683, 684 (D.D.C. 1986), *aff'd*, 828 F.2d 24 (D.C. Cir. 1987) ("[B]arring unusual circumstances, only consumers or competitors in the market in which trade has been restrained have standing . . . ."); *see also Cyntegra, Inc. v. IDEXX Labs, Inc.*, 322 F. App'x 569, 572 (9th Cir. 2009) ("Only an

actual competitor or one ready to be a competitor can suffer antitrust injury.").

Google raised this threshold legal deficiency in its first motion to dismiss.  *See* ECF No. 15 at 13-16.  Plaintiff's amended allegations do not cure the deficiency because there is simply no way for it to plead that it competes in a market for general search services; to the contrary, it claims that there are only four meaningful general search providers: Google, Bing, Yahoo!, and DuckDuckGo.  Am. Compl. ¶ 63.  Plaintiff itself is absent from this list because it does not perform the services it lists as required of general search services, specifically, providing consumers results for at least three types of search queries: "navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase)."  *Id.* ¶ 55.  Plaintiff has not alleged that its products can provide results for any one of these search query categories, let alone all three.

Plaintiff's allegations about the services it does provide further show that it does not compete in the "general search services" market, as Plaintiff itself has defined that market. Plaintiff describes its Keyboard+ app as a "search access point" that merely "provid[es] a window into search" and acts as a "bridge to . . . search engines."  *Id.* ¶¶ 127, 132, 139.  But it is "well-established that mere suppliers of products to the targets of antitrust violators do not have standing to assert antitrust claims."  *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 496 (S.D.N.Y. 2005) (collecting cases).

In an attempt to gin up antitrust standing, Plaintiff added allegations to its Amended Complaint that Keyboard+ and its associated software "generate[] suggested content in ***much the same way*** as a search engine generates search results."  Am. Compl. ¶ 30 (emphasis added).  It also doubled down on allegations that these products "generate[] revenue ***much like*** a search provider."  *Id.* ¶ 5 (emphasis added).  But there can be no mistake:  a mobile keyboard app is *not*

*a search engine in any shape or form because it does not independently generate search results.* *Id.* ¶ 3 (describing a mobile keyboard app as "*using* a general search engine" to "run a search") (emphasis added).

Nothing makes this clearer than Plaintiff's allegations that its product "routes" users as a "search access point."[2]  Am. Compl. ¶¶ 132, 139.  If Fotobom were a competitor in the alleged market for "general search services," it would not need to do that.  This is no different than *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997).  There, the Third Circuit held that only parties who provide a product that is "reasonably interchangeable" with what others offer in the relevant market are competitors with antitrust standing.  *Id.* at 182. So  a  vaccine-marketing  company  that  had  to  rely  on  third-party  vaccine  distributors  to participate in the vaccine distribution market lacked antitrust standing to bring claims itself for alleged harm in that market.  *Id.* at 182-83.  So too here:  Plaintiff only participates in the alleged "general search services" market by referring users to general search engines.  That is not enough.  *See In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129, 1141 (N.D. Cal. 2008) (rejecting claim that purchasers of computers had antitrust standing to sue manufacturers accused of price fixing DRAM (a computer component) because while the markets for the two products may have been interlinked, they were not the same).  To plead cognizable harm in the alleged market for general search services, Plaintiff must be able to plead that its product is reasonably interchangeable with general search engines.  *See Barton & Pittinos*, 118 F.3d at 182.  Unable to so plead, and in fact pleading the opposite (see *supra*, Factual Background), Plaintiff is not a competitor in the alleged "general search services" market and lacks standing to bring Counts One and Two.

---

[2] Plaintiff apparently routes its users to Google Search.

Last, Plaintiff added several allegations to its Amended Complaint concerning a purported partnership with Verizon "to incorporate [Keyboard+'s] search functionality into the Verizon Messages app."  Am. Compl. ¶¶ 4, 48, 229.  According to Plaintiff, Google entered agreements with mobile carriers that require "Google Messages [to] be the default messenger app on each carrier's Android devices, which will result in the end of popular independent messaging apps like Verizon Messages."  *Id.* ¶¶ 11, 51, 212, 230-31.  These allegations do not support Fotobom's exclusive dealing claim, or the Section 2 claims that incorporate that conduct.

As a preliminary matter, these allegations fail to satisfy the threshold requirement that an exclusive dealing claim "both define the relevant market and prove the degree of foreclosure." *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001).  Nowhere does Plaintiff allege any market involving messaging apps, nor does it allege foreclosure of any such relevant market resulting from Google's conduct.  Second, Plaintiff has no antitrust standing to bring claims regarding messaging apps because it has not alleged that it is a competitor or consumer in the market for such products.  *See Adams*, 640 F. Supp. at 684.  At most, Plaintiff is a supplier of software to messaging app developers.  Am. Compl. ¶ 48.  But as discussed, that is not enough to confer standing.  *Aventis Env't Sci.*, 383 F. Supp. 2d at 496.

## B.     Even if Plaintiff competed in the alleged general search services market, it fails to plead substantial foreclosure of competition in that market.

Plaintiff makes the conclusory allegation that "Google's exclusionary conduct has foreclosed a substantial share of the general search services market."  Am. Compl. ¶ 243.  But Plaintiff does not plead facts regarding the extent of any foreclosure allegedly caused by Google's conduct, let alone the degree of "substantial foreclosure" that Plaintiff recognizes it must demonstrate.  *Id.* ¶ 249 (alleging that Google's distribution agreements "unreasonably foreclose competition in a *substantial portion* of the general search services

market") (emphasis added); *see id.* ¶ 243; *see generally Microsoft*, 253 F.3d at 69 ("[I]n all [exclusive dealing] cases the plaintiff must both define the relevant market and prove the degree of foreclosure . . . . [T]he requirement of a significant degree of foreclosure serves a useful screening function.").  Without facts to connect Plaintiff's alleged lack of distribution via preinstallation with consumers' access to rival general search engines, there is no adequate pleading of foreclosure of a substantial share of the general search services market.

