**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FOTOBOM MEDIA, INC.,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 22-cv-00712 (APM)** |
| ) | |
| **GOOGLE LLC,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER[1]**

**I.**

Plaintiff Fotobom Media, Inc. is a California-based company that distributes a "smart keyboard" application for Android-run mobile devices.  It brings this action under the Sherman Antitrust Act and California state law, challenging Defendant Google LLC's allegedly unlawful and anticompetitive conduct in two proposed markets: the general search services market and the Android keyboard applications market.

Before the court is Google's Motion to Dismiss.  Google argues that (1) Plaintiff does not have antitrust standing to assert claims regarding the general search services market, (2) Plaintiff has failed to state plausible causes of action as to the Android keyboard applications market, and (3) Plaintiff's state law claims do not apply extraterritorially and thus cannot be adjudicated in this court.

---

[1] The court apologies to the parties and counsel for the length of time it has taken to issue this decision.

The court grants in part and denies in part Google's motion.  The court finds that Plaintiff has not pleaded antitrust injury in the market for general search services and therefore dismisses Plaintiff's monopoly maintenance (Count One) and exclusive dealing claims (Count Two) as to that market.  On the other hand, the court holds that Plaintiff has stated plausible claims for exclusive dealing (Count Two), illegal tying (Count Three), and attempted monopolization (Count Four) in the market for Android keyboard applications.  Plaintiff's claim for violation of California's Unfair Competition Law (Count Five) may proceed but only to the extent that it overlaps with Plaintiff's federal claims relating to the Android keyboard applications market.  Finally, Plaintiff's California common law claim for intentional interference with prospective economic advantage (Count Six) is dismissed because, as pleaded, it requires extraterritorial application.

## II.

### A.

Plaintiff Fotobom Media, Inc. is a California-based company that distributes a proprietary mobile device application known as "Keyboard+," which is a "smart keyboard" that "offers more functionality than traditional mobile keyboards that consumers use to type on their phones." Am. Compl., ECF No. 19, ¶ 2 [hereinafter Am. Compl.].  According to Plaintiff, Keyboard+ "offers users its own search results." *Id.* ¶ 3.  It "direct users to content (for example, links to buy movie tickets) precisely at the time that content will be useful to them (for example, when texting a friend to arrange a time to go see a movie)." *Id.*  A mobile user also can "run a search in the keyboard using a general search engine without needing to leave an application or open a browser. Keyboard+ displays its own links alongside the search engine's results, so the user can compare results and pick the most relevant content." *Id.*  To distribute Keyboard+, Fotobom has sought to

partner with original equipment manufacturers ("OEMs") and wireless carriers to preload Keyboard+ as the default keyboard application on their devices. *Id.* ¶¶ 8, 198.

Defendant Google, LLC is the dominant general search services firm in the United States, accounting for almost 90 percent of general search queries by U.S.-based users. *Id.* ¶ 64.  Google also distributes other products related to general search, including the Android operating system (the major competitor to Apple's iOS), Android-powered mobile devices, and a web browser (Chrome). *Id.* ¶¶ 71, 149, 151, 153.  Google also distributes its own "smart keyboard," Gboard, which comes preloaded on some Android devices. *Id.* ¶ 79.

Plaintiff claims that Google has violated the Sherman Antitrust Act and California law by engaging in anticompetitive behavior in two markets: (1) general search services and (2) Android keyboard applications.[2]  Each count of the Amended Complaint corresponds to one or both markets.  The court summarizes the relevant allegations in Part IV when discussing the grounds for dismissal.

**B.**

Plaintiff filed suit on March 15, 2022.  Compl., ECF No. 1.  Soon thereafter, Google filed a partial motion to dismiss.  Partial Mot. to Dismiss, ECF No. 15.  Plaintiff then amended its pleading, *see* Am. Compl., thereby mooting the pending motion to dismiss.  Min. Order (Aug. 17, 2022).  Google subsequently renewed its motion to dismiss, which is now before the court.  Def.'s Mot. to Dismiss, ECF No. 21; Mem. of P&A in Supp. of Def.'s Mot. to Dismiss, ECF No. 21-1 [hereinafter Def.'s Mem.].

---

[2] Google does not, for purposes of its motion, challenge Plaintiff's market definitions.  *See generally* Mem. of P&A in Supp. of Def.'s Mot. to Dismiss, ECF No. 21-1.

### III.

"To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration omitted).   An antitrust plaintiff must allege sufficient "fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).   Courts should exercise caution "before dismissing an antitrust complaint in advance of discovery," but must bear in mind "that proceeding to antitrust discovery can be expensive." *Id.* at 558.

"Determining a claim's plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 679).   The court must accept well-pleaded allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Agnew v. Dist. of Columbia*, 920 F.3d 49, 53 (D.C. Cir. 2019).   But the court need not accept as true the complaint's legal conclusions.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### IV.

#### A.   Alleged Anticompetitive Conduct in the Market for General Search Services

The court starts with the claims that pertain to the market for general search services. Am. Compl. ¶¶ 240–253.   Plaintiff defines this market as "search engines" that consumers use "to explore the internet for answers to a wide range of queries," *id*. ¶ 55, and geographically limits the market to "general search services offered in the United States," *id*. ¶ 62.   Count One asserts monopoly maintenance in violation of Section 2 of the Sherman Act, while Count Two advances

a claim of exclusive dealing in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 240–253.[3] Plaintiff contends in Count Five that the conduct comprising these two claims also violates California's Unfair Competition Law. *Id.* ¶¶ 265–270.

