**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FOTOBOM MEDIA, INC., | Case No. 1:22-cv-00712-APM |
| Plaintiff, | |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ████████████ |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S
EXPERTS ERIC FORISTER, MARIANNE DEMARIO, AND PAUL PARSONS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

LEGAL STANDARD............................................................................................1

ARGUMENT ........................................................................................................2

I.    The Court Should Exclude Dr. Forister's Market Power and Foreclosure
      Opinions Because They Are Not Helpful to the Jury Yet Likely to Cause
      Confusion. ..................................................................................................2

      A.    Dr. Forister's Opinions About Google's Power in a Market for
            Android Keyboard Apps are Not Helpful to the Jury. ...............................3

      B.    Dr. Forister's Foreclosure Opinions are Not Helpful to the Jury. ...........5

      C.    Dr. Forister's Opinions About Google's Market Power in the Android
            Keyboard App Market and Foreclosure will Confuse the Jury. ..............6

II.   Ms. DeMario's Damages Opinions Should Be Excluded In Their Entirety.......................8

      A.    Relevant Background ...............................................................................10

            1.    Ms. DeMario's Assumptions Regarding Keyboard+ Default
                  Preload Distribution. ................................................................11

            2.    Ms. DeMario's Assumptions Regarding Keyboard+
                  Monetization. ...........................................................................12

            3.    Ms. DeMario's Inclusion of Verizon Phones in Her Damages
                  Estimate.....................................................................................18

            4.    Ms. DeMario's Damages Calculations. ....................................19

      B.    Argument ................................................................................................20

            1.    Ms. DeMario's Revenue Estimates Are Unreliable Because
                  They Lack Any Reliable Principles or Methodology and Rest
                  Instead on Unsupported Speculation. .......................................20

                  a.    Ms. DeMario's Calculations Improperly Include
                        Samsung Devices. .........................................................20

                  b.    Ms. DeMario Has No Basis to Opine That Fotobom
                        Would Have Achieved Her Estimated Revenue in the
                        But-For World.................................................................22

2.      Ms. DeMario's Opinions Regarding Verizon Do Not Fit the
        Case......................................................................................................25

3.      Ms. DeMario's Browser Use Case Was Barred by Lawful
        Contractual Provisions. ...................................................................28

4.      Ms. DeMario Cannot Testify to "Lost Business Value"
        Damages Because Fotobom Was Not Driven Out of Business. ...............29

III.    Dr. Parsons' Opinions Should Be Excluded In Their Entirety. ..........................30

        A.      Dr. Parsons Lacks Relevant Keyboard Application Expertise. ............................31

        B.      The Court Should Exclude Dr. Parsons' Opinions. .................................................32

                1.      The Opinions in Sections IV.C and V.A–D of Dr. Parsons'
                        Rebuttal Report Are Improper Narration......................................32

                2.      The Opinions in Sections IV.A–B and VI of Dr. Parsons'
                        Rebuttal Report Are Not Properly Grounded. ...........................36

                3.      Dr. Parsons' Opinions on Dr. Wobbrock's Experimental
                        Analysis and Conclusions Are Ipse Dixit. .................................38

CONCLUSION.....................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Albrecht v. Herald Co.*,
   452 F.2d 124 (8th Cir. 1971) ...................................................................................29

*Am. President Lines, LLC v. Matson, Inc.*,
   775 F. Supp. 3d 379 (D.D.C. 2025) ......................................................................5, 6

*American Bearing Co., Inc. v. Litton Industries, Inc.*,
   540 F. Supp. 1163 (E.D. Pa. 1982) ......................................................................3, 7

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   537 F. Supp. 3d 273 (N.D.N.Y. 2021) .....................................................................35

*Arias v. DynCorp*,
   928 F. Supp. 2d 10 (D.D.C. 2013) ...........................................................................39

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
   917 F.2d 1413 (6th Cir. 1990) ...................................................................................3

*Ask Chems., LP v. Comput. Packages, Inc.*,
   593 F. App'x 506 (6th Cir. 2014) .............................................................................22

*Bazarian Int'l Fin. Assocs. v. Desarrollos Aerohotelco, C.A.*,
   315 F. Supp. 3d 101 (D.D.C. 2018) ..................................................................2, 5, 6

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
   582 F.3d 1227 (11th Cir. 2009) ................................................................................26

*CDW LLC v. NETech Corp.*,
   906 F. Supp. 2d 815 (S.D. Ind. 2012) ......................................................................24

*Champagne Metals v. Ken-Mac Metals, Inc.*,
   458 F.3d 1073 (10th Cir. 2006) ..........................................................................21, 22

*Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*,
   78 F. Supp. 3d 208 (D.D.C. 2015) .............................................................................1

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................................25, 26, 27

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ..................................................................................22

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ...................................................................................................3

*Cyntegra, Inc. v. Idexx Lab'ys*,
520 F. Supp. 2d 1199 (C.D. Cal. 2007) ...............................................................23

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................... *passim*

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
833 F.3d 399 (3d Cir. 2016) ...............................................................................6

*Edmonds v. United States*,
563 F. Supp. 2d 196 (D.D.C. 2008) ...............................................................2, 21

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
213 F.3d 198 (5th Cir. 2000) .............................................................................24

*Estate of Gaither ex rel. Gaither v. District of Columbia*,
831 F. Supp. 2d 56 (D.D.C. 2011) ..............................................................36, 38

*Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*,
2024 WL 1076741 (D.D.C. Mar. 8, 2024) ..........................................................32

*Gas Util. Co. v. S. Nat. Gas. Co.*,
996 F.2d 282 (11th Cir. 1993) (per curiam) .......................................................23

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
221 F. Supp. 3d 1033 (N.D. Ind. 2016) .............................................................29

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989) ..............................................................................4

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ..........................................................32, 37

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
458 F. Supp. 423 (N.D. Cal. 1978) ....................................................................21

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..........................................................33, 34

*Joy v. Bell Helicopter Textron, Inc.*,
999 F.2d 549 (D.C. Cir. 1993) .....................................................................22, 23

*Kim v. Benihana, Inc.*,
2024 WL 3550390 (C.D. Cal. May 20, 2024) ......................................................2

*Legendary Art, LLC v. Godard*,
2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ......................................................24

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
  387 F. Supp. 2d 794 (N.D. Ill. 2005) ..................................................................25

*Mazda v. Carfax, Inc.*,
  2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ......................................................5, 6

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) ............................................................................21

*Memorex Corp. v. IBM Corp.*,
  636 F.2d 1188 (9th Cir. 1980) ............................................................................21

*MOSAID Techs. Inc. v. LSI Corp.*,
  2014 WL 807877 (D. Del. Feb. 28, 2014) ..........................................................24

*Parsi v. Daioleslam*,
  852 F. Supp. 2d 82 (D.D.C. 2012) .................................................................24, 29

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
  619 F. Supp. 441 (N.D. Cal. 1985) .......................................................................4

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Co.*,
  598 F. Supp. 694 (N.D. Cal. 1984) .......................................................................4

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .................................................................................3

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
  22 F. Supp. 3d 585 (E.D.Va. 2013) ....................................................................26

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
  556 F. Supp. 825 (D.D.C. 1982) .........................................................................26

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................................32, 39

*Sciambra v. Graham News Co.*,
  841 F.2d 651 (5th Cir. 1988) ..............................................................................29

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ...............................................................................................3

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ....................................................................................6

*Sykes v. Napolitano*,
  634 F. Supp. 2d 1 (D.D.C. 2009) .......................................................1, 33, 36, 37

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
  2017 WL 5905509 (D.D.C. Nov. 28, 2017) ..................................................................32, 33

*United States ex rel. Morsell v. Symantec Corp.*,
  2020 WL 1508904 (D.D.C. Mar. 30, 2020)..................................................................3, 7, 8

*United States v. Anderson*,
  851 F.2d 384 (D.C. Cir. 1988) ...........................................................................................7

*United States v. DynCorp Int'l LLC*,
  715 F. Supp. 3d 45 (D.D.C. 2024) .......................................................................................1

*United States v. Libby*,
  461 F. Supp. 2d 3 (D.D.C. 2006) ..................................................................................2, 5, 6

*United States v. Mitchell*,
  4 F.3d 769 (D.C. Cr. 995) ................................................................................................33

*Vandervelde v. Put & Call Brokers & Dealers Ass'n*,
  344 F. Supp. 118 (S.D.N.Y. 1972).....................................................................................29

*Victory Recs., Inc. v. Virgin Recs. Am., Inc.*,
  2011 WL 382743 (N.D. Ill. Feb. 3, 2011) .........................................................................24

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ........................................................................................29

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
  715 F. Supp. 3d 587 (D. Del. 2024)...................................................................................22

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)..............................................................................................24

# INTRODUCTION

Fotobom has proffered three experts: Eric Forister, as an economic expert, Marianne DeMario, as a damages expert, and Paul Parsons to respond to Google's user experience expert. Each offers opinions that are unreliable and unhelpful to the jury. For the reasons below, the Court should exclude Dr. Forister's market power and foreclosure opinions, and Ms. DeMario's and Dr. Parsons's opinions in their entirety.

# LEGAL STANDARD

The Court is charged with acting as a "gatekeep[er]" to ensure the requirements of Rule 702 are met for expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Fotobom bears the burden of proving the admissibility of each of its experts' opinions. *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009). And as the recently amended Rule 702 makes clear, Fotobom must carry that burden by a preponderance of the evidence. *See* Fed. R. Evid. 702; *United States v. DynCorp Int'l LLC*, 715 F. Supp. 3d 45, 54 n.5 (D.D.C. 2024) (discussing 2023 amendment to Rule 702).

To carry this burden, Fotobom must first prove that each proffered expert has "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). Fotobom also must show that its experts' proffered opinions are reliable, *i.e.*, that the testimony is "based on sufficient facts or data[,]" is "the product of reliable principles and methods[,]" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). That is, Fotobom must show that "the methodology underlying an expert's testimony is valid and the expert's conclusions are based on 'good grounds.'" *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (citation omitted). "[T]estimony that rests solely on

'subjective belief or unsupported speculation' is not reliable." *Edmonds v. United States*, 563 F.

Supp. 2d 196, 204–05 (D.D.C. 2008) (citation omitted).

## ARGUMENT

**I.      The Court Should Exclude Dr. Forister's Market Power and Foreclosure Opinions Because They Are Not Helpful to the Jury Yet Likely to Cause Confusion.**

To be admissible, expert testimony must be helpful to the jury. *Daubert*, 509 U.S. at 591–

92; Fed. R. Evid. 702(a).  Expert testimony that does not "fit" the facts of the case is unhelpful.