The only market Plaintiff alleges it actually competes in is the market for Android keyboard applications.  Am. Compl. ¶¶ 2, 37, 69.  Thus, the only potential foreclosure it has standing to complain about involves words typed on smart keyboard applications on Android devices that are sent to general search engines.  *See Adams*, 640 F. Supp. at 684.  Yet nowhere does Plaintiff quantify the extent of general search engine results that are provided to consumers *through smart keyboards on Android mobile devices*.  Indeed, Plaintiff's own allegations demonstrate that the affected share of general search results would be *de minimis* at best—even if (contrary to fact, *see supra*, note 2) Plaintiff were sending words typed using its keyboard to a rival search engine.

*De minimis* foreclosure of a market does not meet the standard for a well-pleaded exclusive dealing claim under Sections 1 or 2 of the Sherman Act.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 329 (1962) ("foreclosure of a de minimis share of the market will not tend substantially to lessen competition") (internal quotation marks omitted)); *see, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent. . . .  [L]ow numbers make dismissal easy[.]"); *Eastman v. Quest Diags. Inc.*, No. 15-cv-00415, 2015 WL 7566805, at *12 (N.D. Cal. Nov. 25, 2015) ("30 to 50 percent . . . is

generally required to plead an exclusive dealing claim."); *It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 502 (D. Md. 2015) (foreclosure percentage of "between 23% and 30% . . . does not meet the Fourth Circuit's threshold for 'substantial'); *R. J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 390 (M.D.N.C. 2002) (foreclosure percentage of 34% does not indicate "foreclose[ure] from a substantial share of the relevant market"); *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (foreclosure percentages of 21.5% and 18.5% in two markets "fall far short of any value presumed to be substantial").

According to the Complaint against Google in *United States v. Google LLC*, which Plaintiff cites and quotes in its Amended Complaint, mobile search represents roughly 60% of total searches in the alleged general search services market; the rest come from desktop computers which do not rely on mobile keyboard applications and which are not implicated by any of the Android contracts referenced in Plaintiff's Amended Complaint.[3]  DOJ Compl. ¶ 44. Plaintiff further alleges that roughly 30% of mobile devices are covered by Google's Android related agreements, while Apple iOS devices account for roughly 60% of mobile devices in the United States.  *See* Am. Compl. ¶ 207.  Plaintiff's Keyboard+ app is available only on Android,

---

[3] "[I]n deciding a Rule 12(b)(6) motion, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54 (D.D.C. 2016).  Where, as here, a plaintiff cites documents that form the basis of a claim, those documents are incorporated by reference into the complaint. *Id*. at 71.  Here, Plaintiff cites liberally from the *United States v. Google LLC* complaint to describe the interplay among search access points.  Am. Compl. ¶¶ 1, 10.  In any event, Plaintiff elsewhere quotes and incorporates by reference a study finding that mobile search comprises 64% of the general search services market.  *Id.* ¶ 130.

*id.* ¶¶ 37, 48; there is no such app available for Apple devices.  Accordingly, at most, roughly 18% of all general search engine queries come from Android mobile devices (i.e., 30% of 60%).[4]

Moreover, as Plaintiff alleges, users access general search services through multiple search access points on Android devices, including web browsers, static search bars, and search applications—all aside from the smart keyboard apps that are the subject of Plaintiff's Complaint.  *Id.* ¶ 131.  While Plaintiff fails to specify the percentage of search queries run through smart keyboards on Android devices, that number can be only a small fraction of the total number of searches run on Android devices across all access points.  In other words, the share of general search queries run through Android keyboard apps can only be a small fraction of 18%.

Under these circumstances, Plaintiff has not adequately pleaded "substantial foreclosure." Courts have held that foreclosure of much higher shares of the relevant market did not meet the "substantial" foreclosure threshold.  Plaintiff's failure to plead substantial foreclosure warrants dismissal of its federal antitrust claims that rely on exclusive dealing allegations pertaining to an alleged general search services market (Counts One and Two), as well as its state law claims (Counts Five and Six) that rely on the same.[5]

---

[4] Even still, Plaintiff's allegations relate to only a subset of Google's Android agreements.  Am. Compl. ¶¶ 37, 79, 165, 182.  So the true percentage of the market potentially impacted by the conduct Plaintiff alleges is only a small fraction of this 18% figure.

[5] Count Two is a standalone Sherman Act Section 1 exclusive dealing claim.  Am. Compl. ¶ 247. The only relevant market alleged to have been "substantially foreclosed" in this count is the "general search services" market.  *See id.* ¶¶ 248-50.  To the extent Fotobom claims that the alleged Android keyboard apps market is also implicated in Count Two, the claim fails for the same reasons.  Count One alleges that Google maintained its monopoly in the alleged general search services market, in part, by "exclusionary distribution agreements."  *Id.* ¶ 242.  This part of Count One fails for the same reasons Count Two fails.