Plaintiff alleges that Google has unlawfully maintained its monopoly in general search services "through tying arrangements; through exclusionary distribution agreements that lock up the preset default positions for search access points" on desktop and mobile devices; and through "other restrictions that drive queries to Google at the expense of competitors." *Id.* ¶ 242. Google carries out these allegedly anticompetitive acts primarily through two types of agreements: (1) Mobile Application Distribution Agreements ("MADAs") and (2) Revenue Share Agreements ("RSAs"). *Id.* ¶¶ 159–60, 167, 201–211, 240–253. These agreements work together to limit search access points on mobile devices. *Id.* ¶¶ 196, 201–202. According to Plaintiff, the MADAs "tie Google's dominant and commercially necessary applications to the preinstallation of Google's search points like Gboard—thus prohibiting Fotobom (a competitor and search access point) from being preloaded on Android devices," *id.* ¶ 196, while the RSAs "prohibit[] the preinstallation of a competing general search access point" in exchange for a share of "Google's search advertising monopoly revenues," *id.* ¶¶ 201–202. Plaintiff further claims that Google has expanded the RSA terms "to preclude the preinstallation of keyboards other than its own Gboard," in part because Keyboard+ "could divert search traffic to other search engines," thereby threatening Google's monopoly power in the general search services market. *Id.* ¶¶ 204, 213.

Google moves to dismiss Counts One and Two on the grounds that Plaintiff lacks "antitrust standing." According to Google, "to have standing to bring a private antitrust action under federal

---

[3] The parties contest whether Plaintiff also has pleaded an exclusive dealing claim as to the Android keyboard applications market under Count Two. Def.'s Mem. at 13 n.5; Pl.'s Opp'n to Def.'s Mot., ECF No. 24, at 13 [hereinafter Pl.'s Opp'n]; Def.'s Reply Mem. of P&A in Supp. of Def.'s Mot., ECF No. 26, at 11–12 [hereinafter Def.'s Reply]. The court addresses that dispute separately below. *See infra* Section IV.B.

law, a plaintiff must show that it was either a consumer or competitor in the market in which it alleges the defendant engaged in anticompetitive conduct," and Plaintiff is neither in the market for general search services. Def.'s Mem. at 7. Plaintiff disputes Google's definition of antitrust standing as overly restrictive. Still, it argues that even under Google's formulation, it competes in the general search services market and thus has "competitor standing." Pl.'s Opp'n at 11–16.

The court agrees with Plaintiff that there is no rigid "consumer or competitor" test when assessing a plaintiff's antitrust standing. The proper inquiry is whether the plaintiff is a market "participant." Even applying this broader construct, however, the court holds that Plaintiff lacks antitrust standing to pursue claims with respect to the market for general search services.

### 1.    The Applicable Standard for Antitrust Injury

A plaintiff that brings a private antitrust action under federal law must demonstrate antitrust injury to establish its standing to sue. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Antitrust injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "While Article III standing is a familiar concept common to all cases, antitrust standing is claim-specific. It asks 'whether the plaintiff is a proper party to bring a private antitrust action.'" *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 981 (D.C. Cir. 2017) (quoting *Associated Gen. Contractor of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)).

Every antitrust plaintiff "must prove"—or, in the present posture, plausibly plead— "antitrust injury, which . . . should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489. Antitrust injury does not arise "until a private party is adversely affected by an *anticompetitive* aspect of the

defendant's conduct"; it is not sufficient that the plaintiff's injury be "causally related to an antitrust violation," "since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield*, 495 U.S. at 334, 339 (second quotation cleaned up).

Google argues that a plaintiff must be either a "consumer or competitor" to have antitrust standing in the relevant market. Def.'s Mem. at 7. For this proposition, Google relies almost exclusively upon a single opinion from this District, *Adams v. Pan American World Airways, Inc.*, 640 F. Supp. 683, 684 (D.D.C. 1986). Def.'s Mem. at 7. The *Adams* court did indeed state that "it is safe to generalize that, barring unusual circumstances, only consumers or competitors in the market in which trade has been restrained have standing to bring a section 4 action." *Adams*, 640 F. Supp. at 684. But in that case, the plaintiffs were former employees of an airline company whose collapse was precipitated by anticompetitive conduct—not only were they neither consumers nor competitors, but they "d[id] not even participate in the same market as the defendants." *Id.* at 685. The court noted that "there is not a single reported case where employees of the victim of an antitrust violation have been allowed to recover for loss of employment resulting from the injury to the employer." *Id.* at 684. Thus, the *Adams* court did not articulate a categorical rule that only consumers and competitors can assert antitrust injury; it relied on that "general[]" principle to contrast the particular circumstances of that case. *See id.* [4]

Google cites a handful of out-of-Circuit cases in support of its categorical rule, but none are binding upon this court, and those that have referenced the standard have not strictly adhered to it. For example, Google quotes an unpublished decision from the Ninth Circuit, *Cyntegra, Inc. v. IDEXX Laboratories, Inc.*, as stating, "[o]nly an actual competitor or one ready to be a

---

[4] While the D.C. Circuit affirmed the trial court's dismissal of the complaint, it did not affirm the broader rule that Google proposes. Instead, the Circuit's reasoning focused on the particular harms suffered "by employees of a firm victimized by antitrust violations," analyzing several factors enumerated by the Supreme Court to conclude that the plaintiffs lacked standing. *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 29 (D.C. Cir. 1987).

competitor can suffer antitrust injury." Def.'s Mem. at 7–8 (citing 322 F. App'x 569, 572 (9th Cir. 2009)). But in an earlier published decision, the Ninth Circuit said, "[t]he Supreme Court has never imposed a 'consumer or competitor' test but has instead held the antitrust laws are not so limited." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). "While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury." *Id.* The "consumers or competitors" phrase, the court said, is merely "a rough gloss" on the "market participant test," and usually applies in cases "concern[ing] parties who are clearly not participants of any kind[.]" *Id.* at 1058 (internal quotation marks omitted) (collecting cases). Ultimately, the court explained, the antitrust standing inquiry turns on whether the plaintiff is a participant in the relevant market and "suffered its injury in the market where competition is being restrained." *Id.* at 1057. Other circuits have adopted the Ninth Circuit's broader view of antitrust injury. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (citing *Am. Ad Mgmt.*).