*Daubert*, 509 U.S. at 591.  So when expert testimony is mismatched from the factual record, courts

exclude that testimony before trial.  *See Bazarian Int'l Fin. Assocs. v. Desarrollos Aerohotelco,*

*C.A.*, 315 F. Supp. 3d 101, 118–20 (D.D.C. 2018) (excluding expert testimony that did not have

"a valid connection to the pertinent inquiry, which is a precondition to admissibility" (cleaned

up)); *United States v. Libby*, 461 F. Supp. 2d 3, 10–18 (D.D.C. 2006) (excluding expert testimony

that was "inapposite to what the jurors will have to decide in this case").

Dr. Forister's market power and foreclosure opinions are not helpful to the jury because

there is no "valid connection" between the methodology he employs and the factual record of this

case.[1]  That is because Dr. Forister's methodology for assessing Google's purported market power

in an Android keyboard market consisted of combining Google's and Samsung's market shares as

if they were a single company.  He then calculated the supposed "foreclosure" of that alleged

market by *excluding* Samsung Keyboard altogether despite Fotobom's claims that the relevant

market includes Samsung.  Because those opinions are totally divorced from the factual record and

Fotobom's own contentions in this case, the Court should exclude them.

---

[1] Dr. Forister previously had testimony excluded for proffering opinions that were unhelpful to the jury.  *See Kim v. Benihana, Inc.*, 2024 WL 3550390, at *5–7 (C.D. Cal. May 20, 2024) (excluding Dr. Forister's opinions as "unreliable and unhelpful to the trier of fact").

Exclusion is particularly warranted here because the complex economic principles involved in Dr. Forister's opinions are likely to confuse the jury such that they may not understand why those opinions are mismatched from the questions they must answer. *See United States ex rel. Morsell v. Symantec Corp.*, 2020 WL 1508904, at *7 (D.D.C. Mar. 30, 2020) (excluding testimony that, to be helpful to the jury, "require[d] drawing a finer line than the Court thinks the jury can safely be asked to draw without becoming confused or misled"); *American Bearing Co., Inc. v. Litton Industries, Inc.*, 540 F. Supp. 1163, 1171–72 (E.D. Pa. 1982) (excluding testimony that was likely to mislead the jury because it was based on data that "clearly were not tailored to fit the market which the economist was attempting to quantify").

### A.     Dr. Forister's Opinions About Google's Power in a Market for Android Keyboard Apps are Not Helpful to the Jury.

Fotobom's Section 2 claim alleging that Google has attempted to monopolize a market for Android keyboard apps (Count Four) requires proof of a "dangerous probability" that Google will achieve monopoly power in that alleged market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The first step in determining whether that dangerous probability exists is an examination into the power (if any) that Google has in that alleged market. ECF No. 27 at 23.[2]

The market power that is relevant for these inquiries is the market power that Google—and Google alone—possesses. For Section 2 claims, the law is clear that "[t]o pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995); *see also Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432–33 (6th Cir. 1990) (holding

---

[2] Separately, to the extent Dr. Forister's market power analyses are offered in support of Fotobom's Section 1 claims (Counts Two and Three), under the rule of reason, the jury will likewise need to conduct "an inquiry into [Google's] market power." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

that plaintiff's experts were "mistaken" to combine an "independent competitor['s] . . . market share with defendants' share in order to establish the dangerous probability of success requirement" absent "evidence that they acted in conspiracy or concert to exclude competition"); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (affirming ruling that the market shares of two defendants "could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two").[3]  Google is the only defendant in this case and Fotobom has not alleged (nor is there proof of) a conspiracy between Google and any other party.

Nonetheless, Dr. Forister's opinion is that "the appropriate share to evaluate" Google's power in the market for Android keyboard apps "*combines* Gboard and Samsung's Keyboard." Ex. A, Excerpts of Opening Expert Report of Eric F. Forister (June 9, 2025) ¶ 458, 182 fig. 13 (emphasis added).  As he explained in his deposition, one opinion that he intends to offer to the jury is that "in terms of evaluating the market power that Google has in the Android keyboard app market, because of the relationship  . . . between Google and Samsung, *combining* their market shares of their two keyboards together is the appropriate way."  Ex. B, Excerpts of Transcript of Deposition of Eric F. Forister (Oct. 28, 2025) at 128:16–129:8.  After combining the market shares of Gboard and Samsung's Keyboard, Dr. Forister ultimately reaches the opinion that Google possesses market and monopoly power in a market for Android keyboard apps.  *See*  Forister Opening Rpt. ¶¶ 449–95 (Ex. A).  Because Dr. Forister's opinion about Google and Samsung's

---

[3] Similarly, in performing the market power inquiry under the rule of reason for Section 1 claims, courts recognize that "[a]bsent a conspiracy among defendants, plaintiff may not aggregate the respective market shares of individual defendants to establish market power."  *Ralph C. Wilson Indus., Inc. v. Am. Broad. Co.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984); *see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 619 F. Supp. 441, 451 n.8 (N.D. Cal. 1985) (refusing to aggregate market shares of companies where "there is no evidence that the defendants acted jointly").

combined power in a market for Android keyboard apps is "inapposite to what the jurors will have

to decide in this case" (they must decide the extent of Google's market power, standing alone), the

Court should exclude it.  *Libby*, 461 F. Supp. 2d at 10–18; *see Daubert*, 509 U.S. at 590–91;

*Bazarian Int'l Fin. Assocs.*, 315 F. Supp. 3d at 118–20.

**B.    Dr. Forister's Foreclosure Opinions are Not Helpful to the Jury.**

To prevail on its theory of "anticompetitive bundling" in support of its attempted

monopolization claim (which Fotobom never alleged in the operative complaint), Fotobom must

prove that Google's purported bundling "foreclosed" a substantial share of the market for Android

keyboard apps.  *Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 418 (D.D.C.

2025).  The key starting point for the jury in conducting that analysis is the relevant market.  Courts

regularly disregard foreclosure analyses that estimate the impact of the defendant's conduct on

something less than the relevant market as a whole.

In *American President Lines, LLC*, 775 F. Supp. 3d at 420, for example, the plaintiff

pleaded a relevant market that included military and government cargo.  Nonetheless, in

calculating foreclosure the plaintiff's expert "admittedly exclude[d] government customers from

the market."  *Id*.  The court disregarded this foreclosure calculation because it did not answer the

right question—whether the defendant's conduct had foreclosed a substantial share of the relevant

market as pleaded, which would *include* government customers.  *Id.*  Similarly, in *Mazda v.

Carfax, Inc.*, 2016 WL 7231941, at *13 (S.D.N.Y. Dec. 9, 2016), *affirmed by* 726 F. App'x 66 (2d

Cir. 2018), the plaintiff's expert excluded from his foreclosure calculations parts of the market that

the parties had stipulated was relevant.  Because that methodology was improper, the court held

that no reasonable jury could rely on that expert's foreclosure calculation.  *Id.*

Dr. Forister's foreclosure opinions are inadmissible in this case for the same reason; he

does not offer opinions about whether Google's purported bundling foreclosed a substantial share

of the *entire* Android keyboard app market as defined by Fotobom and its expert. In defining that market, Dr. Forister opines that it includes all "[k]eyboard apps for Android devices." Forister Opening Rpt. ¶¶ 225–70 (Ex. A). And he conceded Samsung's keyboard app is a part of it. *Id.* ¶ 225; *see also* ECF No. 19, ¶ 76 (alleging that "Samsung's keyboard" is part of the Android keyboard app market). Yet in calculating his "foreclosure" estimate, Dr. Forister excludes Samsung entirely from the market that Google's purported bundling "foreclosed." Forister Opening Rpt. ¶¶ 736–38 (Ex. A); Forister Dep. Tr. 142:7–143:2 (Ex. B). Whatever that calculation measures, it does not even attempt to measure the share of the Android keyboard app market as pleaded (including Samsung devices) that Google's purported bundling foreclosed. *Am. President Lines*, 775 F. Supp. 3d at 420; *Mazda*, 2016 WL 7231941, at *13; *see also Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403–05 (3d Cir. 2016) (holding, for purposes of Section 1 claim, that where "a plaintiff shows effects only on a small subset of [the relevant] market and makes no attempt to show broader effects, the plaintiff cannot meet the requirements of" proving anticompetitive effects); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) ("To say that some sub-group of customers is foreclosed proves nothing by itself about the impact on [the larger relevant market].") Because Dr. Forister's foreclosure opinions are unhelpful to the jury, the Court should exclude them. *See Daubert*, 509 U.S. at 590–91; *Bazarian Int'l Fin. Assocs.*, 315 F. Supp. 3d at 118–20; *Libby*, 461 F. Supp. 2d at 10–18.

## C.     Dr. Forister's Opinions About Google's Market Power in the Android Keyboard App Market and Foreclosure will Confuse the Jury.

Federal Rule of Evidence 403 provides for the exclusion of evidence when its probative value is substantially outweighed by the risk that evidence will confuse or mislead the jury. As discussed above, the probative value of Dr. Forister's opinions about Google's market power in and foreclosure of the Android keyboard app market is zero, because those opinions do not "fit"

the factual disputes in this case.  For the same reasons, those opinions are likely to confuse and mislead the jury because they involve complex economic principles and the jury may not fully understand that Dr. Forister measured "foreclosure" of something other than the market the jury must analyze, and evaluated the combined market power of Google and Samsung, as opposed to Google's singular market power.  "In jury trials, the danger of prejudice from the presentation of expert testimony is significant because of the potential for the jury to accept an expert witness's testimony automatically." *Morsell*, 2020 WL 1508904, at *7 (internal quotation marks and citation omitted); *see also United States v. Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) ("Courts have frequently noted that there is often an inherent danger with expert testimony unduly biasing the jury because its aura of special reliability and trust." (internal quotation marks and citation omitted)).  The Court should exclude Dr. Forister's market power and foreclosure opinions under Rule 403 to eliminate that prejudice here.  *See Daubert*, 509 U.S. at 595 (noting that courts have "more control" to exclude expert testimony under Rule 403 than they do for lay witness testimony).