II.   **COUNT THREE FAILS BECAUSE PLAINTIFF HAS NOT PLED TYING THAT IS UNLAWFUL UNDER EITHER A *PER SE* OR RULE OF REASON ANALYSIS.**

Count Three alleges that "Google has imposed tying arrangements on Android distributors" consisting of "t[ying] the distribution of the Google Play Store, Chrome, Google's search app, Google Maps, and other dominant Google apps like YouTube to the preinstallation of . . . Gboard."  Am. Compl. ¶¶ 255, 256.  According to Plaintiff, Google "enforces unlawful tying arrangements" in two ways:  (1) through "the Google Mobile Services licensing agreement for Android Go devices requiring OEMs to preload Google's Gboard . . . as the default keyboard app for Android Go devices," *id.* ¶ 165; and (2) through "device certification requirements" that allegedly make it more "expensive" and "increasingly difficult" to preload Keyboard+ compared to "Gboard (or, in some instances, [the OEM's] own keyboard," *id.* ¶¶ 187, 188.  Based on these allegations, Plaintiff claims that "Google's tying arrangements are a *per se* violation of federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade and commerce."  *Id.* ¶ 259.   Plaintiff fails to adequately allege a tying claim that can succeed under either a *per se* or rule of reason analysis.  The Court should dismiss Count Three, and Counts One and Four, to the extent they rely on the same alleged tying claim.

A.   **Plaintiff Fails to Plausibly Allege Coercion.**

The D.C. Circuit recognized in *United States v. Microsoft* that "[t]here are four elements to a per se tying violation:  (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce."  253 F.3d 34, 85 (D.C. Cir. 2001) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-18 (1984)).  Here, Plaintiff fails to plausibly allege the third element,

coercion, *i.e.* that Google affords its Android partners "no choice but to purchase the tied product from it." *Microsoft*, 253 F.3d at 85. Plaintiff's conclusory coercion allegations fall far short of the requisite legal standard, and are, in any event, contradicted by Plaintiff's own admission that Android OEMs **do** license GMS apps from Google without preloading Gboard. *See, e.g.*, Am. Compl. ¶ 84.

To plausibly allege an illegal tying claim, Plaintiff needs to plead "coercion of the consumer." *It's My Party, Inc. v. Live Nat., Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). "What causes [] anticompetitive harms and distinguishes tying from ordinary market behavior is not the mere bundling of two products together but rather the *coercion* of the consumer." *Id.* In other words, it must plead that "the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

Actual coercion exists "if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option," making separate purchases "prohibitively expensive." *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir. 1996).[6] Accordingly, courts routinely dismiss complaints that fail to plausibly allege facts demonstrating why the alleged bundling renders alternatives economically infeasible. *See, e.g.*, *Wholesale All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1080 (E.D. Mo. 2019) (dismissing tying claim where, despite plaintiffs' allegation that new burdens imposed by defendant "make[s] that

---

[6] *Accord Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992); *Ramallos Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 134-35 (D.P.R. 2005); *In re Ind. Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070, 1081 n.6 (D. Kan. 2000); *Ortho Diagnostics Sys. v. Abbott Lab.*, 920 F. Supp. 455, 471-72 (S.D.N.Y. 1996); *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. 93-cv-20613, 1995 WL 853037, at *42 (N.D. Cal. Sept. 7, 1995); *Nobel Sci. Inds., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986).

path [of not purchasing tied product] unviable going forward," plaintiff failed to "allege facts demonstrating how these alleged burdens render [that option] unviable," such as the monetary value of such new burdens and "how many pharmacies have actually chosen [the tied product] in light of the new burdens"); *Eastman v. Quest Diagnostics*, No. 15-cv-00415, 2016 WL 1640465 at *12 (N.D. Cal. Apr. 26, 2016) (*Eastman II*) (dismissing tying claim where, despite plaintiffs' allegation that "medical providers' 'only viable economic option' [wa]s to purchase capitated testing at the discounted rates offered to those medical providers who also refer their fee-for-service testing to Quest," plaintiffs did not allege facts to make this conclusion plausible, such as the difference in pricing or the approximate number of providers who actually entered into discounted capitation agreements based on their referral or fee-for-service business), *aff'd*, 724 F. App'x 556 (9th Cir. 2018) ("Although plaintiffs alleged medical providers' 'only viable economic option' was to accept the alleged Quest tying, plaintiffs did not allege facts to make this conclusion plausible.").[7]

Count Three falls far short of plausibly alleging coercion. ***First,*** Plaintiff's primary alleged tying mechanism—the MADA—does not coerce. As Plaintiff acknowledges, licensing Gboard (the purported tied product) as part of a bundle containing Google's GMS apps is ***not*** the "only viable economic option," *Marts*, 77 F.3d at 1113, and ***not*** in fact pursued by "all rational buyers," *Collins*, 957 F.2d at 1323. Plaintiff admits that many Android devices that are preloaded with the purportedly tying products—GMS apps—are preloaded with "non-Google

---

[7] Other courts characterize coercion as "when a deal induces 'all rational buyers' of the tying product to accept the tied product." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 957 F.2d 1318, 1323 (6th Cir. 1992). This legal standard "sets a very high bar for any plaintiff. Courts should only in the rarest circumstances and under the most coercive of conditions infer a tying arrangement." *Shamrock Mktg., Inc. v. Bridgestone Bandag, LLC*, 775 F. Supp. 2d 972, 981 (W.D. Ky. 2011).

keyboards," including "in some instances, the [OEM's] own keyboard," in place of Gboard. Am. Compl. ¶¶ 84, 186.   Indeed, Samsung preloads its own "Android keyboard app," *id.*, conduct Plaintiff admits is permitted by Google's MADA. *Id.* ¶¶ 84, 161.   For example, the definition of "Google Applications" in the 2011 MADA between Samsung and Google, which Plaintiff extensively quotes in the Amended Complaint, does not include Gboard.  Am. Compl. ¶ 161; *supra*, Factual Background.   In other words, Samsung is allowed to—and did—preload GMS apps on its devices without preloading Gboard at the same time.[8]  *See supra*, Factual Background.