The court is persuaded by this articulation of antitrust injury. *See generally Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers"). Therefore, in determining whether Plaintiff has plausibly pleaded antitrust injury, the court does not strictly confine itself to asking whether Plaintiff is a "consumer or competitor" in the market for general search services.

### 2. Antitrust Injury in the Market for General Search Services

Plaintiff claims to be a participant in the market for general search services primarily under two theories. Pl.'s Opp'n at 13–14. First, Plaintiff asserts it directly competes with Google in general search because Keyboard+ "provide[s] competing search results" based on what a user

types, "just like a search engine." *Id.* at 13 (citing Am. Compl. ¶¶ 30, 36).  For that reason, Plaintiff says, it "has competitor standing." *Id.*  Second, Plaintiff claims its smart keyboard technology threatens Google's market dominance because it "allows users to bypass Google Search and go directly to a relevant webpage." *Id.* (quoting Am. Compl. ¶ 127).  Plaintiff thus positions itself as a "smaller, niche provider[]" that competes with a "dominant firm only in a specialized market segment." *Id.* at 14.  Neither of these theories plausibly establishes that Plaintiff has antitrust standing in the market for general search services.

a.   <u>Keyboard+ Does Not Compete with Google Search</u>

Plaintiff claims that it competes with Google in the relevant market because Keyboard+ "provide[s] competing search results" allowing users to "bypass Google Search and go directly to a relevant webpage." Pl.'s Opp'n at 13 (quoting Am. Compl. ¶ 127).  But the fact that Keyboard+ may produce *some* search results does not make it a competitor in the market for *general* search.

The Amended Complaint alleges that general search services are "unique." Am. Compl. ¶ 55.  "[T]hey offer consumers the convenience of a 'one-stop shop' to access an extremely large and diverse volume of information across the internet." *Id.*  Users can perform several types of searches using a general search engine: "navigational queries (seeking a specific website), informational queries (seeking knowledge or answers to questions), and commercial queries (seeking to make a purchase)." *Id.*  There are, according to Plaintiff, "only four meaningful general search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo." *Id.* ¶ 63.

By Plaintiff's own market definition, Keyboard+ is not, in any sense, a general search engine.  It does not itself search the web, and it does not claim to be a "one-stop" shop capable of providing results for different search types.  Instead, Plaintiff says that it acts as a "bridge" between

a user and a general search engine.  *Id.* ¶¶ 132, 204.  But a "bridge" to Google does not make Plaintiff a competitor of Google.

Plaintiff effectively concedes as much when it claims that Keyboard+ "is more closely analogous to a specialized search engine that offers 'deeper topical results . . . by using specialized data or information' for specific searches."  Pl.'s Opp'n at 13–14 (quoting Am. Compl. ¶ 56).  That analogy fails from the start.  Plaintiff nowhere claims that Keyboard+ produces "deeper topical results" or uses "specialized data or information."  Am. Compl. ¶ 56.  Thus, Keyboard+ does not exhibit the most basic characteristics of a specialized search engine.  Moreover, even if Keyboard+ could be considered some species of specialized search, Plaintiff agrees that such products do not compete with general search engines, like Google.  Specialized search engines include retail marketplaces, like Amazon and eBay, and travel sites, like Expedia or Priceline.  *Id.* Plaintiff concedes that those companies *do not* compete in the market for general search, because they "do not offer consumers the same breadth of information or convenience," are not "'one-stop shops,'" and "cannot respond to all types of consumer queries."  *Id.* ¶ 60.  If Amazon does not compete in general search, neither does Plaintiff.

Plaintiff also attempts to position itself as a nascent competitor to Google, one whose emergence would threaten Google's market dominance in search.  Pl.'s Opp'n at 14.  But that claim is not plausible.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (Alito, J.) ("In order to hold

that [the plaintiff] was in competition with the pharmacists, we would have to conclude that what [the plaintiff] offered was reasonably interchangeable with what the pharmacists offered.").[5]

Here, Plaintiff alleges that Keyboard+ "permits users to browse the internet directly from the keyboard" by powering a web browser that "enables users to access information, make purchases, watch videos, quickly share links with friends, and more.  The browser is useful because it allows users to interact with any website or general search engine without having to leave the application they are using."  Am. Compl. ¶ 31.  Plaintiff, however, nowhere describes what it means by "interact" with a website or general search engine, and it does not explain how that "interaction" makes it an emerging competitor in general search.  If anything, the examples of Keyboard+'s search functionality in the Amended Complaint tell a different tale.

For instance, Plaintiff describes how Keyboard+ might function in a web browser or Google search application when a user types "the mandalorian" in the Google search bar.  In that situation, Keyboard+ offers the user a link to the Disney+ application to watch the show.  *Id.* ¶ 32 (Fig. 2).  In another illustration, Plaintiff shows Keyboard+'s operability within a user chat linking to a Yelp page or the Uber application.  *Id.* ¶ 28 ("[A] user exchanging text messages about biking somewhere in San Francisco may receive a link to a Yelp page regarding bike rentals in San Francisco without the need to switch to a different application or go through a general search engine."); *id.* ¶ 29 ("[I]f Uber's ride-sharing application is installed on a user's phone, when a user texts about needing to call an Uber, Keyboard+ will present an icon that will lead the user to the

---

[5] Plaintiff dismisses the significance of *Barton & Pittinos* on the ground that a later Third Circuit decision, *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, said *Barton & Pittinos* arguably rested on the "overstated premise" that a plaintiff must be a competitor or consumer to suffer antitrust injury.  Pl.'s Opp'n at 15 (citing *Carpet Grp.*, 227 F.3d 76 (3d Cir. 2000), *overruled on other grounds by Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011)).  But that argument misses the point.  *Barton & Pittinos* is relevant because of how that court determined whether the plaintiff and defendant competed in the same market—by asking whether their services were "reasonably interchangeable."  118 F.3d. at 182.  Plaintiff does not dispute that "reasonable interchangeability" is the correct test.  Pl.'s Opp'n at 15.