*American Bearing Co., Inc. v. Litton Industries, Inc.*, 540 F. Supp. 1163, 1171–72 (E.D. Pa. 1982), is instructive.  There, the plaintiff's expert attempted to measure market shares using data that "clearly were not tailored to fit the market which the economist was attempting to quantify" because they included data for products outside that market.  *Id.*  Just like Dr. Forister's foreclosure calculations are mismatched from the market he was attempting to quantify, and just like his market power assessment includes more parties than is appropriate, the court in *American Bearing* held that the expert's opinions there would be "misleading" to the jury.  *Id.* at 1172. Accordingly, it excluded them under Rule 403.  *Id.*

*United States ex rel. Morsell*, 2020 WL 1508904, at *5–7, also illustrates why Rule 403 bars Dr. Forister's market power and foreclosure opinions.  There, the plaintiff offered expert

testimony of a GSA contract auditor who would testify as to whether certain transactions involving the defendant resembled those that he normally would flag as possible violations of a contract between the defendant and the United States Government. *Id*. at *6. The court recognized that the plaintiff could not offer this testimony to prove whether those transactions indeed violated the contract at issue (because that involved a legal question) but nonetheless held that the expert's opinions might be helpful to the jury for a different purpose; "to illuminate the Government's understanding of the [contract]." *Id.* at *6–7. Nonetheless, the court excluded the expert testimony under Rule 403 because asking the jury to consider the testimony for just this limited purpose "require[d] drawing a finer line than the Court thinks the jury can safely be asked to draw without becoming confused or misled." *Id*. So too here. Even if Fotobom were able to articulate some other purpose for Dr. Forister's market power and foreclosure opinions, because they are unconnected to the factual record and Fotobom's articulated relevant market in this case, and given the complex economic principles at play, the risk is simply too great that the jury will be confused or misled into thinking it can accept Dr. Forister's opinions as a proxy for the proper market power and foreclosure questions it must answer. The Court should accordingly exclude these opinions under Rule 403.

*          *          *

For the foregoing reasons, the Court should exclude Dr. Forister's opinions about Google's power in and foreclosure of the market for Android keyboard apps, under both Rules 403 and 702.

## II.    Ms. DeMario's Damages Opinions Should Be Excluded In Their Entirety.

Fotobom offers Marianne DeMario, a certified public accountant without expertise in mobile technology firms or digital advertising, to opine that Fotobom is entitled to "lost profits" damages of $313.7 million, or alternatively "lost business value" damages of $400.6 million. Ex. C, Opening Expert Report of Marianne DeMario (June 9, 2025) ¶¶ 5, 100 tbl. 4, 124 tbl. 6. Ms.

8

DeMario's but-for revenue projections (and the damages estimates she derives from them) are speculative in the extreme, not based on a reliable methodology, and should be excluded. *See* Section II.B.1, *infra*.

**First,** Ms. DeMario assumes—contrary to all record evidence and the conclusion of Fotobom's own economist expert—that Keyboard+ would have been preloaded as the default keyboard on Samsung devices instead of Samsung's own keyboard application that Samsung has always preloaded as the default keyboard on its devices. This unsupported assumption renders her damages estimates unreliable. *See* Section II.B.1.a, *infra.*

**Second**, Ms. DeMario offers no principled or methodological basis for her opinions regarding the advertising revenue she projects Keyboard+ would have earned in the but-for world. *See* Section II.B.1.b, *infra*. The undisputed actual-world evidence is that as of Ms. DeMario's damages date of January 1, 2020, the advertising technology that Fotobom claims it would have deployed on Keyboard+ was still in its infancy, and Fotobom had conducted no user or advertiser tests demonstrating that the concept was viable—let alone that it could turn a profit. There is no evidence in the record, moreover, that Fotobom's plan to advertise on Keyboard+ based on a user's typed keywords has ever before been successfully deployed by any keyboard manufacturer. Ms. DeMario nevertheless purports to bless Fotobom's revenue projections as "reasonable" by comparing them to advertising rates charged by successful search advertising, social media advertising, and "social video advertising" companies. But she offers no principled or methodological basis for projecting Keyboard+'s but-for earnings by reference to the advertising revenues that have been generated by these firms, in other markets. From a user's perspective, Keyboard+ is not a search engine, social media app, or social video app. Nor do the technologies

that these sophisticated advertising platforms employ bear any resemblance to the primitive ads product that Fotobom was developing.

**Finally**, Ms. DeMario has no basis to opine to (1) damages associated with mobile devices sold by Verizon or its subsidiary, TracFone; (2) damages associated with Fotobom's Browser Use Case; and (3) lost business value damages. Ms. DeMario's calculation of damages related to mobile devices sold by Verizon are premised on a but-for world that erroneously assumes away lawful, unchallenged conduct, namely, Verizon's independent decision to switch away from its first-party messaging app. And as of the date Ms. DeMario calculates damages, the record reflects no agreement between Google and Verizon that would have prevented Verizon from setting Keyboard+ as the default keyboard. *See* Section II.B.2, *infra.* The Browser Use Case, for its part, would have been squarely forbidden by *unchallenged* contractual provisions—a fact which precludes recovery of any damages attributable to the Browser Use Case. *See* Section II.B.3, *infra.* Nor can Ms. DeMario opine as to lost business value damages (which she offers as an alternative measure to lost profits) for the simple reason that Fotobom did not go out of business. *See* Section II.B.4, *infra.*

### A.    Relevant Background

Ms. DeMario's damages estimates assume that in the but-for world, Fotobom would have earned revenue by displaying advertisements in Keyboard+ in response to keywords typed by the user. DeMario Opening Rpt. ¶ 67 (Ex. C). Specifically, Keyboard+ would have matched keywords typed by users to paid advertisements when the keyboard was being used to send a text message (what she calls the Messenger Use Case) and, also, when it was being used to type a query into a search engine or browser search box (what she calls the Browser Use Case). *Id.* ¶¶ 44, 84. The advertisements would appear in the keyboard banner above the text keys (where autocorrect and autocomplete suggestions are sometimes found). *Id.* ¶¶ 10–11. If a user clicked on one of

these branded links, Keyboard+ would redirect the user to an app store where the user would be prompted to download the advertiser's mobile app, into the advertiser's mobile app the user had already downloaded on their device, or to the advertiser's webpage.  *Id.*

Ms. DeMario's opinions are premised upon certain assumptions regarding Keyboard+ gaining default preload distribution on certain devices and Keyboard+ monetizing at rates comparable to some of the most sophisticated digital advertising firms in the world.

### 1.    Ms. DeMario's Assumptions Regarding Keyboard+ Default Preload Distribution.

Ms. DeMario's but-for world assumes that, beginning in 2020, América Móvil and Verizon would have entered revenue share agreements with Fotobom to preload Keyboard+ as the default keyboard on more than 120 million Android devices, including through Claro (a subsidiary of América Móvil) and TracFone (which was a subsidiary of América Móvil until November 2021, when it became a subsidiary of Verizon).  *Id.* ¶¶ 13–33, 49, 52, 64.[4]  Ms. DeMario further assumed that the agreements would have had a three-year term and both would have been renewed for a second three-year term.  *Id.* ¶¶ 49, 66.

Ms. DeMario did not exclude Samsung devices from her preload assumptions; that is, she assumed that the agreements with Verizon and América Móvil would have led to Keyboard+ being preloaded as the default keyboard on devices manufactured by Samsung and sold by Verizon, América Móvil, Claro, and TracFone.  Ex. D, Transcript of Deposition of Marianne DeMario (Oct. 22, 2025) at 374:5–10.  But as Fotobom's economic expert opined, Samsung has its own keyboard that is "sacred to Samsung," and "[t]here is no indication that Samsung has, or will in the near future, consider preloading as default on its devices anything but Samsung Keyboard."  Forister

---

[4] América Móvil is a Mexican telecommunications company that operates predominately in Central and South America.  Verizon is a wireless carrier in the United States.

Opening Rpt. ¶ 460 (Ex. A); Ex. E, Excerpts of Rebuttal Expert Report of Eric F. Forister (Aug. 6, 2025) ¶ 247. In nevertheless including Samsung devices, Ms. DeMario adopted the assertion of Fotobom's founders (unsupported by any actual communications with Samsung[5]) that they would have succeeded at preloading a modified version of Keyboard+ on Samsung devices, DeMario Dep. Tr. at 373:13–377:2 (Ex. D), even though Samsung has never preloaded a rival keyboard as the default keyboard on any Samsung mobile device and there is no evidence that Keyboard+ was a higher quality keyboard than Samsung Keyboard.

### 2.   Ms. DeMario's Assumptions Regarding Keyboard+ Monetization.

Fotobom has never delivered any advertisement to any Keyboard+ user. Ex. G, Excerpts of Transcript of Deposition of Adam Goodman (Feb. 7, 2025) at 112:2–11. Nor did Fotobom ever test or conduct user studies of its advertising technology with prospective advertisers, to determine the viability of its monetization model. *See* Ex. H, Excerpts of Transcript of Deposition of Ryan Nobrega (Jan. 21, 2025) at 207:24–209:2; Ex. I, Excerpts of Transcript of Deposition of Perry LaForge (Mar. 13, 2025) at 175:13–177:9; Ex. J, Excerpts of Transcript of Deposition of Andrew LaForge (Mar. 14, 2025) at 91:4–21, 95:6–96:3. Fotobom's underlying technology could only support one advertiser per keyword (i.e., if Macy's was matched to "new shoes," no other advertiser could be matched to "new shoes"), Nobrega Dep. Tr. at 209:12–21 (Ex. H); Ex. K, Email from Nobrega (Fotobom) to A. LaForge (Fotobom) (FOTO_GOOG_0030440), and never progressed to implementing any form of an ad auction, *see* Nobrega Dep. Tr. at 184:17–185:11 (Ex. H). Fotobom had not built any means for advertisers to purchase keywords through an

---

[5]  In her reply report, Ms. DeMario cites emails between Fotobom and *América Móvil* that she claims constitute "evidence that Samsung was open to preloading Keyboard+ with Samsung-specific modifications." Ex. F, Reply Expert Report of Marianne DeMario (Sep. 30, 2025) ¶ 8 & n.8. But those emails are not evidence as to what *Samsung* would have permitted.

automated system—rather they would have had to interface directly with a Fotobom employee to do so. *Id.* at 201:5–20. And there is no evidence in the record that any *other* keyboard has generated revenue by advertising in the keyboard in response to a user's typed keywords.