Plaintiff's claim of a tie through the MADA is thus, as it admits, limited to instances where an OEM entered into a MADA concerning the small subset of Android devices named "Android Go" devices.  "Android Go is a stripped-down version of Android designed to run on low-end and budget smartphones with 2 GB of RAM or less."  Am. Compl. ¶ 37.  According to Plaintiff, "the Google Mobile Services licensing agreement for ***Android Go*** devices requires OEMs to preload Google's Gboard . . . as the default keyboard app for ***Android Go*** devices."  *Id.* ¶ 165 (emphases added).

Plaintiff's concession that this alleged tying mechanism only bundles Gboard with GMS apps for a small subset of Android Go devices is a fatal flaw in Count Three.  Plaintiff does not plead any relevant antitrust market that is limited to "low-end" and "budget" smartphones.  None of the relevant markets pleaded in the Amended Complaint—markets for general search services, Android keyboard apps, Android app distribution, Android mobile browsers, and Android

---

[8] Plaintiff alleges that "Gboard comes preloaded as the default on all Android devices manufactured by many OEMs, including OnePlus, Xiaomi, and nearly every small OEM, and every Android Go phone.  Gboard is also the default keyboard for many LG devices."  *Id.* ¶ 79. Tellingly, that list of OEMs omits at least Samsung, Motorola and Huawei—some of the largest Android OEMs in Plaintiff's purported worldwide market.  *Id.* ¶¶ 69, 73.

navigation apps—draw any distinction between standard Android devices and Android Go devices.  *Id.* ¶¶ 60, 69, 85, 103, 114.  Indeed, by pleading relevant markets that apparently include both standard Android and Android Go devices, Plaintiff tacitly pleads that these subcategories of devices are reasonably interchangeable with one another.  Thus, across the alleged relevant markets that encompass both standard Android and Android Go devices, Google is demonstrably not "afford[ing] [customers] no choice but to purchase the tied product from it." *Microsoft*, 253 F.3d at 85.  Rather, OEMs have the choice to license GMS apps from Google without licensing Gboard for standard Android devices.  Google affords OEMs the choice; therefore, there can be no coercion.  And, as noted above, Plaintiff has failed to identify a single OEM or carrier in the United States who was coerced into preloading Gboard when it would have instead preferred to preload Plaintiff's product.  And Plaintiff fails to allege that any MADA (which an OEM may enter into for free) prevented an OEM from preloading Plaintiff's keyboard app in addition to Gboard.

  ***Second***, Plaintiff's other alleged tying mechanism—the GMS certification process—does not coerce any OEM or carrier to preload anything.  According to Plaintiff, this certification process "verifies the compatibility of the device's hardware and software, . . . verifies the compatibility of the OEM device and the Android system," and "tests the compatibility of Google proprietary apps with the device."  Am. Compl. ¶ 183.  These allegations have nothing to do with preloading any Google apps at all, much less coercing any preloading of Gboard.  Plaintiff does not plead—nor could it—that an OEM that chooses to preload a non-Gboard keyboard ***cannot*** obtain GMS certification through the standard "GMS Certification" path.  Its assertion that "Google's device certification requirements have made it impossible for Keyboard+ to be preloaded as the default keyboard app on Android devices" is therefore nothing

but hyperbole.  *Id.* ¶ 197.  As discussed above, Plaintiff concedes that Android devices (including those manufactured by the largest Android OEMs) can be preloaded with non-Google keyboards (*id.* ¶ 84); thus, any "impossib[ility]" for Plaintiff to compete with those non-Google keyboards for preloading cannot, on the face of the Amended Complaint, stem from Google's device certification requirements.

To the extent Plaintiff's complaint is that it is more costly and difficult to obtain GMS certification when an OEM preloads a non-Google keyboard, that does not state an antitrust claim either.  Plaintiff baldly asserts that (1) the standard "GMS Certification" path is "complicated," "time consuming," "expensive," "opaque" and "uncertain[]," *id.* ¶¶ 183-85; (2) the path for OEMs who preload a non-Google and non-OEM keyboard under the standard "GMS Certification" path is even more time-consuming and expensive and "increasingly difficult" because Google reimburses the GMS certification fee for OEMs that exclusively preload Gboard, *id.* ¶¶ 186-87; and (3) the more streamlined and cheaper "GMS Express Certification" process is reserved for Android devices with "pre-tested, pre-certified, fully compliant Android builds" that require exclusivity for a number of proprietary Google apps, including Gboard, *id.* ¶¶ 191-94.

That the "GMS Express Certification" process is less costly and time-consuming should come as no surprise—it is naturally easier for Google to certify a "pre-tested, pre-certified, fully compliant Android build." *Id.* ¶ 191.  In any event, such allegations cannot substitute for pleading of actual coercion.  As noted, where, as here, a plaintiff does not allege that the defendant only distributes the tied product in a bundle with the tying product, it must plausibly allege that "the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option," renders separate purchases "prohibitively expensive," *Marts*,

77 F.3d at 1113, and "induces 'all rational buyers' of the tying product to accept the tied product," *Collins*, 957 F.2d at 1323.  Plaintiff makes no such allegations here.

The Amended Complaint contains no allegations detailing (i) the incremental burden—either monetary or in terms of other resources—for an OEM pursuing the standard "GMS Certification" path to preload a non-Google keyboard; (ii) the incremental burden—either monetary or in terms of other resources—for an OEM pursuing the standard "GMS Certification" path versus the "GMS Express Certification" path; (iii) the impact of such incremental burdens on the economic viability of preloading a non-Google keyboard; or (iv) the number and proportion of OEMs that license Gboard instead of a competing keyboard app due to the burdens imposed by the GMS certification requirements.  *See, e.g.*, *Wholesale All.*, 366 F. Supp. 3d at 1080 (dismissing tying claim where plaintiff failed to plausibly allege such facts); *Eastman II*, 2016 WL 1640465, at *12 (same), *aff'd*, 724 F. App'x 556 (9th Cir. 2018) ("Although plaintiffs alleged medical providers' 'only viable economic option' was to accept the alleged Quest tying, plaintiffs did not allege facts to make this conclusion plausible.").  Plaintiff is unable to make such allegations because the burden it alleges in fact has *not* driven a number of large Android OEMs—much less "all rational buyers," *Collins*, 957 F.2d at 1323—to abandon their non-Google keyboard and pursue the "GMS Express Certification" process.  Therefore, Plaintiff has not plausibly pleaded that Google uses the GMS certification process to coerce OEMs into accepting the alleged tie.