Uber application as shown below.").  In none of these instances did Keyboard+ provide the user

with a results page that offers a "large and diverse volume of information across the internet[.]"

*Id.* ¶ 55.  It merely matched the user's input to a result in a mobile application or a specialized

search site.  That output bears no resemblance to a general search engine results page.

The court accepts that, in some instances, Keyboard+ will provide a more user-friendly

way to get to limited search results or a mobile application.  But that functionality does not make

it reasonably interchangeable with a general search engine.  Keyboard+ therefore is not plausibly

a nascent competitor to Google in the market for general search services.

> b.    Diverting Users from General Search

Plaintiff's alternative theory of market participation is that its product threatens Google's

monopoly in search, not because it is a direct competitor, but because its search functionality

permits users to avoid the Google search engine altogether.  This theory, too, is flawed.  Plaintiff

nowhere explains how the challenged conduct that harms Keyboard+ reduces competition in the

market for general search, thereby causing Plaintiff antitrust injury in that market.

The reason for the disconnect is because of the product itself.  According to Plaintiff,

Keyboard+ enables a user to reach their desired result without having to open a browser, input a

search query, and then click a relevant link.  In this way, the user avoids using Google search.  But

if that is how Keyboard+ operates, it also permits the user to circumvent Google's rivals: Bing,

Yahoo!, and Duck Duck Go.  In other words, Keyboard+'s browser functionality enables a user to

avoid *all* general search engines.  Greater use of Keyboard+ thus will not increase competition in

general search.  Its effect would be to diminish users' reliance on all general search engines by

increasing traffic to a variety of different informational sources.  Less general search overall may

benefit Plaintiff, but it will not enhance competition in the market for general search, let alone

injure Plaintiff in that market. *See United States v. Google LLC*, No. 20-cv-3010 (APM), 2023 WL 4999901, at *23 (D.D.C. Aug. 4, 2023) (rejecting a similar theory of competitive harm in the market for general search services involving the alleged diminishment of specialized vertical providers).

For similar reasons, Plaintiff's reliance on *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007), and *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), is inapposite. Pl.'s Opp'n at 15–16. In *Novell*, the Fourth Circuit found that a plaintiff, who developed office productivity software, had antitrust standing to challenge Microsoft's conduct that "allegedly had the effect of thwarting the ability of [the plaintiff's] products to lower the application's barrier to entry into the operating-system market, therefore harming competition in that market." *Id.* (citing *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)). Here, Plaintiff has not alleged that greater use of Keyboard+ will do anything to enhance competition in the general search services market, such as reducing barriers to entry. If anything, increased use of Keyboard+ will divert users from *all* general search engines, not just Google.

This rationale also demonstrates why Keyboard+'s alleged injury is not "inextricably intertwined" with harm to competition in the general search services market. In *McCready*, the Supreme Court held that though the plaintiff "was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on" market participants. 457 U.S. at 483–84. The Supreme Court did not define what it meant by "inextricably intertwined," but several circuits have construed *McCready* as recognizing antitrust injury where the plaintiff was "used as [a] conduit[] to harm the defendants' actual competitors," such that the plaintiff's harm is "an indispensable aspect of the scheme[.]" *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015); *see also Province v. Cleveland*

*Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) ("An inextricably intertwined injury is one that results from the manipulation of the injured party as a means to carry out the restraint of trade in the product market."); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 161 (same); *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995) (same). "[H]arm that is secondary to the anticompetitive conduct cannot support antitrust injury." *Hanover 3201 Realty*, 806 F.3d at 173.

The Amended Complaint comes nowhere close to clearing this high bar. Plaintiff does not, for instance, allege that increased use of its technology would enable other search engines to better compete with Google or would facilitate new market entrants by reducing barriers to entry. Plaintiff asserts that it "could" route users to Google's competitors. Am. Compl. ¶ 213. But it never claims that it has ever considered doing so. Furthermore, even if Keyboard+ were to divert queries to rival search engines, the court is left to speculate what difference that would make. Plaintiff has not, for instance, alleged that a meaningful percentage of search queries come through smart keyboards, such that redirecting search traffic to, say, Bing would increase competition in general search. Without such a basic allegation, it is simply not plausible that causing harm to Plaintiff is an "indispensable" part of Google's alleged scheme to maintain dominance in the general search services market. Plaintiff therefore has not pleaded that its claimed injury is "inextricably intertwined" with anticompetitive effects in the relevant market. *Cf. Hanover 3201 Realty*, 806 F.3d at 174 (holding that the plaintiff had established antitrust standing because injuring the plaintiff "was the very means by which Defendants could get" to the rival it sought to keep out of the market; the plaintiff's "injury was necessary to Defendants' plan").

*       *       *

The court therefore finds that Plaintiff has not demonstrated the requisite antitrust injury to bring claims in the market for general search services.  Because Plaintiff lacks antitrust standing, the court dismisses Count One in full and Counts Two and Five insofar as they concern the general search services market.[6]

### B.   Exclusive Dealing in the Market for Android Keyboard Applications

Plaintiff contends that Count Two should not be dismissed in its entirety because an aspect of that claim concerns the separate "Android keyboard market."  Pl.'s Opp'n at 13.  Plaintiff defines that market as including "keyboard application[s] for a mobile device [that] allow[] the user to type messages, notes, search queries, and more."  Am. Compl. ¶ 69.  Plaintiff maintains that, because Google "does not contest" that Keyboard+ and Google's smart keyboard, Gboard, are competitors, it "has [antitrust] standing as a competitor to bring an exclusive-dealing claim for foreclosure in that market."  Pl.'s Opp'n at 13.