Ms. DeMario opines that Fotobom would have earned both impression-based revenue (i.e., the advertiser pays when its ad is shown) and click-based revenue (i.e., the advertiser pays only when the ad is clicked). *See* DeMario Opening Rpt. ¶ 91 (Ex. C). Ms. DeMario added these two figures together to calculate a total revenue per user, which she multiplied by the number of daily active users she opines Keyboard+ would have achieved in the but-for world. *Id.*

Central to Ms. DeMario's revenue projections were her selection of (1) the percentage of messages (Messenger User Case) or searches (Browser Use Case) for which Fotobom would have shown a relevant ad and (2) the amount Fotobom would have charged to advertisers. *Id.* Ms. DeMario selected these numbers based on advertising figures cherry-picked from internal Fotobom models (which were themselves wholly speculative), which she then purported to "confirm" against "industry" averages and public reports of cost data from some of the world's leading digital advertising platforms (Google Search, YouTube, Twitter (also known as X), Instagram, and Facebook). *Id.* ¶¶ 71, 76; DeMario Dep. Tr. at 15:2–9 (Ex. D). But, as explained below, she provides no basis for her use of those comparators.

***Ms. DeMario's selection of the percentage of messages/searches for which Fotobom would have served an advertisement in response to a user's keyword.*** Ms. DeMario opines that Fotobom would have shown advertisements on 1.5% of text messages, and on 10% of online searches. DeMario Opening Rpt. ¶¶ 69–70, 75, 86 (Ex. C). For the 1.5% ad-serving assumption in the Messenger Use Case, Ms. DeMario relied primarily on the statements of Fotobom's founders, Andrew and Perry LaForge, that Fotobom intended to serve ads on one to two percent

of messages (to avoid serving too many ads).  *Id.* ¶ 70.[6]  But that begs the question of whether Fotobom would have achieved that percentage.  Whether Fotobom would have done so depends on a number of variables, including which keywords Fotobom could have successfully sold to advertisers, whether Fotobom had available ad inventory to show a Keyboard+ user relevant advertisements in real time, and whether Fotobom's technology was able to match users' keywords to relevant advertisements.  Ms. DeMario, however, provides no basis for her assumptions beyond the representations of Fotobom's founders that they believed they could be successful, and the fact that advertisers had expressed an interest in the product.  *Id.* ¶¶ 68, 74.  Ms. DeMario undertook no independent assessment of the viability of Fotobom's plan to match advertisers with users' text messages.  *See* DeMario Dep. Tr. at 174:10–175:3 (Ex. D).  Ms. DeMario had no knowledge of whether Fotobom's suggested-action feature was ever tested at scale, *id.* at 155:18–157:11 (it was not); whether the record contains any testing plans, *id.* at 157:13–20 (it does not); or whether Fotobom had developed the technological capability to run an auction such that advertisers could bid against each other to show their ads in response to keywords, *id.* at 176:19–178:4 (it had not).

Regarding the 10% ad-serving assumption for the Browser Use case, Ms. DeMario's lone reasoning is her surmise that because Google Search shows ads for approximately 20% of queries, Fotobom could achieve 10%.  DeMario Opening Rpt. ¶ 86 (Ex. C).  She provides no methodology whatsoever for this conclusion.

---

[6] Ms. DeMario claims to have "confirm[ed] the reasonableness of the assumptions included in Fotobom's revenue models" with the results of a 15-day test in Verizon Messages.  DeMario Dep. Tr. at 66:13–67:9 (Ex. D).  That test, however, did not test whether Fotobom could successfully match keywords with relevant advertisements in real time.  Rather, what that test entailed was Fotobom selecting ten keywords for which it would serve a bolded keyword, and tracking how many users clicked on the bolded keyword (in Verizon Messages, the user had to click on the sponsored keyword to receive the ad impression); it did not test user response to actual advertisements.  DeMario Opening Rpt. ¶ 70 (Ex. C); DeMario Dep. Tr. at 69:14–74:13 (Ex. D).

14

***Ms. DeMario's selection of the price Fotobom would have charged for advertising in Keyboard+.*** Ms. DeMario opines that, in the United States, advertisers who paid on an impression basis would have paid Fotobom $9.00 per thousand impressions for the Messenger Use Case and $10.00 per thousand impressions for the Browser Use Case. She further opines that advertisers who paid on a cost-per-click basis would have paid $1.30 per clicked ad for the Messenger Use Case and $1.50 per clicked ad for the Browser Use Case, with a click-through rate of 1.2% for the Messenger Use Case and 2.0% for the Browser Use Case. *Id.* ¶¶ 72, 78, 88–90.[7]

With respect to her calculated cost-per-thousand impressions ("CPM"), Ms. DeMario stated that "she reviewed internal and external data points concerning CPM in and around the damages period," *id.* ¶ 71, and she concluded based on that review that the "use of a $9.00 CPM in the US market is reasonable," *id.* ¶ 72. But there are no such "internal" data points, as Fotobom never priced or sold these advertisements; rather she relied exclusively on Fotobom's projections *made in the absence of any historical data.*

As for external data points, Ms. DeMario's sources include an industry source for "social media advertising" and public data sources quoting CPM for Google Search Ads, Google Display Network Ads, YouTube Ads, Twitter, and Facebook. *Id.* ¶ 71.[8] To begin with, Ms. DeMario provided no basis for the assumption that Fotobom could have matched user and advertiser intent in real time on a comparable basis to these established, successful platforms that have invested

---

[7] Ms. DeMario reduced the cost-per-thousand impressions and cost-per-click figures by 75% for Latin America. DeMario Opening Rpt. ¶¶ 88–90 (Ex. C).

[8] Specifically, Ms. DeMario cites the following public CPM figures: a CPM for Google Search Ads of $28.80; a CPM for Google Display Network Ads of $2.81; a CPM for YouTube Ads of $9.61; a worldwide average range for social media advertising of $6.06 to $6.52; a median CPM for Twitter of $5.00 worldwide, a $35.00 CPM for Facebook in the United States; a $2.00 CPM for Facebook in Mexico; and a CPM for GIPHY between $4.00 and $10.00. *Id.* ¶ 71.

decades and hundreds of millions of dollars developing and improving their advertising technology. As described above, Fotobom had developed only a primitive matching technology that bears no resemblance to the sophisticated auctions run by Ms. DeMario's comparator platforms.

Beyond that, Keyboard+ is not a social media app such that the cited social media advertising industry averages is a relevant comparator, and none of the specifically identified companies and corresponding products share any similarity to Fotobom or its keyboard interface, either. In deposition, Ms. DeMario was unable to identify *any* comparable advertising platform, instead describing Keyboard+ as unique. DeMario Dep. Tr. at 234:19–236:16 (Ex. D). With respect to her use of "industry averages," she did not know what companies were included in the industry from which the average was drawn. *Id.* at 262:1–269:9. In assessing the reasonableness of Fotobom's assumptions, she would consider any company operating in the digital advertising space to be an appropriate comparator. *Id.* at 271:4–15. Ms. DeMario acknowledged that her comparator products all display non-sponsored content (in addition to advertisements), and she could not identify any successful digital advertising company or platform that exclusively or primarily displays sponsored content. *Id.* at 297:16–298:19, 300:14–301:5. Yet she was unaware of any plans by Fotobom to display non-sponsored content in Keyboard+. *Id.* at 299:15–300:5.

Ms. Demario also included in her CPM comparators two keyboards that offer stickers and GIFs: GIPHY and Tenor. But GIPHY and Tenor are not general-purpose typing keyboards like Keyboard+; the contemplated advertisements were for sponsored stickers and GIFs, not for links to products and services as envisioned by Fotobom. Ex. L, Excerpts of Transcript of Deposition of Angana Ghosh (Mar. 18, 2025) at 269:4–270:1; Ex. M, *Completed Acquisition by Facebook, Inc (now Meta Platforms, Inc) of Giphy, Inc.* (June 12, 2020) (hereinafter "GIPHY CMA Report"),

at 133–34.  In any event, Ms. DeMario cites estimates of the CPM Google (Tenor) and Facebook (GIPHY) *hoped* to achieve;  Google never successfully monetized Tenor, Ghosh Dep. Tr. at 222:11–223:14 (Ex. L), and, by GIPHY's own admission, its "revenue model was flawed" and it "*would not have generated revenue*" as a standalone company.  GIPHY CMA Report, at 153 (Ex. M) (emphasis added).

With respect to cost-per-click ("CPC"), Ms. DeMario concluded that Fotobom's internal model projecting a CPC of $1.30 in the United States was "reasonable."  DeMario Opening Rpt. ¶ 78 (Ex. C).  Here she relied on publicly reported CPC estimates for Facebook, Twitter, Google Search Ads, and Google Display Ads, as well as search advertising industry averages.  *Id.* ¶ 76.[9]  As with her CPM, she offered no explanation for why the CPCs charged by those advertising platforms can be used to reasonably project the prices Fotobom's Keyboard+ product could charge its advertisers.  Nor does she explain how she reconciles these rates with her selection of $1.30.  Notably, the lone data point from the record reflecting the CPC Fotobom could hypothetically hope to charge advertisers is contained in an email between Fotobom and a representative of Ad.net—a digital marketing firm that serves as an intermediary between advertising platforms and advertisers—in which Ad.net stated that it mapped four advertisers to starting cost-per-click: one at $0.15, two at $0.20, and one at $0.25.  *Id.*; DeMario Dep. Tr. at 308:4–309:6 (Ex. D) (acknowledging "that this is the only document that I have seen that is a correspondence with an

---

[9] Specifically, Ms. DeMario cites the following public CPC figures: Average worldwide search advertising cost-per-click in 2019, 2020, and 2021 of $0.66, $0.55, and $0.62; a worldwide Facebook cost-per-click range from $0.20 to $1.53; a worldwide Twitter cost-per-click range from $0.26 to $0.58; an average search advertising cost-per-click in the United States of $4.66; Google's United States cost-per-click average of $1.99; Google's Mexico cost-per-click average of $0.49; Google's mobile cost-per-click average in the United States for search ads of $2.67; and Google's mobile cost-per-click in the United States for display ads of $0.60.  DeMario Opening Rpt. ¶ 76 (Ex. C).

advertiser that lists prices"); Ex. N, Email from Goodman (Fotobom) to A. LaForge (Fotobom) (FOTO_GOOG_0101207).  Ms. DeMario provided no methodology by which she attempts to reconcile her projected CPC of $1.30 with these quoted rates in the record.