## B.    Plaintiff Fails to Plead Illegal Tying Under the Rule of Reason.

Count Three fares no better under the rule of reason.  For such a claim, Plaintiff would need to plead that the complained-of conduct "unreasonably restrained competition" in violation of the Sherman Act, *Microsoft*, 253 F.3d at 95; in other words, that it "actually injures competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  "Meeting

that burden 'involves an inquiry into the actual effect' of [defendant's] conduct on competition in the tied good market." *Microsoft*, 253 F.3d at 95 (quoting *Jefferson Parish*, 466 U.S. at 29). Alleging actual injury to competition is particularly important in the tying context because "tying arrangements may promote rather than injure competition," and "may be a response to a competitive market rather than an attempt to circumvent it." *Brantley*, 675 F.3d at 1199-200; *see Jefferson Parish*, 466 U.S. at 12 ("[A] seller's decision to offer . . . packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act."). To be sure, where a tying claim "fail[s] under the more plaintiff-friendly per se analysis, it would also likely fail under the more demanding rule-of-reason analysis." *In re Cox Enters., Inc.*, 871 F.3d 1093, 1112 n.13 (10th Cir. 2017).

To plead injury to competition "sufficiently to withstand a motion to dismiss, [Plaintiffs] may not merely recite the bare legal conclusion that competition has been restrained unreasonably," but "must, at a minimum, sketch the outline of the injury to competition with allegations of supporting factual detail." *Brantley*, 675 F.3d at 1198 (internal quotation marks and alterations omitted). "In addition, plaintiff[s] must plead an injury to competition beyond the impact on the plaintiffs themselves." *Id.* "[P]laintiffs must also allege facts showing that an injury to competition flows from these tying arrangements." *Id.* at 1201.

The only specific example Plaintiff provides of the impact of the alleged tie is a contemplated deal between itself and Unimax, "an American OEM based in New York," to preload Keyboard+. Am. Compl. ¶ 198. According to Plaintiff, Unimax decided against preloading Keyboard+ because such devices failed "the type of certification [Unimax was] using for this particular unit" due to a failure to preload Gboard as the default. *Id.* "Unimax also explained that to go through a different certification process would take additional time and

increase the costs of certification." *Id.* This is not a plausible allegation of actual injury to competition. To the contrary, Plaintiff's allegations are equally consistent with a scenario in which Unimax erred by putting the devices on which it chose to use Keyboard+ through the wrong certification process, and then subsequently made the business decision to use Gboard rather than "go[ing] through a different certification process" again and incurring the additional costs. *Id.* As explained above, according to the Amended Complaint, all OEMs including Unimax had the choice between (i) preloading a non-Google keyboard and pursuing the standard "GMS Certification" path; or (ii) using pre-tested and pre-certified Android builds and pursuing the "GMS Express Certification" path. *See supra* Section II.A. That some (e.g. Samsung) chose the former and some (the only one identified in the complaint being Unimax) chose the latter merely reflects differing business decisions, rather than foreclosure in an Android keyboard market.[9] In any event, any purported impact on Plaintiff itself, without more, is insufficient to meet Plaintiff's burden to plausibly allege actual injury to competition. *See Brantley*, 675 F.3d at 1198. The Court should dismiss Plaintiff's tying claim under the rule of reason.

## III. THE COURT SHOULD DISMISS COUNT FOUR BECAUSE PLAINTIFF FAILS TO ALLEGE ANTICOMPETIVE CONDUCT OR A DANGEROUS PROBABILITY OF MONOPOLIZATION.

Count Four alleges that "Google unlawfully has attempted to monopolize the market for Android keyboard apps in violation of Section 2 of the Sherman Act." Am. Compl. ¶ 262. To plead attempted monopolization, a plaintiff must allege "(1) that the defendant has engaged in

---

[9] Plaintiff also vaguely asserts that it "had a similar experience" (referring to Unimax) "with an American OEM called TeleEpoch, as well as many others, including Senwa and Vortex," providing no other details. Am. Compl. ¶ 199. That does not plausibly allege market foreclosure for the same reasons the Unimax allegations are insufficient. Plaintiff also alleges that "Korean companies NHN (owner of popular Korean search engine Naver) and Daum alleged that Google was blocking the installation of their search service on Android phones by delaying the certification of devices that had other search services as their default." *Id.* ¶ 200. But this allegation does not even concern Android keyboard apps, much less in the United States, and could not plausibly support an allegation of foreclosure of the alleged relevant market.

predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Microsoft*, 253 F.3d at 80.  As a threshold matter, because the only alleged anticompetitive conduct pleaded in support of Count Four consists of exclusive dealing and tying, Count Four should be dismissed for the same reasons that Counts Two and Three fail.  In addition, Plaintiff also fails to discharge its burden to allege the third element of an attempted monopolization claim—that there is "a dangerous probability that such conduct, if unchecked, would produce the desired monopoly." *Ass'n for Intercollegiate Athletics for Women v. Nat'l Collegiate Athletic Assoc.*, 735 F.2d 577, 585 (D.C. Cir. 1984).