Google responds that Count Two contains no such claim and that Plaintiff is attempting to "rewrite" that count "to avoid [its] dismissal" altogether.  Def.'s Reply at 12.  But Google reads the complaint too narrowly.  To be sure, there is only a single reference to the Android keyboard market in the paragraphs specific to Count Two, Am. Compl. ¶ 251, but Google cannot claim to be surprised that Plaintiff has asserted an exclusive dealing claim in that market.  Plaintiff devotes at least 20 paragraphs of its pleading to describing how Google's exclusive agreements with various OEMs and carriers have blocked Keyboard+ from being preloaded as the default smart

---

[6] Plaintiff has not argued that its California Unfair Competition Law ("UCL") claim can survive without pleading antitrust injury.  Courts have dismissed UCL claims based on lack of antitrust standing under the Sherman Act, given the similarity of the injury inquiries under federal law and the UCL.  *See, e.g., Reilly v. Apple Inc.,* 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022); *Total Recall Techs. v. Luckey,* No. 15-cv-02281 (WHA), 2016 WL 1070656, at *5 (N.D. Cal. Mar. 18, 2016); *Eastman v. Quest Diagnostics Inc.,* 108 F. Supp. 3d 827, 838 (N.D. Cal. 2015).  The court does the same here.

keyboard on various mobile devices.  *Id.* ¶¶ 212–232.  In particular, the complaint cites two examples of impending deals with América Móvil and Verizon that Plaintiff's potential partners eventually scuttled over concerns that preloading Keyboard+ would violate their exclusive agreements with Google.  *Id.* ¶¶ 216–225 (América Móvil), ¶¶ 226–231 (Verizon).  Plaintiff also alleges harm to other potential competitors in this market, including Microsoft's SwiftKey application, *id.* ¶¶ 42–44, as well as anticompetitive effects experienced by all keyboard applications and users, *see id.* ¶¶ 83–84.

Given these well-pleaded allegations, dismissal of Count Two as to the Android keyboard market is not warranted.

## C.   Procedural Bar to Counts Three, Four, Five, and Six

Before considering Google's arguments for dismissal of Plaintiff's remaining claims, the court must address a procedural bar raised by Plaintiff based on Rule 12(g)(2).  That rule generally provides that "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2).

According to Plaintiff, Rule 12(g)(2) forecloses Google from moving to dismiss Plaintiff's illegal tying (Count Three) and attempted monopolization (Count Four) claims.  Pl.'s Opp'n at 20–22.  It argues that Google cannot seek dismissal of the attempted monopolization claim because it did not move to dismiss that claim from the original complaint.  *Id.* at 21.  Further, Plaintiff maintains that Google cannot contest its tying claim on grounds that were previously available but not advanced in its original motion—namely, the failure to plead coercion and an unreasonable restraint of trade.  *Id.* at 21–22.

Plaintiff overstates the preclusive force of Rule 12(g)(2).  Where a party raises a new argument in a successive motion, and ruling on the argument would promote judicial efficiency, courts in this District have read Rule 12(g)(2) to permit consideration of the new argument. *See, e.g.*, *Campbell-El v. Dist. of Columbia*, 881 F. Supp. 42, 43 (D.D.C. 1995); *He Depu v. Oath Holdings, Inc.*, 531 F. Supp. 3d 219, 236–37 (D.D.C. 2021); *United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc.*, No. 13-cv-1844 (CKK), 2020 WL 224504, at *3 (D.D.C. Jan. 15, 2020). That approach is sound.

Under Rule 12(h)(2), "a defendant does not waive its right to assert that the plaintiff has failed to state a claim upon which relief can be granted simply by not including that defense in its initial Rule 12(b) motion to dismiss." *Lindsey v. United States*, 448 F. Supp. 2d 37, 54–55 (D.D.C. 2006).  Rather, the rule contemplates that that the defense can be raised at later stages of the case, including on a Rule 12(c) motion for judgment on the pleadings.  It makes little sense, and would create needless inefficiency, to bar a defendant from asserting a new argument in a successive motion to dismiss, when the defendant can assert that very same argument on a motion for judgment on the pleadings.  *See Pac. Architects & Eng'rs*, 2020 WL 224504, at *3 ("[B]y allowing and addressing any new arguments from Defendant about issues that have not yet received a ruling, the Court is able to significantly advance the progress of this litigation."); *Sierra v. Hayden*, No. 16-cv-1804 (RC), 2019 WL 3802937, at *8 (D.D.C. Aug. 13, 2019) (same).  Accordingly, Rule 12(g)(2) does not bar Google's new arguments to dismiss Counts Three and Four.

### D.    Remaining Claims Concerning the Android Keyboard Applications Market

Turning then to the merits, Plaintiff asserts various claims specific to the Android keyboard applications market.  They rest on the charge that Google has unlawfully tied its proprietary bundle of "must have" applications (the "GSuite") with the preloading of Gboard on new devices.

Plaintiff alleges that "Google's tying arrangements are a *per se* violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade and commerce." Am. Compl. ¶ 259.   It further claims that "Google's unlawful tying and exclusive dealing arrangements[] evince[] a specific intent to monopolize and a dangerous probability of monopolizing the market for Android keyboard applications."  *Id.* ¶ 263.   Count Three asserts illegal tying in violation of Section 1 of the Sherman Act.  *Id.* ¶¶ 254–260.   Count Four alleges attempted monopolization in violation of Section 2 of the Sherman Act.  *Id.* ¶¶ 261–264.   And Count Five under California's Unfair Competition Law encompasses the anticompetitive conduct alleged in Counts Three and Four.  *Id.* ¶¶ 265–270.

      *1.    Illegal Tying*

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6 (1958)).   "Such an arrangement violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market."  *Id.* (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).