Finally, with respect to click-through rate ("CTR"), Ms. DeMario stated that the 1.2% assumed click-through rate in Fotobom's models is a "reasonable and conservative assumption" based on her review of public data regarding click-through rates for Google Search Ads, Google Display Ads, and Twitter, and average click-through rates for search advertising, social media advertising, and "social video advertising."  DeMario Opening Rpt. ¶¶ 76, 77 (Ex. C).[10]  She provided no methodology for why or how these click-through rates can be applied to Fotobom's product, which is not a search engine, social media app, or social video app.  Nor did she provide any other basis for her reliance on Fotobom's (untested) assumption of a 1.2% click-through rate, other than that "the LaForges thought that the click-through rate of 1.2 percent was conservative." DeMario Dep. Tr. at 196:16–197:20 (Ex. D).  But she did not know the basis for the LaForges' view that they could achieve a 1.2% click-through rate; she resorts to surmise:  "It's possible that – that – likely, they didn't make the number up, and that they used industry data to support the numbers."  *Id.* at 197:22–199:10; *see id.* at 200:1–201:12.

### 3.    Ms. DeMario's Inclusion of Verizon Phones in Her Damages Estimate.

Fotobom had a partnership with Verizon—separate from Keyboard+—that integrated Fotobom GIFs, stickers, and emojis into Verizon's messaging app.  DeMario Opening Rpt. ¶¶ 13–

---

[10] Specifically, Ms. DeMario cites the following public CTR figures: an average worldwide search advertising click-through rate of approximately 2%; an average worldwide click-through rate for social media advertising of approximately 0.65%; YouTube's worldwide rate of 0.1%; Instagram's worldwide rate of 1%; Facebook's worldwide rate of 1.78%; Google Search Ads' U.S. rate of 4.1%; Google Display Ads' U.S. rate of 0.6%; Twitter's worldwide rate range from 0.78% to 2.22%; and an overall U.S. search advertising click-through rate number of 6.42%.  *Id.*

███████████████████████████

15 (Ex. C).  Fotobom and Verizon briefly tested a suggested-actions feature in Verizon Messages, where the user would receive a link to content based on the keywords typed.  *Id.* ¶¶ 16–17.  The suggested-actions integration never progressed beyond a limited test conducted in December 2020.  *See id.*; *supra* n.6  In 2022, Verizon stopped preloading its Verizon Messages app on mobile devices it sold, and instead preloaded the RCS-compliant Google Messages; Verizon eventually discontinued its Messages app, citing the industry shift to the RCS messaging standard.  DeMario Opening Rpt. ¶ 19 (Ex. C); Ex. O, *Verizon Messages (Message+) FAQs.*

Ms. DeMario assumed that Verizon would have agreed to distribute Keyboard+ based on the bare assertion of Fotobom's co-founders that, had Fotobom "been able to ███████████

███████████████████████████████████████████

█████████████████████████ Verizon's Android devices."  DeMario Opening Rpt. ¶ 63 (Ex. C).  Fotobom does not allege, however, that any Google conduct that Fotobom challenges in this case caused Verizon to decline to deploy Fotobom's advertisements on the Messages app or to discontinue that app.  DeMario Dep. Tr. at 34:1–17 (Ex. D)  (acknowledging that "the software that Fotobom loaded onto Verizon [Messages] . . . [was] not part of this case").

Ms. DeMario assumed that Verizon would have entered this Keyboard+ distribution agreement by January 1, 2020.  DeMario Opening Rpt.  ¶¶ 44–45, 48–50 (Ex. C).  At that point in time, there was no contract between Google and Verizon requiring that Gboard, or any other keyboard, be set as the default keyboard on mobile devices sold by Verizon; the contract between Google and Verizon that Fotobom challenges in this case was not entered into until June 1, 2021.  Forister Opening Rpt. ¶ 142 (Ex. A).

### 4.    Ms. DeMario's Damages Calculations.

Ms. DeMario uses the above assumptions and inputs (among others) to arrive at what she claims is a "reasonable" estimate of expected profits, which she then discounts to the present value

as of January 1, 2020. As an alternative measure of damages, and based on her assumption that the alleged conduct drove Fotobom out of business, she also calculated lost business value damages. Below are the alleged damages calculated by Ms. DeMario. DeMario Opening Rpt. ¶¶ 6 tbl. 1, 100 tbl. 4 (Ex. C).

| Summary of Fotobom's Claimed Damages | | |
|---|---|---|
| **Lost Profits** | **Lost Profits - Undiscounted** | **Lost Profits Discounted to 1/1/2020** |
| Total Lost Profits - Messenger Use Case | $134,010,457 | $73,397,016 |
| Total Lost Profits - Browser Use Case | $514,795,034 | $240,281,932 |
| Total Lost Profits | $648,805,491 | $313,678,948 |
| | | |
| **Total Lost Value** | | **Lost Value at 1/1/2020** |
| | | $400,583,209 |

B.    **Argument**

1.    **Ms. DeMario's Revenue Estimates Are Unreliable Because They Lack Any Reliable Principles or Methodology and Rest Instead on Unsupported Speculation.**

a.    **Ms. DeMario's Calculations Improperly Include Samsung Devices.**

Ms. DeMario's damages calculations are unreliable. The but-for world she constructed assumes that Fotobom's agreements with Verizon and América Móvil would have led to Keyboard+ being preloaded on Samsung-manufactured devices sold by Verizon and América Móvil. DeMario Dep. Tr. at 374:5–10 (Ex. D). But the assumption that Samsung would have preloaded Keyboard+ as the default keyboard on its devices finds no support in the record. As Fotobom's own economic expert Dr. Forister noted, Samsung has its own keyboard that is "sacred to Samsung," and "[t]here is no indication that Samsung has, or will in the near future, consider

preloading as default on its devices anything but Samsung Keyboard." Forister Opening Rpt. ¶ 460 (Ex. A); Forister Rebuttal Rpt. ¶ 247 (Ex. E). For her part, Ms. DeMario "did not conduct research concerning Samsung's keyboard" and was not even "sure if Samsung had its own keyboard." DeMario Dep. Tr. at 254:7–12, 373:13–374:3 (Ex. D). She relied on the LaForges' belief that they could modify their keyboard such that Samsung would load it. *Id.* at 374:11–375:9. She cites no correspondence, however, between Fotobom and Samsung. An expert cannot "simply accept the self-serving statement of an interested party as fact." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006); *Edmonds*, 563 F. Supp. 2d at 204–05 ("Expert testimony that rests solely on subjective belief or unsupported speculation is not reliable." (cleaned up)).

Ms. DeMario did not offer an alternative measure of damages in which she excludes Samsung devices. That is, she did not estimate the portion of her damages attributable to devices manufactured by companies other than Samsung; she thus provides "no basis" for the finder of fact to determine "what the effect on damages would be" by eliminating Samsung devices. *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980); *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162–63 (7th Cir. 1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage"). That failure renders all of her damages calculations speculative and inadmissible. *ILC Peripherals*, 458 F. Supp. at 434; *MCI Commc'ns Corp.*, 708 F.2d at 1163–64, 1174 (setting aside jury verdict when "the jury was left with no way to adjust the amount of damages" to exclude unrecoverable damages); *Wirtgen Am., Inc. v. Caterpillar, Inc.*, 715 F. Supp.

3d 587, 593 (D. Del. 2024) (noting such an error "goes to admissibility, not weight"); *see also*

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056–57 (8th Cir. 2000) (holding expert

opinion should have been excluded when expert "ignored inconvenient evidence" and but-for

world "was not grounded in the economic reality of the . . . market").

> **b.      Ms. DeMario Has No Basis to Opine That Fotobom Would
>          Have Achieved Her Estimated Revenue in the But-For World.**

With respect to the revenue Ms. DeMario estimates from each assumed Keyboard+ user,

neither Fotobom's internal models nor the cited external data sources provide bases for Ms.

DeMario's opinions, and she offers no reliable principles or methodology by which her

calculations are derived.

With respect to Fotobom's "revenue models," those models demonstrate only what

Fotobom ***believed*** its revenue could be ***if*** Fotobom could achieve its wholly unreliable projected

cost-per-thousand impressions, cost-per-click, and click-through-rate.  DeMario Dep. Tr. 183:5–

12 (Ex. D).  Those projected inputs are not based on any historical data or experience.  Rather, Ms.

DeMario merely credited the LaForges' belief that they would have succeeded in achieving these

rates.  But, once again, an expert must do more than accept the unsupported assertions of an

interested party. *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) (reversing

a damages award where the expert's opinion should have been excluded for basing assumptions

almost exclusively on "conversations with [the Plaintiff]"); *Ask Chems., LP v. Comput. Packages,

Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) ("Where an expert merely offers [her] client's opinion

as [her] own, that opinion may be excluded."); *Champagne Metals*, 458 F.3d at 1080 n.4.

The LaForges' speculation is in any event without record support.  On the user side,

Fotobom conducted no user-experience testing, including on the question of whether serving ads

would have deterred users from Keyboard+ altogether.  Nobrega Dep. Tr. at 207:24–209:2 (Ex.

H) ("I'm a big believer in the quantitative approach.  In this particular case, I didn't do any of that at this company.").  On the advertiser side, Fotobom never tested its technology to determine whether it was (1) capable of real-time matching of users with relevant ads and (2) able to generate return on investments for advertisers such that they were willing to pay for ads on Keyboard+. Goodman Dep. Tr. at 112:2–11 (Ex. G); *cf. Cyntegra, Inc. v. Idexx Lab'ys*, 520 F. Supp. 2d 1199, 1207 (C.D. Cal. 2007) ("Demonstrating that a new diagnostic product is viable requires validation testing and other steps."); *Gas Util. Co. v. S. Nat. Gas. Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (per curiam) (showing concepts "in the abstract" does not demonstrate that a company was able to make those concepts a reality (citation omitted)).  Beyond those threshold questions, there is no data regarding how many advertisers would be willing to pay for Keyboard+ ads; whether the products and services they are advertising would have been able to be targeted in the manner Fotobom envisioned; how many users would interact with those ads within Keyboard+; the extent to which users would follow through on the advertisement such that the advertiser stands to benefit; and the amount advertisers would be willing to pay based on the ads' actual performance.