In assessing whether there is a dangerous probability of monopolization, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Such analysis typically involves a number of market characteristics including "market share analysis," "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Int'l Distr. Ctrs. Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987); *see Microsoft*, 253 F.3d at 82 (holding that "a firm cannot threaten to achieve monopoly power in a market unless that market is, or will be" "protected by significant barriers to entry").  For example, in *Dial a Car v. Transportation, Inc.*, the D.C. Circuit affirmed the dismissal of plaintiff's attempted monopolization claim because its "own complaint acknowledges that there are multiple Blue Car service providers in competition with appellees, and there is no reasonable basis for believing that all other competitors for on-call, point-to-point transportation will be driven out of business."  82 F.3d 484, 487 (D.C. Cir. 1996).  In other words, because "no facts have been alleged to indicate that any company (including [Plaintiff]) is even close to being driven from the

[alleged relevant] market[,] this hardly indicates a dangerous probability of successful monopolization." *Id.* at 487 n.2.

Here, Plaintiff fails to plead facts to support the notion that Google's allegedly anticompetitive conduct creates a dangerous probability of actual monopoly. As an initial matter, the Amended Complaint acknowledges the abundance of competitors in the purported market—calling out by name, in addition to Plaintiff's Keyboard+, Microsoft's Swiftkey keyboard with "a share of less than 26 percent," Samsung Keyboard, GO Keyboard, Tenor's GIF Keyboard, PayKey, GIPHY, Kika keyboard, Ginger Keyboard, Grammarly Keyboard, Chrooma, and ai.type. Am. Compl. ¶¶ 38, 42, 76, 78. Plaintiff also cites articles recommending the "12 Best Keyboards for Android for Privacy and Security in 2022" and "10+ Best Keyboard Apps of 2021 for Easier Typing." *Id.* ¶¶ 79 n.6, 80 n.7. Indeed, "there are at least 11 Android keyboard apps, including Swiftkey, Gboard, and Paykey, that are available on four or more continents," *id.* ¶ 75, and Swiftkey and Samsung's keyboard support hundreds of languages. *Id.* ¶ 76. These market conditions, as described in the Amended Complaint, are incongruous with Google having a dangerous probability of monopolizing an alleged Android keyboard app market.

Instead, Plaintiff's effort to satisfy the "dangerous probability" element is based entirely upon purported allegations of Google's market share in the relevant market. Specifically, Plaintiff asserts that "Google has a significant share of the Android keyboard app product market – at least a 50-percent share, and likely a higher percentage." Am. Compl. ¶ 78. The assertion is essential to Plaintiff's claim because a market share less than 50 percent is "rarely . . . sufficient to establish a dangerous probability of monopolization" and has been deemed by some courts to be "insufficient as a matter of law." *U.S. v. Microsoft Corp.*, 1998 WL 614485, at *25 (D.D.C. 1998) (internal quotation marks and citations omitted). Yet Plaintiff's only support for its

market share allegation is that "Google has over a 50-percent share of ***Google Play's keyboard app installations.***"  Am. Compl. ¶ 78 (emphasis added).  But that ignores entirely the fact that other apps are preloaded by OEMs and/or may otherwise be accessed by consumers outside the Google Play Store.  *Id.* ¶ 76.  For example, Samsung—far and away the largest manufacturer of Android mobile devices—preloads its own Samsung Keyboard app on all Samsung devices instead of Gboard.  *Id.* ¶¶ 76, 84, 207.  Samsung makes its keyboard app available on Samsung devices and therefore it is not a standalone app that can be downloaded from the Google Play Store (and thus not included in Plaintiff's review of Google Play download calculations).  Given this marketplace reality, Plaintiff's sleight of hand focusing only on Google Play app downloads is not evidence of Google's market share in an Android keyboard apps market.  Plaintiff thus fails to plausibly allege that Google's market share in the purported market gives rise to a dangerous probability of actual monopolization.

Plaintiff also alleges that "Google's market share is . . . durable because scale is a significant barrier to entry."  *Id.* ¶ 81.  But that too falls short of Plaintiff's burden.  As noted, Plaintiff has not adequately alleged an accurate estimate of Google's market share, and merely alleging that Google's market share is *durable* could not establish a dangerous probability of successful monopolization in any event.  Plaintiff's allegation is premised on the twin assertions that (1) "customers rarely change a default," and (2) "[f]or Google's rivals, preloading a keyboard app as the default is impossible."  *Id.* ¶¶ 81, 83.  The former is insufficient for an attempted monopolization claim—as the D.C. Circuit recognized in *U.S. v. Microsoft*, "consumers' reluctance to switch browsers" does not establish barriers to entry required to show attempted monopolization insofar as it is "a reluctance not shown to be any more than that which stops consumers from switching brands of cereal."  *Microsoft*, 253 F.3d at 83.  As to the latter, as

explained *supra*, Section II.A, preloading a non-Google keyboard app on an Android device is far from impossible—it is both allowed by the MADA and Google's GMS certification requirements and practiced by Android OEMs, including Samsung. And even as to the low-end Android Go devices where Gboard is allegedly bundled with GMS apps, in the absence of any allegation as to the proportion of low-end Android Go devices in the purported relevant market, Plaintiff does not plausibly allege a "dangerous probability" that any conduct with respect to this subset of devices would enable Google to achieve actual monopoly.

## IV. THE COURT SHOULD DISMISS COUNTS FIVE AND SIX BECAUSE PLAINTIFF RELIES ENTIRELY ON ALLEGED CONDUCT OUTSIDE THE JURISDICTIONAL REACH OF THE RELEVANT STATUTES AND ARTICULATES NO INDEPENDENT LEGAL VIOLATION.