Tying arrangements can be deemed illegal under one of two alternative theories: a *per se* violation or a violation of the rule of reason.   Some cases involve "agreements whose nature and necessary effect are so plainly anticompetitive" that a detailed analysis is not "needed to establish their illegality—they are 'illegal *per se*.'"  *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978).   In *United States v. Microsoft*, the D.C. Circuit set forth the four elements of a

*per se* tying claim: "(1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Microsoft Corp.*, 253 F.3d at 85. "Even under notice pleading, an antitrust defendant charged with illegal tying is entitled to some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, the anticompetitive effects in a specified market, and the effect on the business of the plaintiff." *E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23, 32 (2d Cir. 2006). "[T]he coercive use of market power to restrict buyers' decision-making" is present where the defendant "use[s] its dominance in the . . . industry to require companies who desire" to use their product "to buy more than they wish to purchase." *United States v. Nat'l Ass'n of Broads.*, 536 F. Supp. 149, 162–63 (D.D.C. 1982).

Alternatively, Plaintiff maintains that Google's tying arrangements are illegal under the rule of reason. Am. Compl. ¶ 259. The rule-of-reason theory "focuses directly on the challenged restraint's impact on competitive conditions." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 688. "A restraint is unreasonable if it has the 'net effect' of substantially impeding competition." *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1183 (D.C. Cir. 1978). "[A]pplying this framework usually requires some fairly detailed facts, the ascertainment of which is often beyond the scope of a Rule 12(b)(6) inquiry." *Vazquez-Ramos v. Triple-S Salud*, *Inc.*, 55 F.4th 286, 299 (1st Cir. 2022). Thus, at the motion to dismiss stage, a plaintiff need only "plausibly alleg[e] that the agreement unreasonably restrains trade." *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, No. 15-mc-1825 (ESH), 2017 WL 11830269, at *3 (D.D.C. June 13, 2017). This requires the plaintiff to "sketch the outline of the injury to competition with allegations of supporting factual

detail" and to "plead an injury to competition beyond the impact on the plaintiffs themselves." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012).

The court is satisfied that Plaintiff has stated a plausible tying claim, regardless of the applicable theory. *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (stating that where the parties have briefed the tying claim under both theories, "the Court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment"). Plaintiff's theory is that Google's GSuite, which Google makes available through the MADA, contains a bundle of "must have" proprietary applications that substantially motivates, if not coerces, Android OEMs and wireless carriers to preload Gboard (instead of rival smart keyboards) onto their mobile devices. Such "must haves" include the Google Play Store, which enables users to access the universe of Android applications; Google's browser, Chrome; Google's search application; Google's navigation applications; and YouTube, a Google-owned product. Am. Compl. ¶¶ 170–174. These allegations establish that the tying (GSuite) and tied (Gboard) goods are different products and that Google has market power in the tying product market (GSuite). *Microsoft Corp.*, 253 F.3d at 85. It also explains why OEMs and carriers have little choice but to preload Gboard. *See id.*

The strength of the tie, Plaintiff further alleges, is reinforced by the Google Mobile Services ("GMS") certification requirement. To run an Android device with GSuite applications, the device must first be certified by Google. There are two paths to certification: the standard process and an express, or expedited, certification. *Id.* ¶ 182. If an OEM preloads only Google's proprietary applications, it can proceed through "express certification"; however, "if an OEM preloads a non-Google search access point, like Fotobom's keyboard, its device" must go through a longer certification process that is "purposefully opaque," meaning that devices "can fail the

20

certification process at any point in the process without a clear explanation as to why or how to resolve the issue." *Id.* ¶ 185.  As a result, OEMs including Unimax, TeleEpoch, Senwa, and Vortex, have found it too burdensome to install Keyboard+ onto their devices. *Id*. ¶¶ 198–199.  Unimax, for instance, abandoned Keyboard+ because it failed GMS certification without Gboard as the preloaded default. *Id.* ¶ 198.  Plaintiff also says it has had "similar experience[s]" with other OEMs. *Id.* ¶ 199.  Thus, the complaint alleges that the MADAs and GMS certification process have a mutually reinforcing, coercive effect. *Id.* ¶¶ 183, 185 (alleging that the MADAs and the GMS certification process "make it unreasonably difficult for [OEMs] to preload non-Google controlled search access points" onto Android devices, "dissuad[ing] OEMs from working with Google's competitors").

The plausibility of these allegations is bolstered by the claimed market conditions. "Google has a significant share of the Android keyboard application product market—at least a 50-percent share, and likely a higher percentage." *Id.* ¶ 78.  Gboard is viewed as the "most widely used keyboard application on Android." *Id.* ¶ 80.  Additionally, "Gboard comes preloaded as the default on all Android devices manufactured by many OEMs, including OnePlus, Xiaomi, and nearly every small OEM, and every Android GO phone," and "many LG devices." *Id.* ¶ 79.  Google's market predominance arguably confirms the effectiveness of its allegedly anticompetitive activities. *Microsoft Corp.*, 253 F.3d at 85.

Google attempts to rebut Plaintiff's tying allegations with various arguments.  For one, Google highlights Plaintiff's admission that some Android devices come preloaded with "non-Google keyboards," most notably Samsung's. *Id.* ¶¶ 84, 161 (quoting 2011 MADA between Samsung and Google, which does not list Gboard as a covered application).  It also says that Plaintiff's apparent inclusion of Android Go devices in the market for Android devices is "fatal,"

because it shows that OEMs have a choice *not* to install Gboard as the default on standard Android devices, thus establishing the lack of coercion.  Def.'s Mem. at 17–18.  Further, Google dismisses as "hyperbole" Plaintiff's contention that the GMS certification process has made it "impossible" to preload non-Google keyboards as the default application on Android devices.  Def.'s Mem. at 18–19; Am. Compl. ¶ 197.  And, finally, as to market impacts, Google argues that Plaintiff has alleged only harm to itself, not to competition.  *Id.* at 21–22.