Notably, in opining that Fotobom would monetize its Keyboard+ product through in-app keyword-based advertising, Ms. DeMario assumed Fotobom could have achieved what no other mobile keyboard application ever had done.  She cites no keyboard application that successfully monetized by showing keyboard ads to users based on typed keywords; to the contrary, she acknowledged that Fotobom's "business plan [was] fairly unique in the way they were going to monetize Keyboard+."  DeMario Dep. Tr. at 365:9–366:2 (Ex. D); *see also id.* at 234:19–236:16. Given the absence of supporting data, Ms. DeMario cannot base her expert opinions on Fotobom's own internal models.  *See Joy*, 999 F.2d at 568 (holding expert's opinion should have been excluded because it was based almost entirely on conversations with the plaintiff); *ZF Meritor,*

23

*LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (holding that a company's internal projections cannot serve as a reliable basis for an expert opinion when the expert did not know the methodology or assumptions underlying the projections); *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 95 (D.D.C. 2012) (excluding damages expert whose opinion was premised on assumptions "so untethered from the reality of [the company's] finances"); *MOSAID Techs. Inc. v. LSI Corp.*, 2014 WL 807877, at \*2–3 (D. Del. Feb. 28, 2014) (excluding damages opinion based on company's business plan because the expert "provided no support for the accuracy of the statements and figures contained in" the business plan); *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at \*4–5 (E.D. Pa. Aug. 17, 2012) (excluding expert's opinion as unreliable where expert "conducted no independent verification" of the forecast and instead "relied exclusively" on plaintiffs' "self-serving data"); *Victory Recs., Inc. v. Virgin Recs. Am., Inc.*, 2011 WL 382743, at \*2 (N.D. Ill. Feb. 3, 2011) (relying on company projections rendered analysis unreliable where expert failed to articulate a basis "for concluding that [the] internal projections provide an acceptable foundation").

Nor can Ms. DeMario ground her projections on the external data sources she cites as supposed support. Her comparators have nothing in common with either Fotobom as a company or Keyboard+ as a product, and she offers no methodology by which any such comparison could be drawn. *See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000) (reversing damages judgment where expert damages opinion failed to demonstrate the "reasonable similarity" of the comparator company); *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 824–25 (S.D. Ind. 2012) (excluding expert opinion that failed to "establish comparability" of a chosen comparator and noting that "[a]n expert's choice in data sampling is at the heart of his methodology"); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812–13 (N.D. Ill. 2005) (excluding damages expert opinion that predicted future lost profits based on eight

companies that "could scarcely be said to be comparable"; explaining "to have the requisite predictive capacity and the reliability *Daubert* demands . . . [an expert must] select samples that are truly comparable" (cleaned up)).

Fotobom is, by Ms. DeMario's own description, an "early-stage company." DeMario Opening Rpt. ¶ 5 (Ex. C). And Keyboard+'s advertising technology was still in development as of the asserted damages period. Yet Ms. DeMario looked to some of the world's most established and successful digital advertising platforms—including Google, Meta, and Twitter—to "confirm" Fotobom's projected cost-per-million impressions (for impression-based advertising) and cost-per-click and click-through-rate (for click-based advertising). *Id.* ¶¶ 71, 76. Ms. DeMario provided no basis to conclude that the advertising performance achieved by these established platforms is indicative of what Fotobom could reasonably have achieved but-for the challenged conduct. DeMario Dep. Tr. at 290:9–292:15 (Ex. D). Ms. DeMario also cited industry averages, but as noted above Keyboard+ did not operate in those industries, and in any case, she was not familiar with what companies and products are included in the industry averages on which she relies. *Id.* at 262:1–269:9. Ms. DeMario's failure to demonstrate any similarity or comparability of these companies to Fotobom thus renders her damages opinion unreliable and inadmissible.

### 2.    Ms. DeMario's Opinions Regarding Verizon Do Not Fit the Case.

Under Rule 702 and *Daubert*, an expert's opinion must "fit" the case. *Daubert*, 509 U.S. at 591 (citation omitted); Fed. R. Evid. 702(a) (requiring that the expert opinion "help the trier of fact to understand the evidence or to determine a fact in issue"). For a damages expert, "[t]he first step . . . is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (citation omitted). In *Comcast*, the Supreme Court held that a damages expert failed to do so where she created a but-for world that accounted for four alleged antitrust violations, even though only one remained in

the case. *Id.* at 36–38. A damages expert's opinion must be excluded where it "fail[s] to measure damages resulting from the particular antitrust injury on which liability in [the] action is premised." *Id.* at 36; *see S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 981 (D.D.C. 1982) (noting that improper assumptions in a "'but-for' damage model" render the damages calculation "speculative at best"); *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1233–34 (11th Cir. 2009) (affirming exclusion of "ill-fitting" expert opinion where expert's damages opinion "was not confined to [actions] that its liability theory would consider unlawful"); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 592–94, 597 (E.D.Va. 2013) (granting defendant's motion to exclude expert because the expert opinion accounted for "features not causing the alleged infringement").

Here, Ms. DeMario made two fundamental errors in constructing her but-for world with respect to devices sold by Verizon (or its subsidiary TracFone), and each is independent grounds for exclusion of her opinions as to all Verizon-related damages.

First, she failed to consider facts unrelated to the challenged conduct that led Verizon to discontinue its own messaging product. Ms. DeMario theorized that "had [Fotobom] been able to widely roll out and monetize its suggested actions in Verizon Messages, Verizon and Fotobom would have ***then*** worked toward preloading Keyboard+ on Verizon's Android devices." DeMario Opening Rpt. ¶ 63 (Ex. C) (emphasis added). This first step—rolling out and monetizing Fotobom's suggested action feature in Verizon Messages—never occurred for reasons that have nothing to do with the conduct alleged to be unlawful.

There is no question that the failure of the Fotobom-Verizon Messages partnership is unrelated to any challenged conduct. Fotobom contends that the partnership failed because Verizon discontinued work on its messaging app following its decision to replace that app with

Google Messages, but as Ms. DeMario conceded, whatever led to Verizon sunsetting Messages is "not part of this case." DeMario Dep. Tr. at 34:1–17 (Ex. D). Nevertheless, in her but-for world, she excludes not only the alleged unlawful conduct, but also lawful conduct that is not at issue here.

By assuming that Fotobom's integration with Verizon Messages would have succeeded, Ms. DeMario's damages calculations "fail[] to measure damages resulting from the particular antitrust injury on which [] liability in [the] action is premised." *Comcast Corp.*, 569 U.S. at 36. This error requires exclusion of her opinions regarding damages attributable to a but-for distribution agreement between Fotobom and Verizon (i.e., all Verizon devices, as well as TracFone devices following Verizon's purchase of TracFone in 2021, that she assumes would have preloaded Keyboard+ as the default keyboard).

Second, Ms. DeMario assumes that Fotobom would have entered into a preload distribution agreement with Verizon by January 1, 2020. DeMario Opening Rpt. ¶¶ 44–45 (Ex. C). But the fact that Fotobom did not enter into such an agreement in the real world cannot have been attributable to Google's allegedly unlawful conduct. As of that date, Verizon and Google had not entered into an agreement that required Verizon to set Gboard—or any other keyboard—as the default keyboard on mobile devices sold by Verizon; the agreement Fotobom challenges was not entered into until June 2021. *See* Forister Opening Rpt. ¶ 142 (Ex. A). Thus, Ms. DeMario's Verizon-related damages estimate did not measure damages stemming from the allegedly anticompetitive conduct. *See Comcast Corp.*, 569 U.S. at 36.

In her reply report, Ms. DeMario attempted to solve for this factual gap by presenting an alternative damages calculation "if the factfinder determines that it is appropriate to start damages related to Verizon users in 2021," DeMario Reply Rpt. ¶ 2 n.2 (Ex. F), when Verizon and Google

entered the contract that Fotobom challenges in this case. But Ms. DeMario did not explain or cite any record basis to suggest why Verizon would have entered into a Keyboard+ distribution agreement with Fotobom on that date. For the reasons above, there is no record support for such an assumption. Ms. DeMario cannot rehabilitate her Verizon damages estimate through unsupported assumptions. Without a basis for her assumption that Fotobom and Verizon would have entered a distribution agreement at the operative time but for the challenged contract with Google, Ms. DeMario cannot opine to damages claimed to have stemmed from Keyboard+'s failure to obtain preload distribution on devices sold by Verizon.

> ### 3. Ms. DeMario's Browser Use Case Was Barred by Lawful Contractual Provisions.

Ms. DeMario assumes that Fotobom would have deployed and monetized what she terms the Browser Use Case. Under that use case, as a user typed a query into the search box that included a keyword Fotobom had matched to an advertisement, Keyboard+ would display a branded link in its keyboard banner. DeMario Opening Rpt. ¶¶ 10–11 (Ex. C). In essence, Keyboard+ would intercept a user, diverting the user from a search engine results page to an app or webpage associated with the advertiser.

For the same reasons detailed in Google's Motion for Summary Judgment, there is no basis for Ms. DeMario's assumption that the Browser Use Case could have succeeded even but-for the allegedly anticompetitive conduct, because it would have violated unchallenged contractual provisions in Google's Mobile Application Distribution Agreements. *See* Google's Motion for Summary Judgment, Section V.A. The fact that unchallenged conduct bars the Browser Use Case is fatal to Ms. DeMario's claimed damages stemming from the Browser Use Case. *See Parsi*, 852 F. Supp. 2d at 93 (excluding a damages expert in part because of his "assumption that defendant's [wrongful conduct] alone [was] responsible for" the damages); *Williamson Oil Co. v. Philip Morris*

*USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (affirming exclusion of an expert's testimony for failing to distinguish between lawful and unlawful conduct); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1042 (N.D. Ind. 2016) (concluding that a plaintiff in an antitrust case "is only entitled to be put in the position it would have been in had competition been lawful").

### 4. Ms. DeMario Cannot Testify to "Lost Business Value" Damages Because Fotobom Was Not Driven Out of Business.

As an "alternative measure of damages," to her lost profits estimate, Ms. DeMario purported to calculate Fotobom's lost business value. DeMario Opening Rpt. ¶ 101 (Ex. C). All of the arguments above apply equally to Ms. DeMario's lost business value calculations, and her lost business value analysis should be excluded for those same reasons.

Ms. DeMario's lost business value damages should be excluded for another independent reason: Fotobom did not go out of business. *See Sciambra v. Graham News Co.*, 841 F.2d 651, 656–57 (5th Cir. 1988) (holding that lost business value is not a permissible measure of damages where the plaintiff "was not forced out of business"); *see also Albrecht v. Herald Co.*, 452 F.2d 124, 130 (8th Cir. 1971) (noting that lost business value is appropriate where the illegal acts "destroyed that business"); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 150 (S.D.N.Y. 1972) (noting that lost business value is an appropriate value of damages where a plaintiff "claims damages for total destruction of his business"). Ms. DeMario acknowledges as much: "Lost business value is an alternative to lost profits as a measure of antitrust damages where the antitrust victim was ***actually forced out of business***." DeMario Opening Rpt. ¶ 45 (Ex. C) (emphasis added). Here, then, for lost business value to be an appropriate measure of damages, Fotobom must have gone "out of business as a result of Google's anticompetitive conduct." *Id.* ¶ 101.