### A. The California Unfair Competition Law does not apply extraterritorially.

Count Five alleges a violation of California's state unfair competition law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"). To the extent Count Five is based on Fotobom's federal antitrust claims in Counts One, Two, Three, and Four, it fails for the same reasons as those counts. *See supra* Sections I, II, & III.[10] To the extent Count Five is based on Google's alleged tortious interference with Plaintiff's potential partnership with America Movil, it fails because the alleged conduct is not tortious and is outside the UCL's jurisdictional reach. "California's unfair competition law does not apply extraterritorially." *Aghaji v. Bank of Am., N.A.*, 202 Cal. Rptr. 3d 619, 1119 (Ct. App. 2016). So a plausible UCL claim requires allegations of conduct that either occurred in California or results in injuries in California. *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-04457, 2013 WL 791457, at *4-5 (N.D. Cal. Mar. 4, 2013); *Contact v. Bank of Am. Corp.*, No. 17-cv-03139, 2018 WL 5292126, at *8 (S.D.N.Y. Oct. 25, 2018).

---

[10] For the same reasons that Plaintiff has failed to plead violations of federal antitrust law, it has not adequately pled that Google engaged in "unfair" business practices that violate California's UCL.

Plaintiff highlights its failed partnership with America Movil, a Mexican company that does not operate in the United States, as an example of Google allegedly preventing carriers and OEMs from preloading Keyboard+ on Android mobile devices.  Am. Compl. ¶ 215.  But the alleged partnership between Fotobom and America Movil had no links to California.  Most importantly, the alleged partnership was set to take place in Mexico and Brazil, not California. *Id.*; *see supra*, Factual Background.  Plaintiff alleges that "Google made clear to America Movil that it would not allow the partnership to come to fruition" and that "Google's search agreements are negotiated by Google's U.S. employees and applied worldwide."  Am. Compl. ¶¶ 223, 225. But Plaintiff does not plead that the alleged interference by Google with America Movil took place in California.  A generic allegation that Google's *U.S.* employees negotiated the agreements that allegedly interfered with the Fotobom-America Movil partnership is not enough to allege that the interference took place in *California*.  *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207-08 (2011) (granting summary judgment on UCL claim because "the stipulated facts d[id] not speak to the location of" the alleged injury).  Moreover, Plaintiff does not plead that any alleged injury because of the America Movil deal occurred in California.

Plaintiff also alleges that "[i]t was the expectation of the parties that America Movil would expand the distribution of Keyboard+ to consumers located in the United States, including through its subsidiary, TracFone."  Am. Compl. ¶ 216.  Again, this speculation about possible future dealings does not establish impact on any California customer.  Moreover, Plaintiff's conclusory pleading that "harm to Fotobom was inflicted in California" is insufficient.  *Iqbal*, 556 U.S. at 681; *see* Am. Compl. ¶ 269.  A UCL Plaintiff must allege more than that it is a California corporation and that it suffered an injury—it must plead facts that link the injury to California.  *See Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1047 (C.D. Cal. 2019)

("A plaintiff's residence alone is not sufficient to bring claims under the UCL or CLRA where the injuries occur outside of California."). Yet Plaintiff merely pleads that Tracfone "served more than 21 million U.S. customers" and many of those customers "are located in the District of Columbia." *Id.* ¶¶ 216, 237. With no allegation that Google's unfair conduct or Plaintiff's injury occurred in California, there can be no UCL claim. *See McKinnon*, 2013 WL 791457, at *4-5.[11]

### B.    California common law does not apply extraterritorially.

Count Six alleges intentional interference with prospective economic advantage under California common law. Am. Compl. ¶¶ 271–77. Like Count Five, Plaintiff again relies on its failed "partnership with American Movil to preload Fotobom's keyboard app." *Id.* ¶ 272. Because Count Six is premised on actions and impacts felt outside California, it too fails.

California courts have not addressed whether the State's common law applies extraterritorially. Federal district courts have recognized as much, and rejected invitations that they be the first to apply California common law extraterritorially. *BLK Enters., LLC v. Unix Packaging, Inc.*, No. 18-cv-02151, 2018 WL 5993844, at *7 (C.D. Cal. June 14, 2018) ("The Court has not found any authority indicating that California common law does or does not apply extraterritorially. Without any authority from the California legislature or courts, this Court will not presume that California common law applies extraterritorially."); *Cave Consulting Grp., Inc.*

---

[11] There are too many unpleaded assumptions necessary for Plaintiff's allegations about a potential future deal with Tracfone to be relevant. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320-23 (2011) (recognizing that only those who suffer "actual or imminent, not conjectural or hypothetical," injuries have standing to bring a California UCL claim). First, America Movil would need to be willing to expand a deal that never came to fruition in Mexico and Brazil elsewhere. Second, that expansion would need to include subsidiary TracFone in the United States. And third, the hypothetical TracFone deal would need to cover California residents. Individually, but certainly together, these conjectural steps make clear that any injury to Fotobom was only hypothetical. *Jordache Enters., Inc. v. Brobeck, Phleger & Harrison*, 18 Cal. 4th 739, 754 (1998) ("[S]peculative and contingent injuries are those that do not yet exist, as when an . . . error creates only a potential for harm in the future").

*v. Truven Health Analytics Inc.*, No. 15-cv-02177, 2017 WL 1436044, at *7 (N.D. Cal. Apr. 24, 2017) (same).  This Court should do the same.

That is especially true because the D.C. Circuit has instructed that "a federal court should be reluctant to retain pendent jurisdiction over a question for which state jurisprudence gives inadequate guidance." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 922 (D. C. Cir. 1996) (quoting *Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C. Cir. 1982)).  This is not a diversity case.  Am. Compl. ¶ 21.  This Court only has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, a statute that directs courts to consider whether claims present "novel or complex" state law issues before exercising jurisdiction.  *See* 28 U.S.C. § 1367(c)(1).  Because California courts have not definitively addressed the territorial reach of California common law, this Court should decline to answer that novel question in the first instance.