These arguments may find success in future phases of the litigation, but they are not enough to warrant dismissal.  At this stage, the court must view the allegations in the light most favorable to Plaintiff and draw all reasonable inferences in its favor.  Under that standard, Plaintiff has adequately pleaded that Google leverages its control over its GSuite bundle of "must have" applications to force Android device manufacturers to accept Gboard as the preloaded default smart keyboard, which has anticompetitive market effects.  Those effects are enhanced by the GMS certification process, which disincentivizes OEMs from preloading non-Google keyboard applications.  To be sure, not all Android devices, notably Samsung models, come preloaded with Gboard.  But that is not fatal.  Under a *per se* tying theory, Plaintiff need only plead that "the tying arrangement forecloses a substantial volume of commerce," *Microsoft*, 253 F.3d at 85, and under the rule of reason, a "'net effect' of substantially impeding competition," *Smith*, 593 F.2d at 1183.  Discovery will bear out whether the alleged tying arrangements in fact have had such substantial anticompetitive effects.  Plaintiff's tying claim survives Google's motion to dismiss.

### 2.    *Attempted Monopolization*

"To establish a § 2 violation for attempted monopolization, 'a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Microsoft*, 253 F.3d

at 80 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "The determination whether a dangerous probability of success exists is a particularly fact-intensive inquiry." *Id.*

A significant market share is an important indicator of a dangerous probability of success. The D.C. Circuit has not established a minimum market share percentage from which courts may infer a dangerous probability, but it has observed that "a share of 30% or less presumptively *disproves* requisite power." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 428 (D.C. Cir. 1986) (emphasis added). One circuit has offered a "general scale that a court may cautiously apply": "(1) claims of less than 30% market shares should presumptively be rejected; (2) claims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant *per se* liable; [and] (3) claims involving greater than 50% share should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied." *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (citing 3 Philip Areeda & Donald F. Turner, Antitrust Law ¶ 835c, at 350 (1978)).

Google argues that Plaintiff employs a "sleight of hand" to make it appear that it has a greater share of the Android keyboard market than it actually does. Def.'s Mem. at 25. Google observes that Plaintiff's allegation that "Google has over a 50-percent share of Google Play's keyboard app[lication] installations," Am. Compl. ¶ 78, ignores "the fact that other applications are preloaded by OEMs and/or may otherwise be accessed by consumers outside the Google Play Store," Def.'s Mem. at 25. Most notably, Plaintiff's download-based percentage takes no account of the fact that Samsung preloads its *own* smart keyboard. Def.'s Mem. at 25. Google also notes that, according to Plaintiff's own complaint, "there are at least 11 Android keyboard applications, including SwiftKey, Gboard, and PayKey, that are available on four or more continents," thereby

undermining the likelihood of Google monopolizing the market.  *Id*. at 24 (quoting Am. Compl. ¶ 75).  Plaintiff responds that arguments regarding the evidentiary support for its market share allegations are inappropriate at the motion-to-dismiss stage, and that Google's conduct in the general search services market buttresses a likelihood of monopolization in the Android keyboard applications market, notwithstanding the presence of other keyboard applications.  Pl.'s Opp'n at 28–30.

The court thinks this issue presents a close call, but one that ultimately tilts in Plaintiff's favor.  Plaintiff alleges that "Google has a significant share of the Android keyboard application product market—at least a 50-percent share, and likely a higher percentage."  Am. Compl. ¶ 78.  That court must accept that allegation as true.  That alleged market share is an indicator of Google's potential to successfully monopolize the market.  *Cf. Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 684 (D.D.C. 1984) (dismissing complaint for failure to include even "a shred of data concerning [the defendant's] market position relative to" competitors).  Although the 50-percent figure corresponds with Google's share of Play Store downloads, the court reads this percentage as illustrative of Google's market dominance, not its actual overall market share.

Moreover, there are other allegations in the complaint that plausibly establish Google's significant share of the market.  Plaintiff quotes from industry publications that recognize Gboard as the product market leader.  Am. Compl. ¶ 79 ("You're probably already using Gboard since it came pre-loaded on your phone," "if you're using an Android device, chances are, you might have used Gboard to search and find this article").  It also identifies several OEMs that preload Gboard as their default keyboard (although, in fairness, the complaint does not identify these devices' overall share of the Android device market).  *Id.*  These allegations provide some support for a market share of greater than 50 percent.

So, too, do Plaintiff's allegations regarding Google's exclusive dealing and tying arrangements, which together create market conditions ripe for potential monopolization. The América Móvil episode is illustrative. Plaintiff claims that Google invoked its exclusive agreements with América Móvil to prevent Keyboard+ from gaining a foothold via preinstallation. *Id.* ¶¶ 223–224. This allegedly "is not an isolated event." *Id.* ¶ 226. Plaintiff also offers examples of how Google uses its GSuite as leverage to pressure OEMs not to preload rival keyboard applications. *Id.* ¶¶ 190, 237. These alleged market realities, if true, plausibly establish the conditions for monopolization. *Cf. Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 487 (D.C. Cir. 1996) (affirming the dismissal of an attempted monopolization claim where the plaintiff "not only fail[ed] to allege any facts supporting its claim that [the defendants] eventually plan to wield monopoly power, it also offer[ed] nothing to indicate that monopolization of the relevant market is even possible, let alone probable").

Finally, the fact that there are other market participants is not dispositive at this stage. Plaintiff identifies SwiftKey as the next closest competitor at 26 percent and the remaining keyboard products combined at less than six percent. Am. Compl. ¶ 78. Though these are download shares, and not market shares, the numbers lend plausibility to Google's potential to dominate the market. Accordingly, Plaintiff has successfully alleged a dangerous probability of monopolization.

### E.    California State Law Claims

Last, the court addresses the California state law claims in Counts Five and Six. As noted, Count Five incorporates Plaintiff's various allegations of anticompetitive behavior as violative of the California Unfair Competition Law ("UCL"). *Id.* ¶¶ 265–270. Count Six is a common law intentional interference with a prospective advantage tort claim specific to the América Móvil

episode. *Id.* ¶¶ 271–277. Plaintiff claims that "Google was aware of Fotobom's negotiations with América Móvil" and "prevent[ed] finalization of Fotobom's agreement with América Móvil" with the intention of "thwart[ing] the preinstallation of [Keyboard+] on América Móvil devices." *Id.* ¶¶ 274–275.