███████████████████████████████████

But here, Fotobom has not gone out of business at all.  Perry LaForge testified as much: "[W]e haven't wound up the company at all.  We still continue to have interest in our capabilities as an organization because of the work that we did for Verizon and the relationships that we had with operators."  P. LaForge Dep. Tr. at 42:16–43:4 (Ex. I).  Andrew LaForge testified that Fotobom still has employees.  A. LaForge Dep. Tr. at 25:7–11 (Ex. J).

For her part, Ms. DeMario summarily states in a footnote that ███████████████████ ███████████████████████ DeMario Opening Rpt. ¶ 101, n.179 (Ex. C).  She performs no evaluation of the value of Fotobom's technology and provides no basis for her understanding.  Ms. DeMario obviously cannot offer expert testimony as to "lost business value" without a reasoned opinion of her own as to what the residual value of the business was; it does not suffice to simply rely on an unsubstantiated and uncited "understanding" ████████████████████.

Not only is Ms. DeMario's lost-business-value counter to and without grounding in any of the facts, it also improperly combines contributing factors that are *not* claimed to be caused by any challenged conduct—the failure of the Verizon Messages partnership—together with the challenged conduct.  As discussed above, *see supra*, II.B.2, Ms. DeMario conceded that whatever led to Verizon sunsetting Verizon Messages is "not part of this case."  DeMario Dep. Tr. at 34:1–17 (Ex. D).  Yet she does not even attempt to account for the role the failure of that partnership played in the current state of Fotobom's business.

## III.    Dr. Parsons' Opinions Should Be Excluded In Their Entirety.

Fotobom expert Dr. Paul Parsons submitted a single report, served in the rebuttal round, relating to the user experiences associated with Fotobom's Keyboard+ and Google's Gboard.[11]

---

[11] Dr. Parsons' report referenced the opinions of Google's experts, Dr. Kostis Hatzitaskos and Dr. Jacob Wobbrock, but Dr. Parsons focused most of his report on responding to Dr. Wobbrock.  Dr. Wobbrock is an expert in mobile user interfaces, including text entry specifically.  He analyzed

See Ex. P, Rebuttal Expert Report of Paul C. Parsons (Aug. 6, 2025) ¶ 16. But Dr. Parsons has no expertise regarding user experience with keyboard applications, and he affirmatively *avoids* opining that Google's experts' opinions regarding user experience with the keyboard applications at issue are incorrect. Ex. Q, Transcript of Deposition of Paul C. Parsons (Sep. 3, 2025) at 15:15–18, 31:20–32:1, 127:19–133:2. In his view, whether Google's experts are right as a matter of substance is "not highly relevant." *Id.* at 131:6–132:3; *see also id.* at 132:4–11. Dr. Parsons is "not prepared to offer an opinion on the user experience of Keyboard+." *Id.* at 75:17–76:7. Indeed, he believes that Keyboard+'s functionality and availability are "not relevant." *Id.* at 127:19–129:16. He also is "not offering evaluations of Gboard or Keyboard+" and "make[s] no claim to comprehensively evaluate any product, both positively and negatively." *Id.* at 152:10–153:14. Instead, Dr. Parsons' opinions consist mainly of improper summaries of record evidence. His remaining opinions lack proper foundation and are unreliable. The Court should exclude his opinions in their entirety.

A.    **Dr. Parsons Lacks Relevant Keyboard Application Expertise.**

Dr. Parsons is a computer scientist by training. Parsons Dep. Tr. at 13:12–14:7 (Ex. Q). But he has no specific expertise in keyboards or keyboard applications. He claims to be an expert in "human-computer interaction," ("HCI") which he confessed in his deposition "is a very broad field," *id.* at 33:14–34:7, and in "user experience design [that] includes design methods, broadly construed" as well as "evaluation of digital experiences." *Id.* But Dr. Parsons does not have experience with text entry evaluation or research. *Id.* at 14:2–7, 15:9–18, 17:13–18, 25:17–26:8, 31:4–32:17. He has never authored a publication or presentation focused on text entry or any input

_____

and tested Keyboard+ and Gboard and offered opinions about users' experiences with those keyboard applications.

technique that is relevant to evaluating keyboards.  *Id.* at 15:9–14.  He has no experience, research, or scholarship regarding user experience with keyboard applications.  *Id.* at 15:15–18, 31:20–32:1. And he has never "done a formal evaluation of a keyboard," including those at issue in this case. *Id.* at 81:12–16; *see id.* at 77:10–78:10, 153:7–14.

**B.      The Court Should Exclude Dr. Parsons' Opinions.**

**1.      The Opinions in Sections IV.C and V.A–D of Dr. Parsons' Rebuttal Report Are Improper Narration.**

The bulk of Dr. Parsons' opinions are a selective narration of "record evidence and public information" that Google's experts supposedly "ignored."  Parsons Dep. Tr. at 95:8–97:13 (Ex. Q); *see* Parsons Rebuttal Rpt. §§ IV.C., V.A–D (Ex. P).  This narrative of record evidence is not based on his expertise and is inadmissible under Rule 702 because it is "inappropriate for experts to become a vehicle for factual narrative."  *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013); *see also U.S. ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509, at *14–15 (D.D.C. Nov. 28, 2017) (excluding expert testimony where the expert merely reviewed  and narrated other witnesses' testimony which "not only involves matters of general knowledge, but is squarely within the traditional province of the jury") (citation omitted); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").  After all, "[e]xpert testimony must assist jurors in understanding an issue 'beyond the ken of the average juror.'"  *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 2024 WL 1076741, at *6 (D.D.C. Mar. 8, 2024) (citation omitted).  Jurors are "entirely capable" of reviewing record evidence and drawing conclusions themselves.  *See Landis*, 2017 WL 5905509, at *15 (citing *United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995)).

In Section IV.C of his report, Dr. Parsons criticizes Google's experts for not discussing certain documents critical of Gboard.   Parsons Rebuttal Rpt. ¶¶ 41–43 (Ex. P).   Dr. Parsons concedes that this is not a substantive criticism of Google's experts' opinions.   *See, e.g.*, Parsons Dep. Tr. at 145:16–146:8, 148:2–149:18 (Ex. Q) ("I'm not offering opinions about the user experience of Gboard or Keyboard+ in these two paragraphs.").   Instead, he deems this a "methodological" criticism.   *Id.* at 95:10–97:13.   But to be clear, Dr. Parsons offers no opinions on scientific methodology; he merely argues that Google's experts did not address certain emails, testimony, and documents that he thinks that they should have.   *See id.*   Dr. Parsons does not purport to be, nor is he, an expert on which evidence Google's experts "should have" considered in undertaking an analysis of keyboard quality that Dr. Parsons himself chose not to undertake. Dr. Parsons' criticism also is not technical or scientific in nature.   *Id.* at 150:6–18.   Dr. Parsons even admits that the supposedly overlooked documents do not necessarily reflect his views.   *Id.* at 151:20–152:9. ("These are not my personal opinions. I'm simply surfacing [these documents] as pieces of evidence that were not accounted for.").   "Surfacing" record evidence, without a substantive, admissible expert opinion based on that evidence, is not the role of an expert—that is the stuff of cross-examination.   It is a non-substantive collateral attack on Google's experts' credibility and is improper under Rule 702.   *See Sykes*, 634 F. Supp. 2d at 8 (expert not qualified under Rule 702 where expert did "not offer 'expert' testimony based on his years of experience" but instead "advocate[d] for the Plaintiff rather than providing expertise to the fact-finder"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert "narrative" consisting of "simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case").

Section V of Dr. Parsons' report, tellingly entitled "Google's Experts Ignore Other Record Evidence That Contradicts Their Opinions," Parsons Rebuttal Rpt. at 22 (Ex. P), presents the same issue. With respect to Section V.A, entitled "Switching Default Keyboards Is Not Easy," *id.*, Dr. Parsons admits he is not an expert on changing defaults, Parsons Dep. Tr at 163:6–9 (Ex. Q), and he has no idea how users switch default keyboard applications. *Id.* at 162:5–14. Instead, he criticizes Google's experts for "overlook[ing]" certain evidence that he says "suggests the experts' conclusion regarding the ease of switching keyboards may be unfounded," Parsons Rebuttal Rpt. ¶¶ 49–50 (Ex. P), even as he concedes he himself performed no analysis or investigation on that very question. *See* Parsons Dep. Tr at 162:5–14 (Ex. Q). He also opines that Google's experts' conclusions are contrary to "public information that they do not address," namely the power of default settings to influence user behavior. Parsons Rebuttal Rpt. ¶ 51 (Ex. P); *see id.* ¶¶ 52–54. But this was not the subject of Google's experts' opinions (they addressed the ease with which a user can perform the steps to change keyboard applications specifically). And regardless, Dr. Parsons admits that he is not an expert in behavioral economics or any other scientific field relevant to assessing the power of default settings. Parsons Dep. Tr. at 32:18–33:5; 177:10–178:9 (Ex. Q).

Dr. Parsons' opinions in Section V.B, "Users Value More Than Text Input and Language Capabilities," suffer from the same deficiency. Dr. Wobbrock opined that Fotobom's Keyboard+ has several features that lead to a negative user experience, notably its "suggestion" feature that interposes ads when a user is typing on the keyboard. *See* Parsons Rebuttal Rpt. ¶ 55 (Ex. P). In his rebuttal, Dr. Parsons does not take on Dr. Wobbrock's opinions as a substantive matter but again criticizes Dr. Wobbrock's report based on his supposed failure to discuss certain evidence. *See id.* ¶¶ 56–60; Parsons Dep. Tr at 183:12–184:11 (Ex. Q). Dr. Parsons admits that he himself did not evaluate the Keyboard+ suggestion feature. Parsons Dep. Tr. at 184:14–185:15 (Ex. Q).

Instead, the "opinions" in this section of his report are merely his inadmissible identification of supposedly ignored evidence. *See* Parsons Rebuttal Rpt. ¶¶ 54–60 (Ex. P).