Plaintiff's intentional interference claim is entirely reliant on alleged harm suffered abroad.  The alleged potential partnership with America Movil contemplated "preloading Fotobom's keyboard on its Android devices—first in America Movil's biggest markets, in Mexico and Brazil, and then elsewhere."  Am. Compl. ¶ 216.  Any alleged harm to Fotobom was suffered in Mexico and Brazil, not in the United States, much less specifically in California.  Similar to Plaintiff's UCL claim, Plaintiff's pleadings of a potential future deal with TracFone are too speculative to be actionable and do not implicate California or its residents.  *See supra*, Section IV.A.  Absent a contrary directive from California courts, this Court should decline to expand the territorial reach of California common law.  *BLK Enters., LLC*, 2018 WL 5993844, at *7; *see Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 234-35 (4th Cir. 2012) (Wilkinson, J., dissenting) (summarizing Supreme Court precedent and questioning whether state tort law may

apply extraterritorially when doing so would interfere with the federal government's ability to conduct foreign affairs); Jeffrey Meyer, *Extraterritorial Common Law: Does the Common Law Apply Abroad?* 102 Geo. L.J. 301, 301 (2014) ("[S]tate courts—not federal courts—should decide the geographical reach of their common law.").

### C. The Court should dismiss Counts Five and Six for the same reasons it should dismiss Counts One, Two, Three, and Four.

Even if Counts Five and Six were not legally infirm for the foregoing reasons, they would fail in any event for the same reasons as Counts One, Two, Three, and Four.

In support of Count Five, Plaintiff alleges that Google "engaged in 'unlawful' business acts and practices . . . in violation of . . . the Sherman Act" and engaged in "interference [that] was and is illegal under federal antitrust laws and California state law." Am. Compl. ¶ 267. Because Count Five is premised on the same legally deficient allegations as Counts One, Two, Three, and Four, the Court should dismiss Count Five, to the extent it relies on those other counts, for the same reasons.

"Where . . . the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition." *LiveUniverse, Inc. v. Myspace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008); *see In re Bystolic Antitrust Litig.*, No. 20-cv-5735, 2022 WL 323945 at *28 (S.D.N.Y. Feb. 2, 2022) ("Because the Court dismisses the federal antitrust claims, however, [Plaintiff's] claims under the antitrust laws of various states—based on the same factual allegations—fail too."); *see also Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 411 (1981) (Brennan, J., dissenting) ("An unqualified dismissal on the merits of a substantial federal antitrust claim precludes relitigation of the same claim on a state-law theory."). Because Plaintiff has not properly pleaded violations of federal antitrust law in

connection with Counts One, Two, Three, and Four, *see supra*, Sections I, II, & III, Plaintiff cannot rely on those alleged violations to support Count Five.  *See Chavez v. Whirpool Corp.*, 113 Cal. Rptr. 2d 175, 184 (Ct. App. 2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers.").

Likewise, with respect to Count Six: Plaintiff's allegations in support of this claim are that Google interfered with Plaintiff's prospective economic advantage in violation of federal antitrust laws and California state law.  Intentional interference with prospective economic advantage under California common law requires a plaintiff to plead: (1) an economic relationship with some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to plaintiff proximately caused by defendant's acts. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  Further, a "plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th 376, 392-93 (1995) (internal quotation omitted).  To show such wrongfulness, a plaintiff must plead that "the defendant employed improper methods which are illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules." *Beverly v. Network Sols., Inc.*, No. 98-cv-0337, 1998 WL 917526, at *10 (N.D. Cal. Dec. 30, 1998).  If the alleged acts

are, indeed, not illegal or independently tortious, the claim for intentional interference with prospective economic advantage fails.

To the extent Count Six is premised upon the same deficient alleged violations of federal antitrust law discussed above, *see supra*, Sections I, II, & III, Plaintiff cannot rely upon such alleged conduct to support a claim of intentional interference with prospective economic advantage. *See Kentmaster Mfg. Co. v. Jarvis Prod. Corp*., 146 F.3d 691, 695 (9th Cir. 1998), *amended*, 164 F.3d 1243 (9th Cir. 1999) (dismissing tortious interference claims as the plaintiff "provide[d] no other wrongful act except those we have already held to be insufficient" under federal antitrust law); *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, No. 15-cv-01086, 2015 WL 7008185, at *6 (C.D. Cal. Sept. 18, 2015) ("Plaintiff fails to sufficiently plead a violation of the Sherman Act. . . . Thus, Plaintiff fails to plead that Defendants' conduct was wrongful by some measure beyond the fact of the interference itself . . . .") (internal quotation omitted); *RLH Indus., Inc. v. SBC Commc'ns, Inc*., 35 Cal. Rptr. 3d 469, 476 (Ct. App. 2005) (dismissing tortious interference claims where the defendant's policy "violates no determinable legal standard, is not independently wrongful, and [therefore] cannot support RLH's intentional interference cause of action."). Plaintiff also has not adequately alleged that Google violated "California state law" for the reasons set forth above. *See Beverly*, 1998 WL 917526, at *10. The Court should dismiss Count Six to the extent it relies on the conduct alleged to violate federal antitrust law in Counts One, Two, Three, and Four and violations of "California state law."

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Amended Complaint with prejudice.

Dated:  September 16, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: *John E. Schmidtlein*
John E. Schmidtlein
(D.C. Bar No. 441261)
Benjamin M. Greenblum
(D.C. Bar No. 979786)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jschmidtlein@wc.com
bgreenblum@wc.com

*Attorneys for Defendant Google LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, I filed a copy of this Motion to Dismiss and related papers via the Court's electronic filing system, and served the same via that system upon all parties through their counsel of record.

Dated:  September 16, 2022                    By: *John E. Schmidtlein*
                                                  John E. Schmidtlein