Google argues that the court should not adjudicate these claims, because neither applies extraterritorially. Def.'s Mem. at 26–30. Plaintiff agrees that the UCL has no extraterritorial application but contends that because "Fotobom is a California plaintiff that suffered injury in California from acts taken in California," the UCL and California common law extend to this controversy. Pl.'s Opp'n at 30–31.

     *1.*    *UCL*

The Supreme Court of California has determined that the UCL does not apply extraterritorially. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). Where a plaintiff fails to allege that the location of the challenged conduct was in California, the UCL does not apply. *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1079 (9th Cir. 2018) ("[I]f the liability-creating conduct occurs outside of California, California law generally should not govern that conduct."); *see also In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011) (same).[7]

In *Cannon v. Wells Fargo Bank N.A.*, the parties agreed that the defendant "ha[d] its principal place of business in California" and alleged that at least some members of the putative plaintiff class would have been injured in California. 917 F. Supp. 2d at 1055–56. Nonetheless, the court dismissed the UCL claim, because though it was "possible" that the challenged actions took place in California, it was not "plausible" in the absence of "additional facts suggesting that

---

[7] The parties dispute the extent to which Plaintiff is required to—and did—allege injuries within California. Pl.'s Opp'n at 30–31; Def.'s Reply at 22–24. Because the location of the injury is not dispositive, *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1055–56 (N.D. Cal. 2013), the court instead focuses its ruling on the location of the challenged conduct.

[the defendant] *did make the decision* from California (i.e., the tortious conduct occurred at least in part in California)[.]"  *Id*. at 1056 (emphasis added).   In contrast, another court has held that where the "[p]laintiffs allege[d] that the wrongful acts underlying th[eir] claims emanated from defendant's California headquarters," and where the defendant "d[id] not adequately rebut plaintiffs' showing that the representations or omissions . . . emanated from California," the UCL applied.  *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008).

Here, with respect to the UCL claim, Plaintiff alleges that Google's "principal place of business [is] in Mountain View, California" *and* that "[a] substantial portion of the unlawful and unfair acts and practices alleged herein occurred from Google's headquarters in California and harm to Fotobom was inflicted in California[.]"  Am. Compl. ¶¶ 19, 269.   Admittedly, these are broad allegations that are not tied to any specific conduct.  Given the breadth of Plaintiff's claims, however, it is plausible that some of the alleged anticompetitive conduct occurred in California. Count Five, as pleaded, thus meets the UCL's jurisdictional requirements and survives to the same extent as Plaintiff's remaining Sherman Act claims.

### 2.  *Intentional Interference*

Plaintiff has not, however, made the same showing with respect to the common law claim. "The mere possibility that certain decisions . . . may have been made in California" is not sufficient to bring a claim within California's territorial jurisdiction.   *Cannon*, 917 F. Supp. 2d at 1056 (quoting *Gustafson v. BAC Home Loans Servicing*, No. 11-cv-915 (JST), 2012 WL 4761733, at *6 (C.D. Cal. 2012)).  Here, Plaintiff nowhere alleges that Google's alleged interference with the América Móvil deal "emanated from California," only that "Google's interference was and is illegal under . . . California state law."  *Parkinson*, 258 F.R.D. at 598; Am. Compl. ¶ 276.   That Google's place of business is in California, without more, is insufficient to "create a plausible

inference that the unlawful conduct emanated from that location," when the alleged interference here concerns a discrete business relationship. *Gross v. Symantec Corp.*, No. 12-cv-00154 (CRB), 2012 WL 3116158, at *7 (N.D. Cal. July 31, 2012).

Because Count Six does not state a claim within California's territorial jurisdiction, it is viable only if the tort applies extraterritorially. Google asserts that "California courts have not addressed whether the State's common law applies extraterritorially," and thus this court should decline to exercise supplemental jurisdiction over Count Six, because to do so would decide a novel question of state law. Def.'s Mem. at 28–29. The court agrees.

A court "may decline to exercise supplemental jurisdiction" if "the claim raises a novel or complex issue of State law[.]" 28 U.S.C. § 1367(c)(2). In determining whether a claim raises a novel issue of local law, the operative question is not whether the issue is novel, but rather *how* novel it is. *Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 947 (D.C. Cir. 1996) (Rogers, J., concurring in part). "[T]he more novel a local-law issue is, the more likely the federal court is to get it wrong, in the sense of deciding the issue differently from how a local court would have decided it . . . The question of 'novelty' is really a question of uncertainty; the issue is how predictable the decision of the local courts would be in light of existing local-law authorities." *Id.*; *see also Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C. Cir. 1982) ("Although the degree of uncertainty in state law is one of several factors that should guide the District Court's discretion, it should be given considerable weight.").

It is far from settled under California law that the intentional interference common law tort applies extraterritorially. Plaintiff cites no case where California courts have found that such a claim has extraterritorial reach, and the court has been unable to find one. Just as other federal courts have declined to exercise supplemental jurisdiction because of the uncertain legal terrain,

so, too, does this court. *See, e.g.*, *BLK Enters., LLC v. Unix Packaging, Inc*., No. 2:18-cv-02151 SVW), 2018 WL 5993844, at *7 (C.D. Cal. June 14, 2018); *Cave Consulting Group, Inc. v. Truven Health Analytics Inc*., No. 15-cv-02177 (SI), 2017 WL 1436044, at *7 (N.D. Cal. Apr. 24, 2017) (declining to exercise supplemental jurisdiction over intentional interference claim).  The court thus grants Google's motion to dismiss Count Six.

**V.**

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 21, is granted in part and denied in part.  The motion is granted as to Counts One and Six, and denied as to Counts Three, Four, and Five (except those portions that overlap with Count One).  Further, Plaintiff may pursue its exclusive dealing claim in Court Two with respect to the market for Android keyboard applications, but not the market for general search services.

Dated:  February 27, 2024

_____
Amit P. Mehta
United States District Court Judge