Section V.C of Dr. Parsons' report purports to rebut Google's experts' opinions about Fotobom's focus on monetization instead of a positive user experience. Again, Dr. Parsons merely identifies evidence that he claims Google's experts ignored. *See* Parsons Dep. Tr. at 186:15–187:5 (Ex. Q) (opinion provided in this section is "the methodological issue of not accounting for variety of evidence that's available"). He admits he did not evaluate whether Keyboard+ offered a poor monetization design and he is not offering any opinions on that topic. *Id.* at 186:3–14. But Dr. Parsons cannot take the stand as an expert simply to point to record evidence that he thinks Google's experts should have considered. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 334 (N.D.N.Y. 2021) (excluding expert opinion where "[t]he conclusions he draws from that [record] evidence consist of arguments [plaintiff's] lawyers can readily make without the aid of expert analysis, and are all well within the province of an ordinary, intelligent juror").

Section V.D of Dr. Parsons' report concerns Google's experts' opinions on the privacy of the keyboard applications. Dr. Parsons does not have any expertise in privacy (Parsons Dep. Tr. at 87:17–88:17 (Ex. Q)), and he did not perform any analysis or offer any opinion with respect to privacy protections for Gboard (*id.* at 89:2–14) or Keyboard+ (*id.* at 89:15–18). So unsurprisingly, he does not disagree with Dr. Wobbrock's opinions regarding Gboard's protection of user privacy. *See id.* at 90:2–15. Instead, Dr. Parsons' opinions are again limited to commenting on evidence that he claims Google's experts disregarded: "The point I'm making here is that the experts . . . ignored certain things that were contrary to their opinions, and that was simply the scope of my -- what I'm articulating here." *Id.* at 95:4–97:5. He is not "drawing on [his] professional expertise," but merely commenting on the evidence. *Id.* at 97:20–98:10. Stated simply, Dr. Parsons' opinions

provide little more than Fotobom's gloss on record evidence.  These are not expert opinions, they are not based on Dr. Parsons' purported expertise, and they will not assist the jury in determining any fact in issue.  Accordingly, the Court should exclude Dr. Parsons' opinions under Rule 702.

**2.    The Opinions in Sections IV.A–B and VI of Dr. Parsons' Rebuttal Report Are Not Properly Grounded.**

Expert testimony needs "a reliable foundation," *Daubert*, 509 U.S. at 597, and must be "properly grounded, well-reasoned and not speculative before it can be admitted."  *Estate of Gaither ex rel. Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 62 (D.D.C. 2011) (quoting Fed. R. Evid. 702, Advisory Committee's Notes, 2000 Amendments).  Mere commentary on record evidence that lacks a sound basis in science is not "properly grounded" expert testimony. *See Sykes*, 634 F. Supp. 2d at 8–9 ("Lay opinions without a basis in education, experience, or other specialized knowledge do not assist a jury, but merely distract or interfere with its deliberations."). Dr. Parsons fails to provide a reliable basis for his conclusions with respect to the opinions in Sections IV.A–B and VI.

In Section IV.B, Dr. Parsons criticizes Dr. Wobbrock's evaluation of Fotobom's Keyboard+ product because it is "based on an out-of-date, non-operational version of Keyboard+." Parsons Rebuttal Rpt. ¶¶ 29 (Ex. P).  This is not a critique based on Dr. Parsons' expertise or his analysis of various Keyboard+ versions, but rather a 15-minute interview he conducted with Fotobom executive Andrew LaForge in which Mr. LaForge told him differences existed between versions.  *See Id.* ¶¶ 31–33; Parsons Dep. Tr. at 40:12–46:10 (Ex. Q).  Mr. LaForge did not "get into the nuances" of differences in Keyboard+'s various versions, but simply "mentioned that there were improvements that were made."  Parsons Dep. Tr. at 45:9–46:10 (Ex. Q).  Dr. Parsons does not know how many different versions of Keyboard+ existed or what was "improved upon" over time (*id.* at 66:6–67:22), he never used any version of Keyboard+ (*id.* at 68:1–19), and he never

performed an evaluation of Keyboard+.  *Id.* at 184:14–185:1.  All Dr. Parsons knows about supposed differences between versions of Keyboard+ is that, "[w]ell, generally, that there were changes made."  *Id.* at 121:5–15.  He thus has no reliable basis to testify that the version of Keyboard+ analyzed by Dr. Wobbrock was not representative or otherwise flawed for the purpose for which it was used, and his opinions on those points should be excluded.  *See Sykes*, 634 F. Supp. 2d at 8–9; *Highland*, 379 F. Supp. 2d at 469–70.

As to the non-operational nature of Keyboard+, Dr. Parsons is referring to the fact that the back-end servers Fotobom used to serve its "suggestions" (ads) no longer exist.  That is not a fact in dispute and was acknowledged by Dr. Wobbrock.  Dr. Parsons states that the suggestion feature was a "critical functionality" for Keyboard+, but he cites no basis for that conclusion other than his 15-minute conversation with Mr. LaForge.  Parsons Rebuttal Rpt. ¶ 31 (Ex. P).  In fact, he "can't say for certain" whether the feature ever existed in Keyboard+, Parsons Dep. Tr. at 50:18–51:22 (Ex. Q), and he admits that how or if Keyboard+ implemented the suggestion feature was "outside the scope of what I was responding to."  *Id.* at 142:21–144:4.  Dr. Parsons quite simply has no basis for opining that a feature is "critical" for a product he never attempted to evaluate.  His opinions in this regard are thus unfounded and unreliable.[12]

Dr. Parsons opines in Section VI that he believes Keyboard+ "*likely* incorporated features that users would have found valuable."  Parsons Rebuttal Rpt. ¶ 69 (Ex. P) (emphasis added).  The problem is that he does not know what features Keyboard+ included and thus has no basis for this

---

[12] Section IV.A, Parsons Rebuttal Rpt. ¶¶ 26–28 (Ex. P), lays the groundwork for Section IV.B.  It consists of three paragraphs that criticize the analysis presented by Dr. Wobbrock in his opening report as "informal," and states Dr. Parsons' opinion that the absence of more formal methods "undermines the reliability" of Dr. Wobbrock's conclusions.  This generalized criticism does not address the substance of Dr. Wobbrock's opinions and cannot help the jury understand or resolve any factual issue.  The Court should accordingly exclude it as well.

opinion.  When asked why he hedged in saying "likely," he admitted "I didn't evaluate Keyboard+ directly, so I'm offering an opinion on the features generally construed, but not specific details of the Keyboard+ product."  Parsons Dep. Tr. at 142:15–144:9 (Ex. Q).  He never undertook to analyze what features were included in Keyboard+, *id.*, and he is "not sure" whether Keyboard+ was ever even a functional product.  *Id.* at 125:17–126:19.  When asked whether Keyboard+ implemented its "suggestion"/ads feature and how it was implemented, Dr. Parsons was unable to answer, stating that "[i]t wasn't part of my assignment to know those kinds of things" and "[t]hat type of information was not relevant to my assignment."  *Id.* at 52:18–22; 59:15–21.  Because Dr. Parsons' opinions in Sections IV.B and VI are not "properly grounded, well-reasoned and non-speculative" they are inadmissible.  *Estate of Gaither*, 831 F. Supp. 2d at 62 (citation omitted).

### 3.    Dr. Parsons' Opinions on Dr. Wobbrock's Experimental Analysis and Conclusions Are Ipse Dixit.

During his deposition, Dr. Parsons disclosed for the first time an opinion responding to a user experiment conducted by Dr. Wobbrock.  Specifically, Dr. Parsons opined that the "participant sample" and "sampling method" of participants as well as a "temporal mismatch" between compared versions of Keyboard+ and Gboard render Dr. Wobbrock's experiment results unreliable.  Parsons Dep. Tr. at 109:17–114:18 (Ex. Q).  But Dr. Parsons does not have the relevant background or expertise to offer these opinions.  Dr. Parsons admits that he has no experience, research or scholarship evaluating keyboard applications or users' experience with them, *id.* at 31:20–32:1, and he "ha[s] not done a formal evaluation of a keyboard before."  *Id.* at 81:12–16.  He has never designed a test of keyboard functionality or evaluated a keyboard's design.  *Id.* at 32:5–17; 162:15–164:7.  So Dr. Parsons has no basis for opining whether, for example, the sample size and sampling method selected by Dr. Wobbrock are adequate and appropriate in keyboard user studies.  And like his "methodological" critiques, Dr. Parsons offers little analysis to support

his sampling critiques. When asked "[w]hat is your concern" about the number of iPhone users in the study, Dr. Parsons said "[w]ell, just simply that it indicates that it's not a representative sample." *Id.* at 114:19–115:5. In other words, he has no idea whether the "concerns" he identified, actually affected Dr. Wobbrock's conclusions. Other than general invocations of "literature," Dr. Parsons' critiques are based purely on Dr. Parsons' conjecture. *See id.* at 109:17–116:14.

Dr. Parsons' credentials may qualify him to serve as an expert in something, but by his own admission, there is nothing in his educational or professional background that would qualify him to serve as an expert on the issue of user experience with keyboard applications or evaluation of the same.[13] *See*, *e.g.*, *Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013) (excluding proposed expert testimony because "the plaintiffs have not demonstrated how his academic and professional experiences make him qualified to testify" about the relevant issue); *Tourre*, 950 F. Supp. 2d at 678 (excluding expert that "does appear to have expertise in the general area of structured finance" because "that is so broad a category as to become meaningless when particularized here to . . . a very specific type of security").

## CONCLUSION

For these reasons, the Court should exclude the market power and foreclosure opinions of Plaintiff's proffered expert Eric Forister and the opinions of Plaintiff's proffered experts Marianne DeMario and Paul Parsons in full.

---

[13] For similar reasons, Dr. Parsons' proffered opinions in Section III, Parsons Rebuttal Rpt. ¶¶ 21–25 (Ex. P), are also improper and should be excluded. This section consists of several paragraphs that generally describe purported best practices for "HCI experts" in performing evaluations of user experience. These general assertions do not challenge the substance of any specific conclusion reached by Dr. Wobbrock and cannot help the jury understand or resolve any factual issue. Dr. Parsons makes no effort to explain why these general principles apply to evaluation of user experience with keyboard applications. The Court should accordingly exclude these opinions.

Dated:  January 15, 2026

Respectfully submitted,

By: *John E. Schmidtlein*

John E. Schmidtlein (Bar No. 441261)
Aaron P. Maurer (Bar No. 476640)
Benjamin M. Greenblum (Bar No. 979786)
Colette T. Connor (Bar No. 991533)
Jesse T. Clay (Bar No. 1721523)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jschmidtlein@wc.com
amaurer@wc.com
bgreenblum@wc.com
cconnor@wc.com
jclay@wc.com

*Counsel for Defendant Google LLC*